Richard A. Dillenburg, Esq.
Arizona Bar # 013813
**RICHARD A. DILLENBURG, P.C.**
2173 E. Warner Rd., Ste. 101
Tempe, AZ 85284-3503
(480) 668-1924
rich@dillenburglaw.com

Lauren M. Rule, *pro hac vice*
Oregon Bar # 015174
Andrew R. Missel, *pro hac vice*
Oregon Bar # 181793
**ADVOCATES FOR THE WEST**
3701 SE Milwaukie Ave., Ste. B
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org
amissel@advocateswest.org

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Neighbors of the Mogollon Rim, Inc., | No. |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| United States Forest Service; United States Fish and Wildlife Service, | |
| Defendants. | |

## INTRODUCTION

1.      Plaintiff Neighbors of the Mogollon Rim, Inc. challenges Defendant U.S. Forest Service's new livestock grazing management strategy for the Tonto National

1

Forest Bar X allotments ("Bar X") and Heber-Reno Sheep Driveway ("Driveway"). The Forest Service's new scheme authorizes cattle grazing in a portion of the Bar X that has been closed to grazing for 40 years, threatening both the health of forest resources and the well-being of local communities. The new grazing strategy also allows more than twice the amount of grazing on the Bar X and Driveway than has occurred in recent years, despite the fact that large portions of the area are nowhere close to achieving resource objectives set out in the Tonto National Forest Plan ("Tonto Forest Plan").

2.      The Forest Service adopted its new grazing strategy despite careful and extensive on-site studies demonstrating the negative effects of high levels of grazing on the Bar X; indeed, the Forest Service expressly discounted those studies in favor of data that is either nonexistent, inadequate, or inconclusive. And Defendant U.S. Fish and Wildlife Service ("USFWS") agreed with the Forest Service that the new grazing strategy is unlikely to adversely affect the Mexican spotted owl and the narrow-headed gartnersnake on the basis of a similarly flawed analysis that ignores key facts and data and fails to explain the departure from USFWS' prior determination that part of the Bar X and Driveway should remain closed to livestock to protect Mexican spotted owls.

3.      The closed portion of the Bar X is located in the ponderosa pine forest directly under the spectacular Mogollon Rim and surrounds the communities of Colcord Estates, Ponderosa Springs, and Ponderosa Springs Estates ("Colcord and Ponderosa communities"). In 1979, following years of study that showed a history of overgrazing which devastated natural resources and wildlife populations, the Tonto National Forest Supervisor excluded grazing in the subject area. The Forest Service could not permit grazing in this area unless it determined in future evaluations that the area had recovered and is capable of supporting livestock grazing on a sustained yield basis.

4.      The 1979 decision also significantly reduced the level of grazing on the remainder of the Bar X to just 59 cattle. The agency later increased the amount of

1    grazing, but not nearly to pre-1979 levels. The Driveway—which bisects the Bar X—was

2    officially closed to cattle grazing in 1963.

3    5.    Over the course of the last decade, the Forest Service has repeatedly

4    expanded grazing on the Bar X and the Driveway. Starting in 2010, the Forest Service

5    began authorizing the Bar X permittee to graze cattle on portions of the Driveway

6    adjacent to the Bar X; in conjunction with that decision, the agency authorized grazing on

7    the Bar X at levels exceeding the term grazing permit. And in 2015, after 35 years of

8    non-use, the Forest Service authorized grazing on the closed portion of the Bar X for one

9    year. The Forest Service issued each of those decisions without conducting the

10    environmental analysis required by the National Environmental Policy Act ("NEPA").

11    The Forest Service also failed to ensure that its Bar X grazing decisions complied with

12    the National Forest Management Act ("NFMA") and the Federal Land Policy and

13    Management Act ("FLPMA").

14    6.    In early 2018, the Forest Service announced its decision to again allow

15    grazing on the long-closed portion of the Bar X and exceed the permitted use levels. In

16    April 2018, Plaintiff Neighbors of the Mogollon Rim sued the Forest Service in this

17    Court, alleging that that decision—along with the earlier decisions described above—

18    violated NEPA, NFMA, and FLPMA. In response to Plaintiff's lawsuit, the Forest

19    Service reversed course and revised its 2018 grazing authorization to prohibit grazing in

20    the closed area and restrict use to the levels allowed under the permit. As part of a

21    settlement agreement with Plaintiff, the Forest Service promised not to authorize grazing

22    beyond the terms of the grazing permit unless and until it completed a new NEPA

23    process and issued a new grazing permit. *Neighbors of the Mogollon Rim v. U.S. Forest*

24    *Serv.*, No. 2:18-cv-01111-DLR, ECF No. 29 (D. Ariz. Oct. 9, 2018).

25    7.    The Forest Service has now completed its NEPA analysis and made a

26    decision to adopt a new grazing management strategy for the Bar X and Driveway. That

3

1   decision is embodied in a Final Decision Notice & Finding of No Significant Impact

2   ("Final Decision Notice/FONSI"), a new allotment management plan for the Bar X

3   ("2019 AMP"), and a new term grazing permit ("2019 Grazing Permit").

4          8.     The Forest Service's decision is both procedurally and substantively

5   unlawful. The decision is based on a deeply flawed NEPA analysis that ignores or

6   downplays grazing's effects on the human environment and relies on scant or entirely

7   fictitious monitoring data instead of in-depth studies. Moreover, the Forest Service made

8   its decision on the basis of an environmental assessment ("EA") rather than a full

9   environmental impact statement ("EIS") despite the fact that the drastic increase in

10   grazing and re-opening of the long-closed area will have significant environmental

11   effects. The new grazing scheme is also inconsistent with the Tonto Forest Plan and thus

12   violates NFMA. Finally, USFWS' determination that the new scheme is unlikely to

13   adversely affect the Mexican spotted owl and the narrow-headed gartnersnake—a

14   determination relied on by the Forest Service in making its final decision—is

15   unreasonable and violates the Endangered Species Act ("ESA") and the Administrative

16   Procedure Act ("APA"). For those reasons, the Court should set aside the Final Decision

17   Notice/FONSI, the 2019 AMP, the 2019 Grazing Permit, the EA, and USFWS' ESA

18   concurrences for the Mexican spotted owl and the narrow-headed gartersnake.

19   **JURISDICTION AND VENUE**

20          9.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this

21   action arises under the laws of the United States, including NFMA, 16 U.S.C. § 1600 *et*

22   *seq*., NEPA, 42 U.S.C. § 4321 *et seq*., the ESA, 16 U.S.C. § 1531 *et seq*., and the APA, 5

23   U.S.C. § 701 *et seq.* An actual, justiciable controversy exists between the parties, and the

24   requested relief is therefore proper under 28 U.S.C. §§ 2201–02 and 5 U.S.C. §§ 701–06.

25         10.     Venue is proper in this Court under 28 U.S.C. § 1391 because all or a

26   substantial part of the events or omissions giving rise to the claims herein occurred within

this judicial district and Plaintiff Neighbors of the Mogollon Rim resides in this district.

11.     The federal government waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

12.     Plaintiff Neighbors of the Mogollon Rim has exhausted all administrative remedies as required by the relevant statutes and regulations.

**THE PARTIES**

13.     Plaintiff Neighbors of the Mogollon Rim, Inc. is a non-profit organization whose mission is to represent and advocate for the interests of concerned neighbors of the Mogollon Rim who seek to preserve and protect the scenic and natural beauty, fish and wildlife, ecological, and other natural resource values of the Mogollon Rim area. Neighbors of the Mogollon Rim directors, volunteers, and supporters are property owners and residents of the Colcord and Ponderosa communities who are dedicated to protecting and conserving public lands and natural resources in the Mogollon Rim area.

14.     Directors, volunteers, and supporters of Neighbors of the Mogollon Rim regularly use and enjoy the Tonto National Forest, including the Bar X area, for various recreational, aesthetic, and other purposes. For instance, they routinely hike, hunt, and fish the forested areas under the Mogollon Rim, including hunting for deer, elk, and turkey in the forest and fishing for trout in Haigler Creek. They enjoy picnicking and photography and derive spiritual fulfillment from their experiences in the Tonto National Forest under the Mogollon Rim.

15.     Neighbors of the Mogollon Rim directors, volunteers, and supporters are gravely concerned about damage to the wildlife populations, riparian areas, native vegetation, and soils caused by re-introduction of cattle in the excluded pastures surrounding their communities as well as overgrazing on the remainder of the allotment. In the past, heavy cattle grazing severely damaged resources on the Bar X, including by reducing numbers of elk, deer, and turkey, damaging riparian areas and fish habitat along

Haigler Creek and other creeks, reducing native vegetation, and causing soil erosion. Damage to resources from current and future livestock use and the very presence of cattle on the Bar X impairs Neighbors of the Mogollon Rim's directors', volunteers', and supporters' enjoyment of the Tonto National Forest when they recreate, hunt, fish, take photographs, and enjoy the aesthetic beauty of nature.

16.     Neighbors of the Mogollon Rim's directors', volunteers', and supporters' interests in using and enjoying the Tonto National Forest, particularly the area surrounding their communities that had been closed to grazing for more than 35 years before cattle were reintroduced in 2015, are being directly harmed and/or will be directly harmed by Defendant's actions. Unless the relief prayed for herein is granted, Plaintiff and its directors, volunteers, and supporters will continue to suffer injury to their interests.

17.     Defendant U.S. Forest Service is an agency or instrumentality of the United States and is charged with managing the public lands and resources of the Tonto National Forest in accordance and compliance with federal laws and regulations.

18.     Defendant U.S. Fish and Wildlife Service is an agency or instrumentality of the United States and is charged with administering the provisions of the ESA with regard to threatened and endangered terrestrial and freshwater aquatic species, including the threatened Mexican spotted owl and narrow-headed gartersnake, each of which is found in and around the public lands of the Bar X allotment.

**STATEMENT OF FACTS**

**I.     Bar X Locale and Resources**

19.     The Tonto National Forest is located northeast of Phoenix. As one of the closest National Forests to that major metropolitan area, it provides extensive opportunities for recreation and respite from urban life. One of the primary purposes for establishing the forest was watershed protection, and thus protecting soil and water

resources is a high priority. The Bar X allotments (including the area that was closed for more than 35 years) cover approximately 30,000 acres, and are located in the northeast part of the forest, near the Mogollon Rim. A map of the Bar X is shown below.

*The Bar X Pastures*

20.    The Mogollon Rim is a 200-mile long escarpment in central Arizona that forms the southern edge of the Colorado Plateau. The Rim is characterized by tall cliffs cut by dramatic canyons, and elevations change from 4,000–5,000 feet south of the Rim to more than 8,000 feet on top. Extensive ponderosa pine forests are found on the slopes of the Rim and on the plateau north of it. Because of the rapid change in elevation, the Mogollon Rim contains a large diversity of flora and fauna, with species from Rocky Mountain ecotypes living on the top of the plateau, and species native to lower elevation, drier ecotypes on the slopes below the Rim. This area is home to much wildlife, including elk, deer, turkey, mountain lion, bobcat, black bear, fox, goshawk, and golden eagle. The

area's beauty and diverse flora and fauna attract many outdoor enthusiasts from the Phoenix area, other parts of Arizona, and other states.

21.     The Bar X contains other special features that provide habitat for a variety of fish and wildlife and are popular recreation areas. For instance, Haigler Creek is a lovely trout stream popular with fishermen, hikers, and campers, and is being considered for designation as a Wild and Scenic River. The Naegelin Rim is another destination on the Bar X for hikers, hunters, and photographers. Imperiled species listed as threatened or endangered under the ESA have been observed on the Bar X, such as Mexican spotted owls, narrow-headed gartersnakes, and occasionally Mexican gray wolves. Plaintiff's directors, volunteers, and supporters use these National Forest lands to relax and enjoy the natural setting and the fish and wildlife that inhabit these areas.

22.     The topography of the Bar X consists of a mixture of rolling, gently undulating hills and areas of steep, rugged slopes and rock outcroppings. The lower elevations in the southern portion provide most of the grazing capacity for livestock. Elevation ranges from 4,600 feet in the southern portion to 7,600 feet along the Mogollon Rim.

23.     The Bar X actually consists of four separate allotments managed together: the Bar X, Haigler Creek, Young, and Colcord Canyon Allotments. The area that was closed in 1979 consists of the Turkey Peak Pasture in the Haigler Creek Allotment and the entire Colcord Canyon Allotment, an area roughly 11,000 acres in size. Over the years, the Forest Service has referred to this area as "Colcord Canyon," "Turkey Pasture," "Colcord Pasture," or "Turkey Peak Pasture." Plaintiff will refer to it as the Colcord/Turkey Pasture.

24.     The Colcord/Turkey Pasture is the most northern portion of the Bar X, located directly under the Mogollon Rim, with its northern boundary at the very top of the Rim abutting the Apaches-Sitgreaves National Forests. The area consists of

mountainous terrain and steep slopes dominated by ponderosa pine. The majority of the Colcord/Turkey Pasture, being primarily forested uplands, has scarce forage for livestock. While the northern reaches of the Colcord/Turkey Pasture abut the Mogollon Rim, the southern portion includes Haigler Creek, and is near the area of the Pleasant Valley Wars, which, in the 1800s, pitted cattlemen against sheepherders for the limited forage resources that exist in the area. The communities of Ponderosa Springs, Ponderosa Springs Estates, and Colcord Estates are located within the Colcord/Turkey Pasture. The communities consist of over 300 properties.

25.     The Heber-Reno Sheep Driveway bisects the Bar X from northeast to southwest. It consists of a string of eight pastures and is roughly two miles wide. The Driveway is used to move sheep between private land near Chandler, Arizona and certain allotments on the Apache-Sitgreaves National Forests. Every year, up to 8,000 sheep are herded along the Driveway in the spring and again in the late summer. Cattle grazing has also periodically occurred on the Driveway. In particular, Forest Service studies conducted in the 1970s noted cattle crazing on the Driveway.

26.     Historically, four pastures on the Driveway have been associated with the Bar X: Lost Salt, Naegelin, McInturff, and Walnut. The Lost Salt Pasture is the northernmost of the four pastures. Like the Colcord/Turkey Pasture, Lost Salt is dominated by ponderosa pine. A map showing the Driveway pastures is shown on the next page.

**II.     Prior Overgrazing of the Bar X Allotment and Driveway**

27.     Overgrazing on the Bar X and Driveway was a serious concern in the 1970s. At the time, the four allotments—Bar X, Haigler Creek, Young, and Colcord Canyon—consisted of approximately 30,000 National Forest acres, run under one unit referred to collectively as the Bar X. The four allotments combined were permitted to graze 468 cattle year-long and 207 yearlings for ten months, which equaled 7686 animal

9

unit months ("AUMs").[1] Of this total, the Colcord Allotment was permitted for 35 cows year-long and no yearlings, or 420 AUMs.

28.    A Range Analysis was conducted on the Bar X from 1975 through 1978 to determine grazing capability. Grazing capability classifications were broken into three categories: (1) No Capacity—terrain incapable of being grazed by domestic livestock on a sustained yield basis under reasonable management; (2) Potential Capacity—terrain presently undergoing accelerated erosion because it does not have sufficient effective ground cover to protect the soil; and (3) Full Capacity—terrain presently stable because effective ground cover is holding soil loss to an acceptable level.



*The Driveway Pastures*

---

[1] An animal unit month is the amount of forage an "animal unit" will eat in one month's time. It appears that the Forest Service currently uses a value of approximately 1.32 AUMs for each cow/calf pair, 0.7 AUMs for each yearling, and 1.2 AUMs for each bull.

29.     The 1978 Range Analysis found that the four Bar X allotments contained 24,654 acres that were No Capacity, 4,813 acres that were Potential Capacity, and 742 acres that were Full Capacity. Of the Full Capacity acres, 579 were in poor or very poor range condition with a downward trend, 163 were in fair condition with a downward trend, and none were in good or excellent condition.

30.     Areas were determined to be No Capacity because they were not capable of producing enough vegetation naturally, had soils with accelerated erosion, were covered by dense brushfields, or had steep slopes. Much of the pine ecotype on the Bar X was delineated as No Capacity because of steep slopes in conjunction with a lack of forage.

31.     Following the Range Analysis, an environmental assessment under NEPA was completed in July of 1979 ("1979 EA"). The 1979 EA found "[s]evere overgrazing and poor management have depleted not only the range resource, but wildlife habitat, soils, and watershed quality." The 1979 EA referenced the "thorough on-the-ground investigation" documenting conditions on the Bar X completed for the 1978 Range Analysis.

32.     Other findings by the Forest Service contained in the 1978 Range Analysis and 1979 EA were as follows (quoted or paraphrased):

      a.  The Ponderosa Pine type has been depleted severely by overgrazing;

      b.  Riparian areas are severely denuded by grazing, including Colcord Canyon, Naegelin Canyon, Cherry Creek, Haigler Creek, and Pine Creek;

      c.  Of the three primary needs of all wildlife species, food and cover have been the most severely damaged [by overgrazing], which has reduced the capability of the land to support viable populations of wildlife species that one would expect to find;

d.  Current Bar X conditions are a result of the excessive abuse and mismanagement of the grazing resources;

e.  Watershed conditions are quite deteriorated throughout the woodland zone, with many dry denuded riparian areas that were at one time dotted with springs;

f.  Excessive soil loss occurs on 97% of the land in the Bar X;

g.  Deer and cattle are in direct competition for browse, especially in the Pine type;

h.  The vegetative resource of the Bar X is depleted drastically in terms of forage production, plant density, desirable species composition and diversity. Historic overstocking, as well as current overstocking, have induced plant community retrogression.

33.  The Forest Service set long-term goals for the Bar X of reversing the downward trend of the range condition, improving and enhancing wildlife habitat, improving aquatic habitat along perennial streams, improving deteriorated watershed conditions, and improving soil conditions by controlling erosion.

34.  The 1979 EA considered closing the entire Bar X to domestic livestock grazing as one management alternative. Other alternatives put the Bar X under an intensive grazing management system while sharply reducing the number of cattle. The Forest Service noted: "[t]he continuation of present management and overgrazing will over a short period of time irreversibly and irretrievably destroy the range resource due to excessive plant and soil loss."

35.  The Forest Service selected the preferred alternative from the 1979 EA, which divided the Bar X into three grazing units, each of which consisted of two to four pastures, and use of the units would be rotated across years. Notably, these three units excluded the Colcord/Turkey Pasture (that is, the Turkey Peak Pasture within the Haigler

Creek Allotment and the entire Colcord Canyon Allotment). This alternative reduced the number of cattle permitted to graze from an "unsupportable" high of 468 cattle and 207 yearlings (7686 AUMs) to 59 cattle (710 AUMs), and closed the Colcord/Turkey Pasture.

36.     In 1981, the Forest Service issued the Bar X, Haigler Creek and Young Allotments Management Plan 1981–1985 ("1981–1985 AMP"). The plan noted that the Bar X Ranch was comprised of the Bar X Allotment, Oxbow Unit of the Haigler Creek Allotment, and the Young Allotment; the Turkey Peak Pasture in the Haigler Creek Allotment and the Colcord Canyon Allotment were not listed as part of the Bar X Ranch. The plan described the northern boundary of the Bar X as the bluffs along Haigler Creek, and stated that construction of a fence along that boundary was necessary "to exclude livestock from the areas closed to grazing." The acreage of the permitted area was about 22,600 acres, and the estimated capacity was 710 AUMs, equating to 59 cattle grazing year-long. An Addendum to the AMP stated that the Forest Service could reopen the Turkey/Colcord pasture if further evaluations determined the area had recovered and is capable of supporting livestock on a sustained yield basis.

37.     An environmental assessment conducted in 1985 ("1985 EA") evidenced improved range conditions on the Bar X due to the decreased cattle use and intensive management. The Forest Service noted that the wildlife habitat "has improved greatly. Probably the greatest evidence supporting this statement is the renewed presence of elk below the Naegelin Rim, historically an elk winter range. . . . The abundance of turkey has also increased throughout the allotment. . . . Riparian habitat along Haigler Creek has responded favorably to improved management." The 1985 EA estimated the Bar X grazing capacity as 1300 AUMs and the Forest Service decided to permit grazing of 1200 AUMs (100 cattle year-long) under the same management system prescribed by the 1979 EA and 1981–1985 AMP. The Colcord/Turkey Pasture remained closed to grazing.

38.     Also, in 1985, the Forest Service completed the Tonto Forest Plan, which is still the governing forest plan.[2] The Tonto Forest Plan contains goals, objectives, standards, and guidelines that provide management direction for various resources and uses of the forest. This includes direction related to protection of fish and wildlife habitat, vegetation, riparian areas, and soils, as well as direction related to management of livestock grazing and other forest uses. For range management, the Plan states that "[l]evels of estimated permitted use and grazing capacities are based on current estimated land capabilities to produce forage for domestic livestock on a sustained yield basis." The long-term goal for the range resource in the Forest Plan is to "[e]mphasize a program of range administration which will bring the range resource under proper management and improve range forage conditions."

39.     The Tonto Forest Plan standards and guidelines that pertain to the Bar X consist of forest-wide standards and guidelines, as well as those for Management Area 5D—Mogollon Rim-Sierra Ancha Area. The forest-wide prescriptions include various restrictions on livestock grazing in riparian areas; providing forage to maximize threatened and endangered species, management indicator species, and emphasis harvest species; managing livestock grazing to maintain Mexican spotted owl prey availability, promote owl habitat, and restore riparian ecosystems; using Range Analyses to document needed adjustments in grazing; and documenting specific allotment guidelines in allotment management plans.

40.     Management Area 5D is to be managed "for a variety of renewable resource outputs with primary emphasis on intensive, sustained yield timber management, timber resource protection, creation of wildlife habitat diversity, increased populations of emphasis harvest species, and recreation opportunity." Direction for this

[2] The Forest Service is currently revising the Tonto Forest Plan, but the existing plan is what governs the decisions challenged here.

particular area is to manage "suitable rangelands" at "Level D" and improve grazing management for rangeland in less than satisfactory condition. "Suitable range" is defined as "[r]ange accessible to livestock or wildlife, and that can be grazed on a sustained yield basis without damage to other resources." Managing at "Level D" means "[m]anagement seeks to optimize production and utilization of forage allocated for livestock use consistent with maintaining the environment and providing the multiple use of the range." For suitable rangelands, the Tonto Forest Plan calls for the Forest Service to evaluate "grazing capacity" for allotments through production/utilization surveys. "Grazing capacity" is the "maximum number of animals that can graze an area without damage to the vegetation or related resources."

41.     Forage production can change over time, altering the capability and capacity of an area to support livestock. The Forest Service acknowledged winter and spring moisture are very important in the physiological development of cool season grasses in the Bar X allotments. The precipitation statistics in the 1979 EA show that the average annual precipitation between 1971 and 1977 was 20.75 inches. In contrast, the average annual precipitation from 2011 to 2018 for the same area was around 14 inches.[3] Reduction in precipitation reduces forage production, which in turn reduces the capability of the area to support livestock grazing.

42.     Based on the Forest Service's 1979 decision, there were no Bar X cattle grazed on the Colcord/Turkey Pasture between 1979 and 2015.

43.     Overgrazing by cattle has also severely affected the Heber-Reno Sheep Driveway. In 1963, large portions of the Driveway were fenced off from adjacent allotments and closed to cattle grazing in order to allow vegetation to recover.

44.     It is unclear whether the Driveway was authorized for grazing by Bar X

---

[3] 2011–2018 precipitation data for the Pleasant Valley Ranger Station site, Young, Arizona, found at http://usclimatedata.com.

cattle in the 1970s. Whether authorized or not, extensive grazing occurred on the Driveway in the 1970s, which resulted in severely reduced forage production and increased soil compaction and erosion. A 1977 Wildlife Habitat Analysis of the Bar X and Driveway described the devastating effects that cattle grazing had had on the Driveway and stated that, due to those effects, the Driveway could "support only low numbers of cattle and sheep."

### III.    Subsequent Management of the Bar X.

45.    The Forest Service manages grazing through three types of decision documents. Allotment management plans ("AMPs") are long-term plans that set objectives and guidelines for managing allotments. Term grazing permits authorize permittees to graze certain allotments, usually for ten years, and establish the maximum number, kind (cattle, sheep, horse), and class (cow, bull, yearling) of livestock that can graze as well as the period of use. Annual operating instructions ("AOIs") are annual documents issued to permittees that provide the specific terms and conditions for grazing that particular year, including the number of livestock and season of use authorized, and the pasture rotation for that particular year.

46.    Various individuals or entities have had permits to graze the Bar X since 1979. The current permittee is a limited liability company, The Bar X, LLC. The Bar X, LLC, on information and belief, purchased the Bar X Ranch in or around 2006/2007. The Forest Service issued Bar X, LLC a ten-year term permit in 2007 to graze 130 head of cattle year-long on the Bar X, Haigler Creek, and Young Allotments, permit #12083.[4] The permit stated that the 1981–1985 AMP—which identified the Colcord/Turkey Pasture as closed—was incorporated as part of the permit. The permit did not authorize

---

[4] A review of records obtained from the Forest Service do not make clear when or why the Forest Service increased the permitted use from 100 cattle to 130 cattle.

grazing on the Driveway.

47.    In 2008, USFWS sent a letter of concurrence to the Forest Service as part of an ESA consultation over grazing in the Tonto National Forest. The agencies agreed that the Colcord/Turkey Pasture and the Lost Salt Pasture would remain closed to cattle grazing due to the presence of Mexican spotted owl protected activity centers ("PACs") in those areas.

48.    Beginning in 2010, the Forest Service authorized the Bar X permittee and permittees of nearby allotments to graze cattle on the Driveway. From 2010 through 2017, Bar X cattle were authorized to graze on the Naegelin, McInturff, and Walnut Pastures. The 2014 AOI listed the Lost Salt Pasture as an "optional pasture" that could be used in case of drought. In all other years, there was no grazing authorized on the Lost Salt Pasture.

49.    From 2012 through 2017, the Forest Service issued AOIs allowing the Bar X permittee to graze more cattle than permitted under the term grazing permit. During that six-year span, the Forest Service authorized an average grazing level of around 4,000 AUMs[5] on the Bar X and Driveway combined, with a minimum of 2,623 AUMs in 2013 and a maximum of around 5,000 AUMs in 2014.[6] The term grazing permit allowed the Bar X permittee to graze 130 cattle year-long on the Bar X, corresponding to around 2,000 AUMs.

50.    Each year's AOI identified which pastures would be used at which times and also included a list of "optional pastures" to be used as an "adaptive management

---

[5] A review of the 2012–2018 AOIs provided by the Forest Service suggests that the agency has not always been consistent about using 1.32 AUMs for cow/calf pairs. For that reason, there is some uncertainty about the precise level of AUMs allowed each year.

[6] The 2014 AOI provided by the Forest Service lists the AUMs allowed that year as 5,471, but that number appears to be an error given the number of cattle allowed. The correct number of AUMs allowed is closer to 5,000.

tactic in response to drought." Each year's AOI also included "allowable use standards" setting limits on the amount of vegetation that could be consumed by livestock in different areas—*e.g.*, up to 30%–40% of the plant biomass of key forage plants in key pasture areas. Each AOI stated that "[u]tilization is measured at the end of the growing season" but that "grazing intensity will be evaluated during the growing season in order to practice pro-active management and make necessary management changes needed for plant development and recovery."

51.     The AOIs from 2012–2014 did not allow grazing in the Colcord/Turkey Pasture. In 2015, however, the Forest Service authorized grazing in the Colcord/Turkey Pasture at the level of 230 cows and 19 bulls from July 19 to September 30 despite the pasture's closed status. Prior to allowing cattle back into the Colcord/Turkey Pasture, there had been no "evaluations" of whether the resources in the closed area had recovered or the current capability of the area to support livestock grazing on a sustained yield basis, as required by the 1981–1985 AMP. Furthermore, no Range Analysis or NEPA analysis was completed prior to this authorization. An email in April 2016 claimed that the pasture was grazed in 2015 after many years of non-use in order to spread out livestock use on the Bar X, and incorrectly stated that the pasture had been included in the stocking capacity assessment for the group of allotments and had never been removed from the grazing allotment.

52.     The Bar X cows degraded the resources in the Colcord/Turkey Pasture and caused significant problems in the Colcord and Ponderosa communities during those few months in 2015. Monitoring at one site on the south side of the Colcord/Turkey Pasture showed that cattle grazing reduced the percentage of ground covered by live basal vegetation from 6% to 1%—a utilization rate of over 80%.

53.     On August 1, 2016, Plaintiff's directors sent a letter to Neil Bosworth, Tonto National Forest Supervisor, informing him of the Forest Service's improper

authorization of grazing in an area that was supposed to be excluded from grazing. The Forest Service responded to this letter with a different explanation from that in the April 2016 email, stating that the cattle were allowed into the excluded pasture in 2015 on a "trial basis" pursuant to Forest Service Handbook Section 2209.13.16.16. However, a Freedom of Information Act request shows that there were *no* Forest Service documents created prior to the 2015 AOI that mentioned grazing the closed pasture on a "trial basis" under Section 2209.13.16.16, and the 2015 AOI itself did not discuss it. Nor was there any written determination that such grazing was consistent with the Tonto Forest Plan and would benefit management of the rangeland resource.

54.     The 2016 and 2017 AOIs did not allow grazing on the Colcord/Turkey Pasture.

55.     In 2017, the Forest Service renewed the Bar X term permit for another ten years, again permitting 130 cattle to graze year-long on the Bar X, Haigler Creek, and Young Allotments. The 2017 permit issued to Bar X, LLC included the following provisions: (1) Pastures lacking a serviceable fence around the entire pasture may not be authorized for use; (2) The Tonto Forest Plan is made a part of the permit; (3) the 1981–1985 AMP is made a part of the permit.

56.     The Forest Service issued a 2018 AOI in January 2018. That AOI authorized grazing on the Colcord/Turkey Pasture in the amount of 240 cows and 18 bulls from June 15 to October 15. The AOI did not include any justification for authorizing grazing on the closed pasture.

### IV.     Prior Litigation

57.     In April 2018, Plaintiff Neighbors of the Mogollon Rim brought suit against the Forest Service in this Court. Plaintiff alleged that the agency had violated NFMA by authorizing livestock grazing on the Bar X in 2012–18 in a manner inconsistent with the Tonto Forest Plan. Plaintiff also alleged that Defendant's

1   authorization of livestock grazing on the Bar X in 2012–18 violated NEPA for failing to

2   analyze the impacts of the changed grazing management, and violated FLPMA for

3   exceeding the permitted level of use.

4         58.    In June 2018, the Forest Service issued an amended 2018 AOI. The

5   amended AOI listed the authorized use as 120 cows and 10 bulls year-long, consistent

6   with the grazing permit. The amended 2018 AOI did not authorize grazing on the

7   Colcord/Turkey Pasture or on any of the Driveway pastures.

8         59.    In October 2018, Neighbors of the Mogollon Rim and the Forest Service

9   entered into a settlement agreement and stipulation of dismissal of the case. As part of the

10  settlement, the Forest Service agreed to "ensure that future AOIs . . . for the Bar X

11  Allotment are consistent with the existing term grazing permit for the Bar X Allotment

12  while this Settlement Agreement is in effect."

13        60.    By its own terms, the settlement agreement was to remain in effect "until

14  the Forest Service issues a new term livestock grazing permit and Allotment Management

15  Plan for the Bar X Allotment, accompanied by a new NEPA analysis and a new

16  consultation under the [ESA], as appropriate."

17        61.    The 2019 AOI, like the revised 2018 AOI, allowed grazing consistent with

18  the term grazing permit: 113 cows and 17 bulls year-long, and no grazing on the

19  Colcord/Turkey Pasture or the Driveway.

20  **V.    The Forest Service's NEPA and ESA Processes**

21        62.    In late 2018, the Forest Service prepared a Biological Assessment ("BA")

22  containing its analysis of the effects of a new grazing strategy on threatened and

23  endangered species in the Bar X area. The BA concluded that the new grazing strategy—

24  which included opening up the Colcord/Turkey Pasture and the Lost Salt Pasture to

25  grazing—would be unlikely to adversely affect the Mexican spotted owl and the narrow-

26  headed gartnersnake as well as their critical habitats. The Forest Service sent the BA to

1   USFWS as part of the agencies' ESA consultation.

2       63.     In early 2019, the Forest Service released a Preliminary EA outlining its

3   proposed plan to alter the grazing strategy on the Bar X. Under the plan set out in the

4   Preliminary EA, grazing would be allowed across the Bar X, including on the

5   Colcord/Turkey Pasture. In addition, the proposed plan would allow the Bar X permittee

6   to use all four of the Driveway pastures associated with the Bar X—including the Lost

7   Salt Pasture—for cattle grazing. The proposed plan would also increase the maximum

8   permitted amount of grazing on the Bar X and associated Driveway pastures to 9,250

9   AUMs, more than twice the amount of actual grazing in recent years and over four times

10  the amount allowed under the 2007 and 2017 term permits.

11      64.     In June 2019, the Forest Service released a Draft EA. The Draft EA

12  analyzed a proposed grazing scheme substantially identical to the one analyzed in the

13  Preliminary EA—one that would increase the total amount of grazing permitted on the

14  Bar X and associated Driveway pastures up to 9,250 AUMs and would open up the long-

15  closed Colcord/Turkey Pasture and the Lost Salt Pasture to grazing. The Forest Service

16  invited comments on the Draft EA.

17      65.     Plaintiff commented on the Draft EA, criticizing several aspects of the

18  Forest Service's reasoning and conclusions. Several other organizations and individuals

19  also submitted comments on the Draft EA. One recurring theme in those comments was a

20  concern that the Forest Service had failed to give enough consideration to how opening

21  the Colcord/Turkey Pasture to grazing would affect the Colcord and Ponderosa

22  communities and the wildlife in that area.

23      66.     In August 2019, USFWS issued a Biological Opinion ("BiOp") regarding

24  the effects of the proposed grazing scheme on endangered and threatened species in the

25  Bar X area. The BiOp included concurrences with the Forest Service's determinations

26

1    that the new scheme "may affect," but would "not likely . . . adversely affect," the

2    Mexican spotted owl and narrow-headed gartersnake as well as their critical habitats.

3         67.     The Forest Service issued a Final EA in September 2019 along with a Draft

4    Decision Notice/FONSI. The Forest Service elected to keep essentially the same

5    proposed grazing scheme as the one described in the Preliminary and Draft EAs. The

6    Forest Service released a revised version of the Final EA in December 2019.

7        **VI.**     **Features of the Final EA**

8        **A.**     <u>**Range of Alternatives Considered in the Final EA**</u>

9         68.     The Final EA analyzes just two alternatives: a "no grazing" alternative and

10    the proposed action. The Draft EA analyzed the same two alternatives.

11        69.     Plaintiff criticized the lack of alternatives in its comments on the Draft EA,

12    noting that the two alternatives analyzed were on the extreme ends of the spectrum of

13    possible grazing plans. Plaintiff suggested that the Forest Service should consider some

14    "in between" alternatives, including a "no action" alternative that would continue the

15    same grazing as under the prior permits, and an alternative in which the Colcord/Turkey

16    Pasture remains closed to grazing while some grazing is permitted on the Driveway.

17        70.     In the Final EA, the Forest Service states that a "no action" alternative "was

18    not analyzed in detail as it does not meet the purpose and need to manage resources in a

19    manner that achieves Forest Plan objectives and desired conditions, or formally

20    incorporate adaptive management that allows for sufficient management flexibility." This

21    was the same explanation offered in the Draft EA for the lack of a no action alternative.

22    The Forest Service added another statement to the Final EA in an apparent attempt to

23    explain the small number of alternatives considered: "[C]urrent [AUMs] are less than the

24    Proposed Action. Additionally, within the existing current allotment management, there

25    is no opportunity for adaptive management, making it difficult to change yearly

26    authorized AUM's as necessary based on current resource conditions. The scope of

1  current management places it within the range of alternatives between the No Grazing

2  and the Proposed Action. As such, the Proposed Action was developed with the strategy

3  to minimize or eliminate the need for additional alternatives to be developed."

**B.  Description of Current Conditions**

5  71.    The Final EA's analysis of the current state of vegetation on the Bar X and

6  Driveway is largely based on the results of monitoring at 16 sites from 2007–2019. Eight

7  of those sites were established in 2007 and eight more were established between 2007

8  and 2014. Two monitoring sites exist on the nearly 11,000-acre Colcord/Turkey Pasture:

9  one on the south side of the pasture and one on the north side of the pasture. No

10  monitoring sites exist on the nearly 7,000-acre Lost Salt Pasture.

11  72.    Several of the sites have shown decreased amounts of live vegetation over

12  the monitoring period. The two sites on the Colcord/Turkey Pasture—which was grazed

13  just once, in 2015—have shown stable vegetation levels, according to the Final EA.

14  73.    Though the Final EA discusses *trends* in vegetation, it does not analyze

15  how the current state of vegetation on the Bar X compares to the desired conditions for

16  the forest. For instance, the Final EA states that there should be "a minimum of 30%

17  effective ground cover for watershed protection and forage production, especially in

18  primary wildlife forage producing areas," but it does not discuss whether such ground

19  cover currently exists or how much it diverges from the 30% objective.

20  74.    According to the Final EA, several pastures on the Bar X and Driveway are

21  rated "poor" for soil productivity and erosion, including many pastures (McInturff,

22  Walnut, and Bar X among them) that have been heavily grazed in recent years. Colcord

23  Canyon Pasture and Lost Salt Pasture are rated "fair" for soil productivity and erosion.

24  None of the pastures is rated "good" for this parameter.

25  75.    The Final EA contains an analysis of the health of the watersheds that are at

26  least partly in the Bar X and Driveway. The analysis, which is based on data from 2011,

23

reflects that 10 of the 11 watersheds are "functioning at risk" and the other watershed has "impaired function." None is functioning properly.

### C.   <u>The Proposed Action</u>

76.     The Final EA states that the proposed action "consists of four components: authorization, improvements, conservation measures, and monitoring."

77.     The proposed action deviates from current grazing authorization practices in the following ways:

    a.  Grazing would be allowed on the Colcord/Turkey Pasture;

    b.  Grazing would be allowed on all four of the Driveway pastures associated with the Bar X, including the Lost Salt Pasture;

    c.  The maximum amount of grazing allowed on the Bar X would be increased to 4,002 AUMs; and

    d.  The maximum amount of grazing allowed on the Driveway pastures associated with the Bar X would be increased to 5,250 AUMs.

78.     The proposed action does not provide any further details about the grazing scheme, such as pasture rotation or level of grazing in any particular area. The Final EA states that the entire herd can graze each pasture for an undetermined amount of time.

79.     The proposed action includes limits on vegetation utilization. For upland herbaceous vegetation, utilization in excess of 30–40% of a given year's growth would trigger changes to grazing practices; for upland browse, utilization in excess of 50% percent of a given year's growth would trigger changes. For riparian woody vegetation, the threshold is 50% browse of leaders on the upper one-third of plants up to six feet tall. For riparian herbaceous vegetation, the threshold is 40% utilization of plant biomass for some species, such as deergrass, and a minimum stubble height of 6–8 inches for rushes, sedges, cattails, and horsetails. These limits are the same or substantially the same as the "allowable use standards" included in the 2012–2019 AOIs.

80.     The Final EA identifies a few specific range improvements such as fences or water troughs that will be built in the next two years, with several improvements to be built on the previously closed pastures, including a corral in between the Colcord and Ponderosa communities. But the Final EA also states that an unspecified amount of "additional infrastructure may be constructed if needed in the future" and that such infrastructure will not trigger further environmental analysis. That infrastructure includes fencing, pipelines, troughs, trick tanks and catchments, and livestock handling facilities.

81.     The proposed action includes both "effectiveness monitoring" measures—measures intended to "track [the] long-term condition and trend of upland and riparian vegetation, soil, and watersheds"—and "implementation monitoring" measures—annual measures intended to ensure that grazing is occurring consistent with the permit and yearly authorizations. Effectiveness monitoring "would occur at established permanent monitoring points," while implementation monitoring would occur "at a minimum" in key areas. Like the measures set out in the 2012–2019 AOIs, the measures set out in the proposed action would allow for pasture moves and/or reductions in livestock numbers to respond to changing resource conditions.

82.     The Final EA states that grazing management "may" be adjusted in response to monitoring data, including data showing that desired resource conditions are not being met. However, the Final EA is vague as to the details of how the Forest Service will choose to respond to such monitoring data. Instead, the Final EA simply lists several possible actions that "may" be appropriate "to respond to certain resource conditions." In addition, the Final EA does not identify what specific triggers would lead to management changes.

D.     **Data and Studies Relied On**

83.     During the NEPA process, Plaintiff and others asked the Forest Service to place more weight on the in-depth studies of the Bar X conducted in the late 1970s and

1   1980s, including the 1978 Range Analysis. In the Final EA, the Forest Service states that,

2   "[w]hile studies from the Bar X's past were reviewed and considered," the "analysis was

3   focused on the most current data." The Forest Service specifically cites "the last 12 years

4   of data, when the current permitee [sic] was first issued a permit for Bar X."

5       84.    Aside from that passing mention of "studies from the Bar X's past," the

6   Final EA does not address the many in-depth studies of grazing effects on the Bar X

7   conducted in the late 1970s and 1980s.

8       85.    The Final EA also references the 2008 letter of concurrence from USFWS

9   agreeing that the Colcord/Turkey and Lost Salt Pastures should remain closed to

10  livestock grazing due to Mexican spotted owl PACs, but does not otherwise engage with

11  that document.

12      86.    Because grazing has occurred on the Colcord/Turkey Pasture just once in

13  the last 40 years (2015), there is no "last 12 years of data" showing the effects of yearly

14  grazing on that pasture. And there is *no* data from recent years showing the effects of

15  grazing on the Lost Salt Pasture. These pastures occur in the ponderosa pine ecotype, and

16  have different soil and vegetation characteristics than the other Bar X and Driveway

17  pastures. One of the two monitoring sites on the Colcord/Turkey pasture had the lowest

18  forage production of all the Bar X and Driveway sites.

19      87.    The Final EA contains multiple statements that are misleading or not

20  supported by underlying data. In discussing the amount of grazing that has been allowed

21  on the Bar X over the last decade, the EA states that "livestock numbers [on the Bar X]

22  have slowly increased but averaged 3,707 [AUMs]." According to the AOIs from that

23  period, however, the average amount of grazing on the Bar X has been far lower. The

24  3,707 AUMs figure reflects the amount of grazing allowed on the Bar X in the initial

25  2018 AOI that was eventually replaced by a revised AOI. The *average* amount of grazing

26  allowed on the Bar X (which does not include the Driveway pastures) in recent years is

26

closer to 2,000–2,500 AUMs, according to the AOIs for those years, and has *never* been as high as 3,707 AUMs.[7] Thus, recent monitoring data for the Bar X pastures would reflect use levels averaging less than 2,500 AUMs.

88.     In several places, the Final EA states that grazing was allowed on the Colcord/Turkey Pasture in 2015 and 2018 on a trial basis for the purpose of gathering data on the effects of grazing on that pasture. However, there was no grazing allowed on the Colcord/Turkey Pasture in 2018 and, as mentioned earlier, Forest Service documents indicate that the "trial basis" rationale for allowing grazing on the Colcord/Turkey Pasture in 2015 was a post-hoc explanation for that action.

89.     The Final EA cites a 2018 capacity analysis as one of the key studies the Forest Service relied on in developing the proposed action. A FOIA request for that analysis returned a document named "Capacity_BarX&Driveway." That document reflects a maximum capacity of 3,973 AUMs for the four Driveway pastures associated with the Bar X. The proposed action allows up to 5,250 AUMs on those four Driveway pastures. The capacity analysis also appears to reflect a maximum capacity of 3,108 AUMs for the Bar X, *including* the Colcord/Turkey Pasture. The proposed action allows up to 4,002 AUMs on the Bar X.

E.     **Analysis of Effects on Vegetation, Soil, and Water Resources**

90.     The Final EA predicts that the proposed action will not have adverse effects on vegetation/range resources. In reaching that conclusion, the Final EA relies heavily on: (1) the "trial grazing periods" in 2015 and 2018, which supposedly showed that the closed pastures can be grazed in a way to "maintain or achieve desired conditions," and (2) the claim that "[m]onitoring has demonstrated that current management has resulted in improvements to vegetative condition in the allotment."

---

[7] As discussed in ¶ 49, the average amount of grazing on the Bar X *plus* its associated Driveway pastures from 2012–2017 was around 4,000 AUMs.

91.     As mentioned earlier, there was no "trial grazing period" in 2018 on the Colcord/Turkey Pasture and the "trial grazing period" in 2015 was not, in fact, a trial. Moreover, there has been no "trial" grazing on the Lost Salt Pasture at any time, and no monitoring data showing how grazing will affect that pasture.

92.     The EA does not explain how current conditions and trends in vegetation health support the conclusion that more than *doubling* the amount of grazing on the Bar X and its associated Driveway pastures will maintain or improve vegetation health.

93.     In its discussion of the proposed action's effects on soil resources, the Final EA states that "[s]oils most likely to have impaired or unsatisfactory conditions . . . are likely to continue to receive a substantial amount of use." Yet the Final EA concludes that such soils "should begin to improve" if "allowable use guidelines are not exceeded." The EA does not square this prediction with the fact that soils in the long-closed pastures have had decades to recover but are still rated as "fair" rather than "good," nor with the fact that soil conditions in grazed pastures are poor or fair despite the use of "allowable use guidelines" similar to those in the proposed action.

94.     According to the Final EA, "[a]reas of traditional livestock concentration . . . may recover fastest in the absence of livestock grazing, [but] . . . such areas can also be maintained or improved under the proposed action." Again, the EA does not explain how this prediction is supported by the data on soil conditions.

95.     The EA acknowledges that cattle tend to concentrate around water sources, including in riparian areas, and that cattle "tend to deposit a greater amount of waste close to water sources than they create in other areas of the range." The EA also acknowledges that large swaths of Haigler Creek have not seen grazing in 40 years. The EA nonetheless concludes that introducing cattle to the long-closed pastures will not significantly affect water quality and riparian resources in and near Haigler Creek. In general, the Final EA concludes that the proposed action is unlikely to have significant

28

effects on water quality and riparian resources in the Bar X area.

96.    As with its analysis of soils, the Final EA's analysis of water and riparian resources does not square its predictions about insignificant effects of *increased* grazing with the fact that such resources are not functioning properly even in areas that have been closed to grazing for years.

97.    The Final EA also dismisses effects of climate change combined with effects of increased grazing as insignificant cumulative effects despite acknowledging that the climate is getting drier and 12 years of drought occurred between 2000 and 2018.

**F.    Analysis of Effects on the Colcord and Ponderosa Communities**

98.    The Final EA notes that members of communities in and around the Bar X, particularly those living within the boundary of the Colcord/Turkey pasture, "voiced concerns and disapproval over . . . the possibility that cattle may enter onto their private property, damage their septic systems, or be present on roadways," but there is no analysis of the likelihood of such events or the magnitude of their impacts on community members' aesthetic enjoyment and economic well-being.

99.    The EA acknowledges that "it is the responsibility of private landowners and private communities to construct a lawful fence to keep out cattle," but does not analyze in any way how the Colcord and Ponderosa communities will be affected, economically and otherwise, by the sudden need to construct fencing and other infrastructure to prevent or mitigate damage caused by cattle grazing.

100.    The Final EA concludes that the proposed action will not have a significant impact on communities in the Bar X because they "have always been within an active grazing allotment." In fact, Ponderosa Springs Estates was not developed until *after* the Colcord/Turkey Pasture was closed to grazing, and residents of Colcord Estates and Ponderosa Springs have not experienced grazing near their communities for 40 years except in 2015, when cattle damaged property and frightened homeowners.

### G.    Analysis of Effects on Wildlife

101.    Cattle damage to riparian areas, such as Haigler Creek, degrades habitat for the narrow-headed gartersnake, which is highly water-dependent. The Final EA, consistent with USFWS' concurrence, concludes that the proposed action may affect, but is unlikely to adversely affect, the narrow-headed gartersnake, which is listed as threatened under the ESA. Many of the areas in Haigler Creek in which gartersnakes have been found are located in the long-closed Colcord/Turkey Pasture, and much of the proposed critical habitat for the narrow-headed gartersnake is located in that pasture, as well. The Final EA, like USFWS' concurrence, does not address whether and how grazing impacts to the narrow-headed gartersnake might be more significant in areas that have previously been closed to grazing.

102.    By grazing native ground vegetation and compacting soils, cattle degrade habitat of small mammal populations, thereby reducing the prey base of Mexican spotted owls, a threatened species under the ESA. The Final EA concludes that the proposed action may affect, but is unlikely to adversely affect the Mexican spotted owl. The EA, like USFWS' August 2019 concurrence, fails to disclose that almost all of the spotted owl PACs and designated critical habitat that overlap the Bar X and associated Driveway pastures are located in the long-closed Colcord/Turkey and Lost Salt Pastures, which contain the pine ecotype used by the owls. And the EA, like USFWS' concurrence, fails to explain what has changed since 2008, when the Forest Service and USFWS agreed that those pastures should remain closed to grazing due to the presence of Mexican spotted owl PACs.

103.    According to the Final EA, the proposed action will not have significant impacts on elk, deer, and other big game. That conclusion is based in part on the idea that elk and deer would benefit from the installation and maintenance of water improvements. However, the EA fails to note that elk, deer and turkey have made a remarkable

comeback in the last 40 years in the Colcord/Turkey Pasture *without* such improvements. In general, the EA does not explain whether or how the reintroduction of cattle to areas that have not been grazed for 40 years will affect elk, deer, and other animals that compete with cattle for forage and water when prior cattle grazing had almost eliminated such wildlife from those areas in the 1970s.

104.    The Final EA does not grapple with the fact that the stable elk populations in the Bar X area are concentrated in the Colcord/Turkey Pasture and the Lost Salt Pasture, where there has been no grazing.

## VII.    The FONSI and Final Decision

105.    The Draft Decision Notice/FONSI released in September 2019 adopted the proposed action laid out in the Final EA. The Forest Service concluded that the proposed action will not have a significant impact on the quality of the human environment and that the proposed action is consistent with the Tonto Forest Plan and NFMA.

106.    The release of the Draft Decision Notice/FONSI started the administrative review and objection period. *See* 26 C.F.R. pt. 218. Plaintiff, along with many others, submitted objections. In December 2019, the Forest Service responded to those objections and released the Final Decision Notice/FONSI. The Forest Service did not change course in response to the objections it received—the Final Decision Notice/FONSI is substantially identical to the Draft Decision Notice/FONSI.

107.    In late December 2019, the Forest Service issued the 2019 AMP and the 2019 Grazing Permit.

## FIRST CLAIM FOR RELIEF
### VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT
### Failure to Prepare an EIS

108.    Plaintiff realleges and incorporates by reference the preceding paragraphs.

109.    This first claim for relief challenges the Forest Service's decision to issue a FONSI and not prepare a full Environmental Impact Statement in connection with its decision to alter the grazing scheme for the Bar X, in violation of NEPA. This claim for relief is brought under the APA's provisions for judicial review of final agency action, 5 U.S.C. § 706(2)(A).

110.    NEPA requires an agency to prepare a full EIS when it proposes to take an action that "significantly affect[s] the quality of the human environment." 42 U.S.C. § 4332. If an agency determines that a proposed action will not "significantly affect the quality of the human environment," it may issue a FONSI and an EA rather than a full EIS. An agency should prepare an EIS whenever there are "substantial questions . . . as to whether the [proposed action] *may* cause significant degradation of some human environmental factor." *WildEarth Guardians v. Provencio*, 918 F.3d 620, 633 (9th Cir. 2019) (citation and quotation omitted and emphasis added).

111.    The Forest Service's FONSI—its conclusion that the new grazing scheme will not "significantly affect the quality of the human environment"—is arbitrary and capricious under APA § 706(2)(A). The Forest Service's FONSI is arbitrary and capricious for reasons including, but not limited to, the following:

        a.    The Forest Service improperly discounted or ignored the serious negative environmental effects of allowing grazing in the Colcord/Turkey Pasture and the Lost Salt Pasture, which have long been closed to grazing;

        b.    The Forest Service improperly discounted or ignored the serious effects of more than doubling the total amount of grazing on the Bar X and associated Driveway pastures;

        c.    The Forest Service improperly discounted or ignored the serious effects of the proposed action on the communities in and around the Bar X,

1   including the Colcord and Ponderosa communities, that have either

2   never had livestock grazing in their vicinity or have not experienced it

3   for 40 years;

4   d.   The Forest Service improperly discounted the serious effects of the

5   proposed action on Mexican spotted owls and narrow-headed

6   gartnersnakes, most of which are located in areas long closed to grazing;

7   and

8   e.   The Forest Service improperly discounted the cumulative effects of

9   grazing combined with climate change as insignificant.

10   112.   The record before the agency clearly shows that there is at the very least a

11   "substantial question[] . . . as to whether the project *may* cause significant degradation of

12   some human environmental factor," thus triggering the Forest Service's obligation to

13   prepare an EIS. *Provencio*, 918 F.3d at 633. Accordingly, the Forest Service's decision to

14   issue a FONSI rather than prepare an EIS was arbitrary, capricious, an abuse of

15   discretion, and contrary to NEPA. Under 5 U.S.C. § 706(2)(A), the court must set aside

16   the Final Decision Notice/FONSI, as well as the 2019 AMP and 2019 Grazing Permit

17   that relied on the FONSI.

18

19                          **SECOND CLAIM FOR RELIEF**
20   **VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT**
     **Failure to Consider an Adequate Range of Alternatives**

21   113.   Plaintiff realleges and incorporates by reference the allegations in

22   paragraphs 1 through 107.

23   114.   This second claim for relief challenges the Forest Service's choice to

24   analyze just two alternatives in the Final EA, neither of which was a "no action"

25   alternative, in violation of NEPA. This claim for relief is brought under the APA's

26   provisions for judicial review of final agency action, 5 U.S.C. § 706(2)(A).

115.    A proper NEPA analysis for a project or action must include "meaningful consideration [of] all reasonable alternatives." *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of the Interior*, 608 F.3d 592, 601–02 (9th Cir. 2010); *see also* 42 U.S.C. § 4332(E). Furthermore, an agency must consider a "no action" alternative in which the status quo is maintained. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1245 (9th Cir. 2005).

116.    The Forest Service violated NEPA by refusing to consider meaningfully any alternatives other than the proposed action and a "no grazing" alternative. The Forest Service rejected without reasonable explanation the "middle-ground" alternatives suggested by Plaintiff—including an alternative in which grazing would be allowed on parts of the Driveway but not on the Colcord/Turkey Pasture, and the agency's reasons for failing to consider a "no action" alternative in any detail were irrational.

117.    Because the Forest Service failed to consider a reasonable range of alternatives, the EA is arbitrary, capricious, an abuse of discretion, and contrary to NEPA.  Under 5 U.S.C. § 706(2)(A), the court must set aside the Final EA, as well as the Final Decision Notice/FONSI, 2019 AMP, and 2019 Grazing Permit that relied on the Final EA.

**THIRD CLAIM FOR RELIEF**
**VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT**
**Failure to Take a "Hard Look" at the Effects of the Action**

118.    Plaintiff realleges and incorporates by reference paragraphs 1 through 107.

119.    This third claim for relief challenges the Forest Service's Final EA for failing to take a "hard look" at the environmental consequences of the new grazing scheme, in violation of NEPA. This claim for relief is brought under the APA's provisions for judicial review of final agency action, 5 U.S.C. § 706(2)(A).

120.    NEPA requires that federal agencies "take a hard look at the environmental

consequences of their actions" in order to "foster[] both informed decision-making and informed public participation." *San Diego Navy Broadway Complex Coal. v. U.S. Dep't of Def.*, 817 F.3d 653, 659 (9th Cir. 2016) (quotations and citations omitted).

121.   In taking a hard look at the environmental consequences of its new grazing scheme, the Forest Service was required to consider all direct, indirect, and cumulative effects of the proposed action, including "effects on natural resources and on the components, structures, and functioning of affected ecosystems"; aesthetic effects; economic effects; social and health effects; and effects on cultural resources. 40 C.F.R. § 1508.8(b).

122.   NEPA required the Forest Service to ensure the accuracy and scientific integrity of its analysis—that is, to use "accurate information and defensible reasoning" in assessing the probable environmental effects of the new grazing scheme. 40 C.F.R. § 1500.1(b), 1508.9(a)(1); *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 570 (9th Cir. 2016). Similarly, if the Forest Service presented "information so incomplete or misleading that the decisionmaker and the public could not make an informed comparison of alternatives," then its analysis violated NEPA. *Native Ecosystems Council v. Marten*, 883 F.3d 783, 795 (9th Cir. 2018) (quotation and citation omitted).

123.   In its NEPA analysis, the Forest Service failed to take a hard look at the effects of its proposed grazing scheme. It failed to do so in many different ways, including, but not limited to, the following:

      a.   The Forest Service did not adequately disclose or analyze the impacts of opening the closed pastures on vegetation, soil, and water resources;

      b.   The Forest Service did not adequately disclose or analyze the impacts of opening the closed pastures on the health, safety, recreational opportunities, aesthetic enjoyment, and economic well-being of the human population living nearby;

c.  The Forest Service did not adequately disclose or analyze how opening the closed pastures will affect multiple wildlife species that occupy that area;

d.  The Forest Service relied on and presented inaccurate data and information throughout the NEPA process, including an overstatement of the amount of grazing that has occurred on the Bar X in recent years, false claims about the number and intent of so-called "trial" grazing periods on the Colcord/Turkey Pasture, and false statements about the Colcord and Ponderosa communities' past experiences with grazing;

e.  The Forest Service failed to adequately consider and disclose to the public highly relevant data about the effects of yearly grazing on Colcord/Turkey and Lost Salt Pastures and instead drew unreasonable conclusions from scant or, in the case of the Lost Salt Pasture, nonexistent data; and

f.  The Forest Service failed to adequately consider and disclose to the public highly relevant data about the effects of grazing on other portions of the Bar X and instead provided an unsupported conclusion that greatly increasing the amount of grazing on the allotment will somehow *improve* the condition of the area's already-degraded resources.

124.   By failing to take a "hard look" at the environmental consequences of the new grazing scheme, the Forest Service issued a Final EA that was arbitrary, capricious, an abuse of discretion, and contrary to NEPA. Under 5 U.S.C. § 706(2)(A), the court must set aside the Final EA, as well as the Final Decision Notice/FONSI, 2019 AMP, and 2019 Grazing Permit that relied on the Final EA.

**FOURTH CLAIM FOR RELIEF**
**VIOLATIONS OF THE NATIONAL FOREST MANAGEMENT ACT**
**Failure to Act Consistently with Tonto Forest Plan**

125.    Plaintiff realleges and incorporates by reference paragraphs 1 through 107.

126.    This fourth claim for relief challenges the Forest Service's Final Decision Notice/FONSI, 2019 AMP, and 2019 Grazing Permit for violating NFMA and its implementing regulations. This claim for relief is brought under the APA's provisions for judicial review of final agency action, 5 U.S.C. § 706(2)(A).

127.    Under NFMA, site-specific projects, authorizations, and activities must be consistent with the governing forest plan. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(e) (1998). A project or activity is not consistent with the Forest Plan if it moves the forest away from the long-term goals set out in the Forest Plan. *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1115–16 (9th Cir. 2018).

128.    As described above, the Tonto Forest Plan includes goals, objectives standards, and guidelines related to livestock grazing and protection of resources on the forest. The Forest Service's new grazing scheme is not consistent with the Tonto Forest Plan in at least the following respects:

        a.   The reintroduction of grazing on the Colcord/Turkey Pasture and the Lost Salt Pasture will damage soil, water, vegetation, wildlife and other resources on those pastures, in violation of Forest Plan direction;

        b.   The drastic increase in the amount of grazing allowed on the Bar X and its associated Driveway pastures will move forest resources, including vegetation and soil resources, away from desired conditions and long-term forest goals; and

        c.   The adaptive management measures that will supposedly minimize negative effects to forest resources are too nebulous and speculative to ensure compliance with the Tonto Forest Plan.

129.    The Forest Service's explanation of how the new grazing scheme is consistent with the Tonto Forest Plan is riddled with speculation, logical errors, and unreasonable inferences drawn from scant data. As such, the agency's conclusion that the new grazing scheme adopted in the Final Decision Notice/FONSI, 2019 AMP, and 2019 Grazing Permit is consistent with the Tonto Forest Plan was arbitrary, capricious, an abuse of discretion, and contrary to NFMA. Accordingly, under 5 U.S.C. § 706(2)(A), the court must set aside the Final Decision Notice/FONSI, 2019 AMP, and 2019 Grazing Permit.

**FIFTH CLAIM FOR RELIEF**
**VIOLATIONS OF THE ENDANGERED SPECIES ACT**
**Arbitrary and Capricious "Not Likely to Adversely Affect" Concurrences**

130.    Plaintiff realleges and incorporates by reference paragraphs 1 through 107.

131.    This fifth claim for relief challenges USFWS' concurrences accompanying the 2019 BiOp that apply to the Mexican spotted owl and narrow-headed gartersnake as well as their respective critical habitats. This claim for relief is brought under the APA's provisions for judicial review of final agency action, 5 U.S.C. § 706(2)(A).

132.    USFWS' concurrence that a particular agency action "may affect, but is not likely to adversely affect," a species protected under the ESA or that species' critical habitat is reviewed under the APA's arbitrary and capricious standard. *Oregon Wild v. U.S. Forest Serv.*, 193 F. Supp. 3d 1156, 1163–64 (D. Or. 2016). Insofar as a concurrence relies on the action agency's BA, the BA itself can also be reviewed. *Id.* at 1164.

133.    USFWS' concurrences with the Forest Service's determinations that the new grazing scheme may affect, but is not likely to adversely affect, the Mexican spotted owl and the narrow-headed gartersnake, as well as their respective critical habitats, are arbitrary and capricious for reasons including, but not limited to, the following:

a.  USFWS improperly discounted the serious effects of the proposed action on Mexican spotted owls and narrow-headed gartnersnakes, most of which are located in areas long closed to grazing;

b.  USFWS's concurrences rely on the BA's inaccurate and misleading descriptions of the proposed grazing scheme's effects and baseline conditions on the Bar X; and

c.  Neither the concurrences nor the Forest Service's BA explain what has changed since 2008, when the agencies agreed that the Colcord/Turkey and Lost Salt Pastures should remain closed to protect Mexican spotted owl PACs.

134.  Under 5 U.S.C. § 706(2)(A), the court must set aside USFWS' concurrences for Mexican spotted owl and narrow-headed gartersnake and their critical habitats, as well as the Final Decision Notice/FONSI, 2019 AMP, and 2019 Grazing Permit that relied on those concurrences.

**PRAYER FOR RELIEF**

A.  Adjudge and declare that the Forest Service's Final EA, Final Decision Notice/FONSI, 2019 AMP, and 2019 Grazing Permit violate NEPA, NFMA, and their implementing regulations, and thus are arbitrary, capricious, an abuse of discretion, and/or not in accordance with law under the judicial review standards of the APA, 5 U.S.C. § 706(2);

B.  Adjudge and declare that USFWS' concurrences concerning the Mexican spotted owl and narrow-headed gartersnake, as well as those species' critical habitats, violate the ESA, and thus are arbitrary, capricious, an abuse of discretion, and/or not in accordance with law under the judicial review standards of the APA, 5 U.S.C. § 706(2);

C.  Vacate and set aside the Final EA, Final Decision Notice/FONSI, 2019

1  AMP, 2019 Grazing Permit, and USFWS concurrences;

2      D.    Order the Forest Service to comply with the requirements of NFMA,

3  NEPA, and their implementing regulations before issuing further grazing authorizations

4  for the Bar X;

5      E.    Order the Forest Service and USFWS to reinitiate consultation over the

6  effects of the new grazing scheme on the Mexican spotted owl and narrow-headed

7  gartersnake, as well as those species' critical habitats;

8      F.    Order such other declaratory relief and temporary, preliminary, or

9  permanent injunctive relief as may be prayed for hereafter by Plaintiff to remedy

10  Defendant's violations of law;

11     G.    Award Plaintiff its reasonable attorney fees, costs, and litigation expenses

12  under the Equal Access to Justice Act and/or any other applicable provision of law; and

13     H.    Grant such further and additional relief as the Court deems just and proper

14  in order to remedy the violations of law alleged herein and to protect the interests of

15  Plaintiff, the public, and the lands at issue.

16

17

18

19

20     Dated:  February 12, 2020        Respectfully submitted,

21                                      /s/ Richard A. Dillenburg
22                                      Richard A. Dillenburg, Esq.
                                        Arizona Bar # 013813
23                                      **RICHARD A. DILLENBURG, P.C.**
24                                      2173 E. Warner Rd., Ste. 101
                                        Tempe, AZ 85284-3503
25                                      (480) 668-1924
26                                      rich@dillenburglaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

/s/ Lauren M. Rule
Lauren M. Rule
Oregon Bar # 015174
Andrew R. Missel
Oregon Bar # 181793
**ADVOCATES FOR THE WEST**
3701 SE Milwaukie Ave., Ste. B
Portland, OR 97202
(503) 914-6388
lrule@advocateswest.org
amissel@advocateswest.org

*Attorneys for Plaintiff*