PAUL E. SALAMANCA
Deputy Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

EMMA L. HAMILTON
(CA Bar No. 325360)
Trial Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 305-0479
Fax: (202) 305-0506
emma.hamilton@usdoj.gov

ANDREW A. SMITH
(NM Bar No. 8341)
Senior Trial Attorney
Natural Resources Section
c/o United States Attorney's Office
201 Third Street, N.W., Suite 900
P.O. Box 607
Albuquerque, NM 87103
Phone: (505) 224 1468
andrew.smith@usdoj.gov

*Attorneys for Federal Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Neighbors of the Mogollon Rim, Inc., | No. CV-20-00328-PHX-DLR |
| Plaintiff, | |
| vs. | **FEDERAL DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| United States Forest Service and United States Fish and Wildlife Service, | |
| Federal Defendants. | |

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

I.      Plaintiff Cannot Undermine the Comprehensive Analysis in the EA by Focusing
        Narrowly on Capacity Estimates and Historic AOIs. ........................................ 3

                A.      The Capacity Calculation Worksheet Is Merely an Estimate. .................. 3

                B.      The AUM Range is Limited by Conditions and Use Thresholds. ............ 6

                C.      Baseline Conditions Include More Than Past Grazing Levels. ................ 7

                D.      Harmless Errors Do Not Undermine the Analysis or Decision. ............... 9

        II.     The Forest Service Considered Potential Effects on the Estates to the Extent
                Required by NEPA. .................................................................................... 13

        III.    The Authorization Allows the Forest Service to More Effectively
                Implement Adaptive Management that Ensures Compliance with the ESA
                and NFMA. .............................................................................................. 18

        IV.     The Alternatives Analysis in the EA Satisfies NEPA's Requirements. ............... 21

        V.      The Forest Service Rationally Determined that an EIS Was Not Required. ........ 24

CONCLUSION ..................................................................................................... 25

i

1

## <u>TABLE OF AUTHORITIES</u>

2

3 **Cases**

4 *Ala. Power Co. v. FCC,*
773 F.2d 362 (D.C. Cir. 1985) .............................................................. 13

5
*Am. Rivers v. FERC,*
6 201 F.3d 1186 (9th Cir. 1999) .............................................................. 8

7 *Animals v. U.S. Dep't of Interior,*
751 F.3d 1054 (9th Cir. 2014) .............................................................. 25

8 *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council,*
9 462 U.S. 87 (1983).............................................................................. 3

10 *Bicycle Trails Council v. Babbit,*
82 F.3d 1445 (9th Cir. 1996) .............................................................. 18

11 *Blue Mountains Biodiversity Project v. Blackwood,*
12 161 F.3d 1208 (9th Cir. 1998) .............................................................. 24

13 *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,*
419 U.S. 281 (1974)............................................................................. 9

14 *Carmel-by-the-Sea v. U.S. Dep't of Transp.,*
15 123 F.3d 1142 (9th Cir. 1997) ............................................... 8, 17, 22, 23

16 *Consol. Delta Smelt Cases,*
717 F. Supp. 2d 1021 (E.D. Cal. 2010) ................................................ 21

17 *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,*
18 No. 09–CV–8011–PCT–PGR, 2011 WL 4551175 (D. Ariz. Sept. 30, 2011)........................ 17

19 *Ctr. for Biological Diversity v. Zinke,*
900 F.3d 1053 (9th Cir. 2018) .............................................................. 10

20 *Friends of Mt. Hood v. U.S. Forest Serv.,*
21 No. CV 97–1787 KI, 2000 WL 1844731 (D .Or. Dec. 15, 2000) ................ 8

22 *Greater Hells Canyon Council v. Stein,*
No. 2:18-cv-00054-SU, 2019 WL 2070418 (D. Or. March 22, 2019) ........ 8

23 *Greenpeace, Inc. v. Cole,*
24 445 F. App'x 925 (9th Cir. 2011) ......................................................... 12

25 *Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy,*
383 F.3d 1082 (9th Cir. 2004) .............................................................. 14

26

ii

*Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci,*
    857 F.2d 505 (9th Cir. 1988) .................................................................. 23

*Idaho Cmty. Action Network v. U.S. Dep't of Transp.,*
    545 F.3d 1147 (9th Cir. 2008) ................................................................ 23

*Lands Council v. McNair,*
    537 F.3d 981 (9th Cir. 2008) .................................................................... 9

*Metro. Edison Co. v. People Against Nuclear Energy,*
    460 U.S. 766 (1983) ............................................................... 14, 15, 17

*Nat'l Labor Relations Bd. v. Bell Aerospace Co.,*
    416 U.S. 267 (1974) .............................................................................. 18

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
    422 F.3d 782 (9th Cir. 2005) .................................................................. 21

*Native Ecosystems Council v. Marten,*
    883 F.3d 783 (9th Cir. 2018) .................................................................. 10

*Native Ecosystems Council v. U.S. Forest Serv.,*
    428 F.3d 1233 (9th Cir. 2005) ..................................................... 22, 23, 24

*Native Village of Chickaloon v. Nat. Marine Fisheries Serv.,*
    947 F. Supp. 2d 1031 (D. Alaska 2013) ................................................ 12

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.,*
    137 F.3d 1372 (9th Cir. 1998) ................................................................ 14

*Northcoast Envt'l Ctr. v. Glickman,*
    136 F.3d 660 (9th Cir. 1998) .................................................................. 17

*Perez v. Mortg. Bankers Ass'n,*
    135 S. Ct. 1199 (2015)........................................................................... 18

*Resolute Forest Prods., Inc. v. U.S. Dep't of Agric.,*
    187 F.Supp.3d 100 (D.D.C. 2016) ......................................................... 13

*Rivers v. U.S Bureau of Land Mgmt.,*
    No. 6:16-cv-01598-JR, 2018 WL 6735090 n.12 (D. Or. Oct. 12, 2018)................. 18

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989)............................................................................... 23

*Salt River Project Agric. Imp. & Power Dist. v. United States,*
    762 F.2d 1053 (D.C. Cir. 1985) ............................................................. 12

*Tri-Valley CAREs v. U.S. Dep't of Energy,*
    671 F.3d 1113 (9th Cir. 2012) .......................................................... 19, 20

iii

*Trout Unlimited v. Morton*,
   509 F.2d 1276 (9th Cir. 1974) ........................................................... 17

*United States v. New Mexico*,
   438 U.S. 696 (1978)........................................................................... 13

*United States v. Pa. Indus. Chem. Corp.*,
   411 U.S. 655 (1973)........................................................................... 18

*Vill. of Kake v. U.S. Dep't of Agric.*,
   795 F.3d 956 (9th Cir. 2015) ............................................................. 10

*W. Watersheds Project v. Abbey*,
   719 F.3d 1035 (9th Cir. 2013) ........................................................... 22

*W. Watersheds Project v. U.S. Dep't of Interior*, No.1:15-cv-00047-REB,
   2016 WL 5745094 (D. Idaho Sept. 30, 2016) ................................... 16

*Westlands Water Dist. v. U.S. Dep't of Interior*,
   376 F.3d 853 (9th Cir. 2004) ............................................................. 22

*Wetlands Action Network v. U.S. Army Corps of Eng'rs*,
   222 F.3d 1105 (9th Cir. 2000) ........................................................... 24

*Wild Rockies v. Brazell*, 3:12-cv- 466-MHW,
   2013 WL 6200199 (D. Idaho Nov. 27, 2013)................................. 9, 12

*WildEarth Guardians v. Bernhardt*,
   No. 16-1724 (RC), 2020 WL 6701317 (D.D.C. Nov. 13, 2020) ........... 13

*WildEarth Guardians v. Provencio*,
   923 F.3d 655 (9th Cir. 2019) ............................................................. 24

*Wilderness Soc'y v. U.S. Forest Serv.*,
   630 F.3d 1173 (9th Cir. 2011) ........................................................... 25

*Winter v. Nat. Res. Def. Council*,
   555 U.S.  (2002) .................................................................................. 9

**Statutes**

Ariz. Rev. Stat. Ann. § 3-1427 ............................................................. 17

Ariz. Rev. Stat. Tit. 3, Ch. 11 ............................................................... 17

**Regulations**

40 C.F.R. § 1502.14(a)......................................................................... 24

40 C.F.R. § 1502.14(d) ........................................................................ 22

40 C.F.R. § 1508.27(b) .................................................................. 24, 25

iv

40 C.F.R. § 1508.27(b)(4)................................................................25

40 C.F.R. § 1508.9................................................................23

40 C.F.R. § 1508.9(b)................................................................24

**INTRODUCTION**

The Forest Service's decision to authorize increased livestock grazing on active grazing allotments on the Tonto National Forest furthers the agency's multiple-use mandate and implements the governing Forest Plan's direction for managing range resources on public lands.  The decision authorizes a new range of maximum stocking levels on an expanded geographic area encompassing the Bar X Allotments and Heber-Reno Sheep Driveway.  But, importantly, the authorization includes much more than a numerical range of allowable grazing levels.  It is also conditioned on and limited by the resource conditions in the Allotments prior to each grazing season.  The level of grazing authorized annually on the Allotments through Annual Operation Instructions ("AOIs") must maintain specific resource conditions and cannot exceed use thresholds.  For example, if cattle graze more than forty percent of plant species biomass in riparian areas or reduce the stubble height of certain plant species below six inches, the authorization requires the Forest Service to make management changes like reducing the number of livestock or requiring pasture rotations and range improvements.  *See* FS006409-10.  As such, the terms and conditions in the authorization are important limiting factors that will ensure livestock grazing in the action area remains consistent with the Tonto Forest Plan and maintains or improves the condition of environmental resources.

Plaintiff has not challenged the use thresholds or other limiting conditions in the authorization.  Instead, Plaintiff takes issue with the flexible AUM range and selectively attacks several summary documents, calculations, and estimates underlying the Forest Service's National Environmental Policy Act ("NEPA") analysis, in an attempt to portray the entire decision as arbitrary and capricious.  But, as the Environmental Assessment ("EA") and other supporting documents in the Administrative Record demonstrate, the Forest Service relied on much more than a single capacity calculation or average of past

stocking levels to develop, analyze, and approve the authorization.  Plaintiff believes the agency should have deconstructed and averaged historic stocking data differently, but the Forest Service's chosen methodology and interpretation of its own capacity data are entitled to substantial deference in judicial review of agency action under the Administrative Procedure Act ("APA").  Moreover, the EA and final authorization were predominantly informed by the in-depth monitoring data describing current conditions in the action area—not the estimated stocking calculations Plaintiff continues to flyspeck.

Plaintiff's response brief repeats its meritless claim that NEPA required the Forest Service to analyze potential effects of grazing on neighboring private landowners, even though Arizona law places the burden of mitigating any such effects squarely on the landowner.  As the Forest Service made clear in response to Plaintiff's comments throughout the NEPA process, Arizona is an "open range" state where private property owners that seek to avoid livestock intrusions are responsible for fencing their land.  The Forest Service's multiple-use mandate requires that it consider and balance various uses on National Forest System lands that are sometimes in tension, and the EA acknowledges several potential impacts that may stem from increased human-cattle interactions on the Tonto National Forest.  NEPA does not require, however, that the Forest Service analyze the preferences and concerns of neighboring landowners who are statutorily responsible for fencing their private land to mitigate unwanted contact with cattle.

Plaintiff's remaining arguments are rooted in its subjective concern that the adaptive management approach and conservation measures detailed in the EA and Biological Assessment ("BA") will not be effective.  But the Forest Service and Fish & Wildlife Service ("FWS") analyzed the best available science and rationally concluded that these measures will ensure authorized grazing levels are consistent with the direction in the Tonto Forest Plan (and thus the National Forest Management Act ("NFMA")), as

well as the Endangered Species Act ("ESA").  Plaintiff's disagreement with the selected

approach does not render the agencies' determinations arbitrary or capricious.  Plaintiff

has failed to meet its high burden to overturn agency action, particularly in light of the

deferential standard courts must apply when reviewing agency action under the APA.

The Administrative Record demonstrates that Federal Defendants "considered the

relevant factors and articulated a rational connection between the facts found and the

choice made."  *See Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 105

(1983).  The Court should grant Federal Defendants' Motion for Summary Judgment and

uphold the Bar X and Driveway Grazing Authorization.

## I.   Plaintiff Cannot Undermine the Comprehensive Analysis in the EA by Focusing Narrowly on AUM Capacity Estimates and Historic AOIs.

In challenging the sufficiency of the EA, Plaintiff's core argument is that the

Forest Service made "serious numerical errors that undermine its analysis and effects

conclusions."  Pl.'s Reply in Supp. of Mot. for Summ. J. & Resp. to Fed. Defs.' Mot.

("Pl.'s Resp. Br.") 8, ECF No. 39.  These alleged "serious errors" include a single

incorrect average reported in the EA, differences between the agency's initial AUM[1]

calculation in the capacity analysis and the range of stocking levels in the final

authorization, and Plaintiff's dissatisfaction with how the Forest Service averaged and

described historic stocking levels on the Bar X.  *Id.* at 8-10.  These arguments fail

because Plaintiff overlooks three key points and overstates the import of minor errors.

### A.  The Capacity Calculation Worksheet Is Merely an Estimate.

First, the capacity calculation worksheet that Plaintiff critiques, FS004382-87,

represents an *estimate* and is but one of many factors the agency considered in analyzing

---

[1] An AUM or "animal-unit-month" is "[t]he amount of forage needed by an 'animal unit' . . . grazing for one month."  FS006404.  In the EA, the Forest Service defines one animal unit as "one mature 1,000-pound cow and her suckling calf."  The agency has also used a conversion factor of 1.32 for converting numbers of animals to AUMs.  FS004329.

the grazing capacity of the action area.  The Region 3 Forest Service Handbook explains the role of initial and ongoing capacity analyses in the grazing administration context, *see* Forest Service Handbook ("FSH") Region 3 2209.13, ch. 90, § 92.14a (2016), and is referenced throughout the EA.  *See, e.g.*, FS006374; FS006404; FS006423.  The Handbook emphasizes that carrying capacity should be analyzed as a range rather than a single average, and that "carrying capacity is highly dependent on many factors that vary seasonally, annually, or over decades.  Thus, estimates of carrying capacity are *general approximations that must be tempered with other information, experience and judgment* (Smith et al. 2007)."  FSH 2209.13, ch. 90 § 92.14a (emphasis added).

The Forest Service followed this approach in conducting its initial capacity analysis for the Bar X and Driveway, which it then used as one tool in developing the stocking range in the proposed action.  *See* FS004382 ("[c]apacity calculation is based on Tonto National Forest production utilization monitoring and GIS coverage data and *is not exact but will provide an estimated figure for management purposes*.") (emphasis added).  Accordingly, the Forest Service's selection of 9,250 AUMs as the high end of its flexible stocking range represents the agency's estimate of levels that the newly expanded action area could *potentially* sustain while complying with use thresholds and other limiting conditions.  The maximum stocking range reflects more than a single mathematical calculation transcribed from the capacity worksheet into the EA[2]—it is an estimate

---

[2] The Court should reject Plaintiff's attempt to fabricate speculative calculations that are not reflected in the Administrative Record.  *See* Resp. Br. at 8 n.6.  Moreover, Plaintiff fails to note that the EA lists proposed numbers of cattle in addition to maximum AUMs, *see* FS006405 (proposing a maximum of 239 adult cattle for the Bar X and 313 adult cattle for associated Driveway pastures), and that these numbers are quite similar to those estimated in the capacity analysis, *see* FS004382-84 (listing an estimated capacity of 259 animals for the Bar X and 331 animals for the four associated Driveway pastures), and similar to the final numbers authorized in the 2019 Term Grazing Permit, *see* FS006549 (authorizing 552 total cow/calf pairs on the Bar X and associated Driveway pastures).

derived from the multi-factor analysis described throughout the EA, which tempers the initial capacity estimate with other monitoring data, best available science, and agency expertise.  *See, e.g.*, FS006376 ("This EA is based upon background information about the allotment and Driveway including current and past inventory and monitoring data and desired conditions of resources . . . derived from direction and guidelines in the Forest Plan and from resource specialists' knowledge of the project area."); FS006431 ("Monitoring has demonstrated that current management has resulted in improvements to vegetative condition in the allotment."); *id.* ("The flexibility of maintaining herds of varying sizes allows appropriate stocking levels to be applied in proper vegetation units at optimum seasons of the year without compromising the overall level of AUMs.").

Plaintiff conflates the estimated AUM figures the Forest Service reached in its initial capacity analysis with the authorization decision itself.  In Plaintiff's framing, a precise numerical capacity calculation should form the basis of the entire analysis and exactly match the number of cattle and AUMs ultimately authorized to graze the Bar X and Driveway.  But this is not the role of a capacity analysis, particularly where, as here, the Forest Service is implementing an adaptive management or "stock-and-monitor" approach to annual authorizations.  On the contrary, "[t]rue grazing capacity can be determined only by stocking with an estimated number of animals and watching the range trend."  FSH 2209.13, ch. 90 § 92.14a (quotation omitted).  The Forest Service will do just that on the Bar X and Driveway through annual reassessment of monitoring data, resource trends, and current stocking levels in line with the terms and conditions included in the authorization.  FS006418-19.  Thus, Plaintiff's claim that the Forest Service "misinterpreted its own grazing capacity analysis or simply failed to accurately transcribe the results of that analysis," Pl.'s Resp. Br. 8, reveals a misunderstanding and oversimplification of the role capacity analyses play in grazing authorizations.

**B.  The AUM Range is Limited by Conditions and Use Thresholds.**

Second, the AUM range authorized for the action area is not a blanket authorization for grazing up to the maximum limit—rather, it sets outer boundaries that frame an annual process of collecting and analyzing monitoring data and issuing AOIs that reflect the true grazing capacity various pastures can sustain for the upcoming season.  "Proposed yearly maximum authorized use would vary between 4,002 - 9,250 Animal Unit months [] adult cattle year-long[,]" and "[a]ctual authorized numbers would vary annually based on current resource conditions."  FS006404.  "All pastures would be available for grazing *within the limits of forage availability* and appropriate season of use *based on current resource conditions*."  FS006409 (emphasis added).  These limiting conditions are also reflected in the final Decision and Finding of No Significant Impact ("FONSI").  FS006522 ("Grazing will be managed to achieve long-term goals in pasture key areas and ensure allowable vegetation use thresholds are not exceeded.").

By framing the decision as merely the selection of this 4,002-9,250 AUM range, Plaintiff obscures the fact that the authorization decision also implements allowable use thresholds that represent a more meaningful upper limit on grazing levels than the AUM range.  The "Allowable Vegetation Use Threshold" table in the EA and FONSI lay out the maximum allowable utilization of different range resources in the project area.  *See* FS006410; FS006522.  Thus, the permittee is not authorized to graze 9,250 AUMs each year if doing so would reduce upland browse more than 50% of the current year's growth, utilize more than 30-40% of upland herbaceous growth, or exceed any of the other explicit limits set forth in the authorization.  FS006522; *see also* FS006382 (table listing specific desired conditions derived from the Forest Plan and situations in which departure from a desired condition would require management changes).  "If monitoring indicates that desired resource conditions are not being achieved in the desired time

1  frame or in areas of this allotment, there are tools, or administrative actions that would be

2  used to modify livestock management[,]" including "[d]ecreas[ing] or increas[ing] herd

3  size within the limits of the permitted numbers[.]"  FS006419-20.[3]

4      Accordingly, the Forest Service's decision to authorize a broad AUM range at the

5  overarching permit level does not mean that the high end of that range will automatically

6  be authorized each year, nor even guarantee that the action area will ever be able to

7  sustain that level of grazing.  Any proposed stocking level, from 4,002 to 9,250 AUMs,

8  will only be authorized for a particular season after the Forest Service has considered

9  "monitoring data, in combination with other factors such as weather patterns, likelihood

10  of plant regrowth, and previous years' utilization levels[,]" and determined that

11  conditions on the ground allow for that level of grazing without exceeding use thresholds

12  or violating other terms in the authorization.  *Id.* at FS006418-19; FS006404.  "Necessary

13  annual adjustments to grazing management . . . would be implemented through the AOI,

14  which would adjust use to be consistent with current vegetation productivity and resource

15  conditions.  The AOI may change season of use and pasture rest periods and may also

16  include mitigation measures to avoid or minimize effects to wildlife, soil, and water

17  quality."  FS006419.  Regardless of the maximum authorized stocking levels, the EA and

18  FONSI include adaptive management mechanisms to prevent overgrazing.

19      **C.  Baseline Conditions Include More Than Past Grazing Levels**.

20      Third, the current conditions of range resources such as soil, vegetation, and

21  watershed health represent the baseline conditions at the core of the Forest Service's

22  analysis.  Much of this baseline data was collected over more than a decade through the

23  "Reading the Range" protocol, "which involve[s] gathering data on herbaceous and half

24

25  [3] Notably, Plaintiff does not directly challenge these conditions and limits, which are
described in the EA and are consistent with the Tonto Forest Plan.

26

FEDERAL DEFS.' REPLY IN SUPP. OF MOTION FOR SUMM. J.                7

1    shrub vegetative cover, utilization monitoring, forage production, frequency, browse

2    monitoring, onsite precipitation data, and characterization of soils." FS006378. The

3    Forest Service synthesized, analyzed, and documented relevant Reading the Range and

4    other monitoring data in the "existing conditions" sections of the EA. FS006376-99.

5         The Forest Service also referenced past stocking levels in the EA,[4] and considered

6    average authorization levels for the Bar X by reviewing historic AOIs and a summary

7    table of those past authorizations. FS000001Sup-52Sup; FS001676. The Forest Service

8    did not, however, dissect each historic Bar X AOI to determine how many of that

9    season's authorized cattle may have utilized adjacent Driveway pastures instead of the

10   Bar X pastures they were formally authorized to graze. But the fact that the Forest

11   Service generally reviewed and referenced past stocking levels in its EA, without

12   adopting Plaintiff's preferred approach of dissecting and recalculating the AOI

13   authorizations by allotment, does not mean that the agency actually ignored information

14   it should have considered. *See Greater Hells Canyon Council v. Stein*, No. 2:18-cv-

15   00054-SU, 2019 WL 2070418, at *19 (D. Or. March 22, 2019) ("the procedural step of

16   assessing the quality or quantity of baseline data is 'not an independent legal requirement,

17   but rather, a practical requirement in environmental analysis often employed to identify

18   the environmental consequences of a proposed agency action.'" (quoting *Am. Rivers v.

19   FERC*, 201 F.3d 1186, 1195, n.15 (9th Cir. 1999)). "[D]isagreements with the

20   methodologies employed by [] USFS scientists in measuring certain things . . . [are] not a

21   reason to invalidate a[] [NEPA analysis]." *Friends of Mt. Hood v. U.S. Forest Serv.*, No.

22   CV 97–1787 KI, 2000 WL 1844731, at *14 (D .Or. Dec. 15, 2000) (quoting *Carmel-by-*

23

24   [4] Federal Defendants admit that the reference in the EA to 3,707 AUMs as the average of
     past grazing authorizations on the Bar X over the last twelve years is incorrect. *See* Fed.
25   Defs.' SOF ¶ 31; Fed. Defs.' Mot. & Mem. in Supp. for Summ. J. & in Opp'n to Pl.'s
     Mot. ("Fed. Defs.' Br.") 21, ECF No. 36.
26

FEDERAL DEFS.' REPLY IN SUPP. OF MOTION FOR SUMM. J.                    8

1    *the-Sea v. U.S. Dep't of Transp.,* 123 F.3d 1142, 1151 (9th Cir. 1997)); *All. for the Wild*

2    *Rockies v. Brazell*, 3:12-cv- 466-MHW, 2013 WL 6200199, at *27 (D. Idaho Nov. 27,

3    2013) (plaintiff must show the agency actually ignored existing data in order to establish

4    a NEPA violation based on inadequate baseline conditions).  Indeed, courts must

5    "conduct a particularly deferential review of an agency's predictive judgments about

6    areas that are within the agency's field of discretion and expertise."  *Lands Council v.*

7    *McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (en banc) (quotations and citations omitted),

8    *overruled on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 726 (2002).

9        Average historic stocking levels are useful data points for contextualizing current

10   range conditions, but they are not in themselves "baseline conditions" that bear directly

11   on the authorization decision.  Indeed, the "*results* of past management" are primarily

12   evaluated in the baseline conditions portion of the Forest Service's analysis.  FS006373.

13   **D.  Harmless Errors Do Not Undermine the Analysis or Decision**.

14       While Plaintiff alleges the existence of "serious errors" in the Forest Service's

15   analysis, it has only identified a single incorrect average reported in the EA, and

16   otherwise merely highlights that the Parties disagree on what weight the Forest Service

17   should have given its initial capacity calculation and how the agency should calculate and

18   document historic stocking data.  At most, Plaintiff has identified harmless errors and

19   less-than-ideal methodological choices.  In reviewing agency action under the APA,

20   courts "will uphold a decision of less than ideal clarity if the agency's path may

21   reasonably be discerned."  *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S.

22   281, 285-86 (1974) (citation omitted).  Here, this single mathematical error and other

23   alleged inconsistencies, even if credited, did not affect the agency's ultimate decision and

24   do not undermine the rational basis for that decision set forth in the EA.

25       Whether an error in an underlying environmental analysis renders a subsequent

26

1   agency decision arbitrary and capricious requires a fact-specific inquiry into the decision.

2   *See Native Ecosystems Council v. Marten*, 883 F.3d 783, 796 (9th Cir. 2018)

3   (acknowledging a calculation error in a survey underlying the agency's analysis but

4   holding that "it does not appear, however, that the mistake was a significant factor in the

5   Forest Service's approval of [the challenged action,]" and "[f]urther, it does not appear

6   that this mistake prevented the public from making an informed decision about the likely

7   effects of" the action.).  An agency's error is not necessarily "inconsistent with its having

8   taken a 'hard look' at the project."  *Id.*; *see also* Ctr. for Biological Diversity v. Zinke,

9   900 F.3d 1053, 1069 (9th Cir. 2018) (noting that "[a]ny error in the 2014 Finding

10  regarding the Madison River and its tributaries was harmless, as FWS expressly did not

11  rely upon the survival of arctic grayling in the Madison River Valley in deciding that

12  listing the arctic grayling was not warranted."); *see also id.* at 1072 ("the burden is on

13  'the opponent of the action to demonstrate [that] an error is prejudicial'" (quoting

14  *Organized. Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 969 (9th Cir. 2015)).

15          Here, any alleged "simple errors of arithmetic, unit conversion, and/or

16  transcription," *see* Pl.'s Resp. Br. 6, were not significant and did not deprive the public of

17  the opportunity to analyze the proposed action using the extensive baseline condition data

18  documented in the EA.  Plaintiff levels broad accusations that the Forest Service has

19  misled the public and authorized unsustainably high levels of grazing in the action area,

20  but has failed to show that the alleged errors it complains of were actually prejudicial.[5]

21  As Federal Defendants have explained, the statement in the EA that 3,707 AUMs was the

22  average authorized grazing level for the Bar X over the last twelve years was merely an

23  attempt to provide a general overview of past management practices, it was not presented

24  _____

25  [5] In fact, Plaintiff possessed the very information it now challenges during the NEPA
    process, and did not raise the issues it now calls "major" in its administrative objection,

26  beyond referring to the capacity analysis worksheet as "skimpy."  FS003293.

FEDERAL DEFS.' REPLY IN SUPP. OF MOTION FOR SUMM. J.                    10

as a concrete baseline upon which the entire decision was based.  Fed. Defs.' Mot. & Mem. in Supp. for Summ. J. & in Opp'n to Pl.'s Mot. ("Fed. Defs.' Br.") 21, ECF No. 36.  Further, the fact that the authorization increases grazing from past levels was in no way hidden from the public or decisionmakers.  The maximum authorization figure is clearly higher than levels that have been authorized in the past.  The EA discloses this, but also explains in great detail the current conditions, adaptive management techniques, and new flexibility to stock cattle across a broader geographic area that support choosing a higher authorization range under which desired conditions will be maintained (or, in some cases, managed for improvement).[6]  *See* FS006408; FS006419-21.

Importantly, even if the Forest Service's methodology in recording historic AUMs and calculating initial capacity data *did* lead to overstatements of past grazing levels or an overly-high maximum authorization, any such errors would be corrected for by the use thresholds and other limiting conditions contained in the authorization.  This

---

[6] Contrary to Plaintiff's attempt to fabricate additional "misleading statements," *see* Pl.'s Resp. Br. 12 n.9, the Forest Service accurately stated in the EA that it authorized grazing in the Colcord/Turkey Pasture in both 2015 and 2018 in order to gather data.  *See* FS006373; Fed. Defs.' SOF ¶ 32-34.  Federal Defendants have explained that, following Plaintiff's previous lawsuit, the 2018 authorization was amended to *not allow* grazing in the Colcord/Turkey Pasture pending additional NEPA analysis.  *See* Fed. Defs.' SOF ¶¶ 32-34; SOF Resp. ¶ 54.  This does not contradict the fact that the agency initially authorized grazing in the Colcord/Turkey Pasture in 2018 in order to collect data.  Federal Defendants have also addressed Plaintiff's assertion that no utilization data was collected in 2015.  *See* SOF Resp. ¶ 53 (admitting that no *utilization* data was collected that year, but clarifying that the Colcord/Turkey Pasture was monitored and that other data was collected following the 2015 grazing season).  As described above and in Federal Defendants' opening brief, utilization data is not the only relevant monitoring data used to analyze baseline conditions.  *See* SOF Resp. ¶ 53, Fed. Defs.' Br. 35.  Within the voluminous data that Federal Defendants provided to Plaintiff as part of the Administrative Record, *see* Fed. Defs.' Notice of Lodging Admin. R. Supplement 2, ECF No. 32, there are numerous examples of monitoring data collected in 2015 for the Colcord/Turkey Pasture.  *See, e.g.*, Exs. A, B.

FEDERAL DEFS.' REPLY IN SUPP. OF MOTION FOR SUMM. J.                    11

distinguishes the current action from the cases Plaintiff cites in support of its argument that mathematical errors undermine the EA.  For example, in *Greenpeace, Inc. v. Cole*, 445 F. App'x 925, 927 (9th Cir. 2011) (unpublished), the Forest Service calculated a carrying capacity for deer to determine how much timber could be harvested in the project areas while still maintaining viable populations of deer.  *Id.* at *1.  In that case, unlike here, the logging decisions that were premised on deer carrying capacity included no mechanism for offsetting the effects of an overly-high initial calculation—based on the agency's erroneous calculations, trees would be cut down.  *Id.* at *1-2.

Plaintiff also cites several cases that affirm the proposition that alleged errors must have actually affected the ultimate decision in order to justify overturning an agency action.  *See, e.g.*, *Native Village of Chickaloon v. Nat. Marine Fisheries Serv.*, 947 F. Supp. 2d 1031, 1056-57 n.182 (D. Alaska 2013) ("Even where an agency's decision rests on erroneous findings, the court must reverse 'only when there is a significant chance that but for the errors the agency might have reached a different result.'" (quoting *Salt River Project Agric. Imp. & Power Dist. v. United States,* 762 F.2d 1053, 1060 (D.C. Cir. 1985))).  In *Chickaloon*, the district court determined that the defendant agency's calculation of estimated take of beluga whales was "clearly erroneous[,]" and that the agency "ha[d] not persuasively demonstrated, nor ha[d] it asserted, that it would have authorized the [action] with a take estimate that would have been significantly higher had corrected density estimates been used.  As such, the agency's incidental take calculations [were] arbitrary and capricious."  *Id.* at 1057.  Here, any errors or lack of clarity in the Forest Service's capacity analysis and AOI summary did not affect the agency's ultimate authorization, which was based predominantly on an analysis of current and past *resource* data combined with specialist expertise.[7]

---

[7] The other non-binding cases Plaintiff cites are also distinguishable on the facts.  *See,*

1       In sum, Federal Defendants certainly do not ask the Court to "forego a careful and

2 searching review of the record," Pl.'s Resp. Br. 1, but rather highlight that Plaintiff

3 selectively focuses its challenges on only a few factors and elements of the record while

4 effectively ignoring the broad range of factors and monitoring data underlying the Forest

5 Service's comprehensive analysis.  Considered as a whole, the EA supports the Forest

6 Service's grazing authorization and reveals a rational connection between the facts

7 analyzed and the decision made.

## II.    The Forest Service Considered Potential Effects on the Estates to the Extent Required by NEPA.

       Plaintiff's members own private property in the Colcord and Ponderosa Estates

subdivision that abuts National Forest System lands—public lands that were "established

for economic reasons[,]" *United States v. New Mexico*, 438 U.S. 696, 708 (1978), and are

subject to congressional mandates to be managed for multiple uses.  The fact that people

visiting or recreating on the Tonto National Forest may see, smell, or otherwise encounter

cattle is well-understood and is not generally considered a threat to public safety or

human health.  *See* FS006403.  Further, Arizona is an "open range state," meaning

federal permitting agencies and ranchers are not responsible for keeping cattle off private

---

*e.g. WildEarth Guardians v. Bernhardt*, No. 16-1724 (RC), 2020 WL 6701317, at *13 (D.D.C. Nov. 13, 2020) (explaining that the computation errors in BLM's environmental analysis would usually be "flyspecks" unlikely to render the entire NEPA analysis inadequate, but "the number of errors suggest[ed] a sloppy and rushed process," so BLM was directed to fix the errors on remand because, unlike in this case, the Court had already determined that the decision should be remanded for further consideration of cumulative impacts); *Ala. Power Co. v. FCC,* 773 F.2d 362, 372 (D.C. Cir. 1985) (holding that a mathematical error undermined the agency's analysis when the crux of that agency action was the calculation of a cable rate, unlike the authorization here that involves much more than a single stocking rate); *Resolute Forest Prods., Inc. v. U.S. Dep't of Agric.*, 187 F.Supp.3d 100, 122–23 (D.D.C. 2016) (numerous errors and inconsistencies undermined an agency action that revolved around the correct calculation of a single de minimis timber harvest figure).

1   land—landowners are.  The Colcord/Turkey Pasture that borders the Estates has been

2   designated as a grazing allotment for decades, even if it has not been regularly grazed for

3   many years.  Throughout the NEPA process, the Forest Service listened to and

4   considered Plaintiff's preference for continued non-grazing in the Colcord/Turkey

5   Pasture and responded to all Plaintiff's objections.  FS004319-81; FS006351; FS004339-

6   54.  This fulfilled the agency's NEPA obligations; the Forest Service is not required to

7   undertake a full analysis of the potential effects of grazing on nearby private property

8   when such impacts are contingent upon whether landowners erect fences under state law.

9        "NEPA['s] implementing regulations provide that federal agencies must examine

10   the 'reasonably foreseeable' environmental effects of their proposed actions when

11   conducting environmental review."  *Ground Zero Ctr. for Non-Violent Action v. U.S.*

12   *Dep't of Navy*, 383 F.3d 1082, 1089 (9th Cir. 2004) (citing 40 C.F.R. § 1502.16,

13   1508.8(b)).  But, the Ninth Circuit has "rejected the notion that every conceivable

14   environmental impact must be discussed in an EIS[,]" *id.*, and held that an EA need only

15   include a "reasonably thorough discussion of the significant aspects of probable

16   environmental consequences."  *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137

17   F.3d 1372, 1376 (9th Cir. 1998).  As the Supreme Court explained, "[t]o determine

18   whether [NEPA] requires consideration of a particular effect, we must look at the

19   relationship between that effect and the change in the physical environment caused by the

20   major federal action at issue."  *Metro. Edison Co. v. People Against Nuclear Energy*, 460

21   U.S. 766, 773 (1983).  Even some effects caused by a change in the physical environment

22   do not fall under NEPA "because the causal chain is too attenuated."  *Id.* at 774.

23        In the EA, the Forest Service discussed the potential effects of increased human-

24   cattle interactions stemming from increased grazing, and discussed potential mitigation

25   measures within the scope of the action area and the agency's management authority.

26

FEDERAL DEFS.' REPLY IN SUPP. OF MOTION FOR SUMM. J.          14

*See* FS006501 ("[i]ncreased [livestock] numbers could result in more frequent human/cow encounters.  These encounters could result in a positive or negative experience depending on the individual recreational user's attitude towards livestock and their desired recreational experience."); FS006502 ("Presence of livestock grazing within dispersed recreation sites does not preclude or prevent other recreational opportunities. However, due to the increased number of proposed cattle and opening of several currently closed pastures, it would be expected that there would be an increase in recreationalist/cow encounters."); *id.* ("Fencing of popular dispersed recreation corridors or scheduling cows to avoid popular dispersed areas during the busiest recreation months could help mitigate these encounters.").

The Forest Service also discussed Plaintiff's concerns related to interactions with livestock on private property, noting that "[u]nfenced private property exists within the allotment boundaries, causing contention with some homeowners[,]" and that "[a] number of residents in these neighborhoods have voiced concerns and disapproval over the Proposed Action and the possibility that cattle may enter onto their private property, damage their septic systems, or be present on roadways."  FS006403.  The EA then includes a thorough explanation of why such concerns were not analyzed further:

> National Forests are "working" forests managed for multiple uses like wildlife, timber, livestock grazing, mining, water quality, and recreation. When the Forest proposed changes to management, such as this Environmental Assessment, property owners are interested parties [and] are offered opportunities to get involved and participate in project planning and have input in these decisions. National Forest lands cannot be grandfathered in" or exempt from multiple uses by virtue of proximity to private property. The scoping process allows ideas, comments, and concerns to be heard and incorporated into the most appropriate management decision.
>
> While some comments reflected concerns about safety and conflicts between the multiple uses allowed in the project area, the multiple uses

1

2

> have been practiced in the project area and the overall forest for many
> years. Although "same place-same time" encounters between uses are
> understood, they are not considered conflicts or safety issues that require
> consideration in grazing authorization planning analyses.

*Id.*  And, in response to Plaintiff's objection to the draft decision, the Forest Supervisor

reiterated that the decision and EA "disclosed the Forest Service's responsibilities as a

multiple use agency and [are] consistent with federal laws and Arizona Revised Statutes

at Title 3, Chapter 11, Article 8[,]" which "requires residents to enclose their property

with a lawful fence to avoid damage resulting from the trespass of animals."  FS006351.

That Plaintiff repeatedly raised its concerns about alleged effects is not enough to

render the Forest Service's conclusion arbitrary and capricious.  *See, e.g.*, *W. Watersheds

Project v. U.S. Dep't of Interior*, No.1:15-cv-00047-REB, 2016 WL 5745094, at *26 (D.

Idaho Sept. 30, 2016) (holding that the plaintiff's "concern that 'seed dispersal by wind'

can 'spread and alter remaining healthy plant communities' . . . while understandable, is

simply an inchoate concern on this record" and the plaintiff fell short of meeting its

burden to show the NEPA analysis inadequate when it "present[ed] no evidence of this

ever happening . . . near the Allotment's boundary.").  Here, the only evidence Plaintiff

offered throughout the NEPA process to suggest significant health or safety impacts to

residents of the Estates is a 2017 letter from an environmental engineer explaining how to

preserve septic system leach areas by preventing activities that might compact soil,

including (among many other activities), "heavier grazing."  FS003438-39.  Plaintiff did

not present the Forest Service with any scientific studies or other information suggesting

significant health, safety, aesthetic, or recreational impacts from human-cattle

interactions, and the Forest Service's response to Plaintiff's comments was adequate.

NEPA does not require the Forest Service to analyze potential impacts to residents

of the Estates by speculating as to whether or not they will choose to incur the cost of

fencing their property pursuant to state statute, or, if they choose not to, what effects an

FEDERAL DEFS.' REPLY IN SUPP. OF MOTION FOR SUMM. J.                16

increased risk of livestock intrusions might have on their private property.  Declarations

from Plaintiff's members and residents of the Estates illustrate the speculative nature of

these alleged effects on private property.  *See* Olsson Decl., ECF No. 35-1 at 4 ("cattle

will force community members to either construct costly, unattractive fencing or risk

physical harm and damage to their septic systems").  But "[a] *risk* of an accident is not an

effect on the physical environment."  *Metro. Edison Co.*, 460 U.S. at 775.  "A risk is, by

definition, unrealized in the physical world" and "the element of risk lengthens the causal

chain beyond the reach of NEPA."  *Id.*; *see also Northcoast Envt'l Ctr. v. Glickman*, 136

F.3d 660, 668 (9th Cir. 1998) ("NEPA does not require an agency to consider the

environmental effects that speculative or hypothetical projects might have on a proposed

project.") (citation omitted)); *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283-84 (9th

Cir. 1974) ("An EIS need not discuss remote and highly speculative consequences[,]"

even if "the statement could have been improved by a discussion of these issues").

The Arizona Legislature has placed the responsibility for avoiding unwanted cattle

intrusions on private land squarely on landowners.  *See generally* Ariz. Rev. Stat. Tit. 3,

Ch. 11, Art. 8; Ariz. Rev. Stat. Ann. § 3-1427 (1991) ("An owner or occupant of land is

not entitled to recover for damage resulting from the trespass of animals unless the land is

enclosed within a lawful fence . . . .").  As such, neither the potential economic impact of

complying with state law nor the potential impacts of choosing not to fence private

property needed to be thoroughly analyzed in the EA.  *Cf. Carmel-By-The-Sea*, 123 F.3d

at 1162-63 (holding that when future effects of a proposed federal action were contingent

upon state or local laws, "[n]o further analysis is warranted" because "the absence of a

more thorough discussion in an [EIS] of an issue that was sufficiently analyzed in

referenced state materials does not violate [NEPA]"); *Ctr. for Biological Diversity v. U.S.

Bureau of Land Mgmt.*, No. 09–CV–8011–PCT–PGR, 2011 WL 4551175, at *10-12 (D.

Ariz. Sept. 30, 2011) (holding that BLM "did not violate NEPA by failing to discuss the environmental impact of its decision not to address the impacts of hunting with lead ammunition on condors" because, by statute, "the management of hunting on public lands is reserved to the states." (citations omitted)).  The Forest Service's livestock grazing decisions are distinct from the State of Arizona's open range statute, and the potential impacts of that statute on private landowners need not be fully analyzed every time the Forest Service authorizes grazing on National Forest System lands.

At bottom, NEPA does not require a detailed environmental analysis of the fact that some of Plaintiff's members "don't have a fence now and don't want a fence." Doolittle Decl. 4, ECF No. 35-3 at 4.[8]  As the Ninth Circuit has recognized, "NEPA does not require that an agency take into account every conceivable impact of its actions, including impacts on citizens' subjective experiences." *Bicycle Trails Council v. Babbit*, 82 F.3d 1445, 1466 (9th Cir. 1996).  Here, the Forest Service analyzed the potential effects of human-cattle interactions to the extent required by NEPA.

**III.    The Authorization Allows the Forest Service to More Effectively Implement Adaptive Management that Ensures Compliance with the ESA and NFMA**.

Plaintiff charges that the Forest Service's reliance on adaptive management renders the EA inadequate because current adaptive management "has not helped

---

[8] Plaintiff's suggestion that its members have established reliance interests in non-grazing on the Colcord/Turkey Pasture is inapposite.  *See* Pl.'s Resp. Br. 4-5 n.1.  In the context of agency rulemakings, the Supreme Court has "generally limited [the] application [of reliance interests] to policy changes involving criminal or civil liability."  *Rivers v. U.S Bureau of Land Mgmt.*, No. 6:16-cv-01598-JR, 2018 WL 6735090, at *9 n.12 (D. Or. Oct. 12, 2018) (citing *United States v. Pa. Indus. Chem. Corp.*, 411 U.S. 655, 670-75 (1973); *Nat'l Labor Relations Bd. v. Bell Aerospace Co.*, 416 U.S. 267, 295 (1974); *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015)).  Moreover, the idea that individuals who purchased property abutting a National Forest have a reliance interest in public land being managed only for their preferred uses is completely antithetical to congressional mandates that the Forest Service manage National Forest System lands for economic return and multiple uses, expressly including livestock range development.

FEDERAL DEFS.' REPLY IN SUPP. OF MOTION FOR SUMM. J.                    18

environmental resources on the Bar X meet the desired conditions laid out in the Forest Plan" and is not significantly different from the adaptive management approach proposed in the Bar X and Driveway Authorization.  *See* Pl.'s Resp. Br. 13.  Both these arguments fail to demonstrate that Federal Defendants "made a clear error in judgment" in analyzing and approving the decision and its adaptive management approach.  *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1124 (9th Cir. 2012) (citation omitted).

First, Plaintiff alleges repeatedly that adaptive management has "failed" to protect and improve resources on the Bar X and Driveway over the last several decades.  *See, e.g.*, Pl.'s Resp. Br. 13.  But this oft-repeated misstatement is belied by the Administrative Record.  *See* FS006373 ("This management plan has been in place for the last 40 years and during this time conditions have improved.").  Plaintiff has offered no evidence that "the old strategy has led to substandard conditions in grazed areas."  Pl.'s Resp. Br. 24.  To the contrary, in discussing existing conditions in the action area and the general effects of grazing on key resources, the EA cites scientific data to explain that range conditions are influenced by a host of nuanced factors.  For example,

> Shifts in plant community composition are caused by a range of natural disturbances. While grazing can cause shifts in vegetation state, it is not always the leading cause. Often, grazing pressures are removed with the idea that its absence would allow the vegetative community of a specific site to return to historical conditions (Ruyle and Dyess 2010). Historical conditions of the site may not be reached even with the removal of grazing. Altered soil characteristics such as water infiltration rates (Castellano and Valone 2007), seed source deficiencies, and presence of exotic or invasive plant species are additional limitations (Ruyle and Dyess 2010).

FS006424.  Plaintiff does not meaningfully rebut this analysis or the Forest Service's other conclusions regarding current resource conditions in the project area.  *See* FS006376-99.  A blanket assertion that Plaintiff considers current conditions "far from ideal," *see* Pl.'s Resp. Br. 16, does not undermine the Forest Service's reasonable reliance

on the scientific studies and specialist expertise described in the EA.  Nor does it

undermine the agency's subsequent conclusion that its adaptive management approach

will maintain or improve resource conditions in the action area.  *See, e.g.*, FS006427

("With the grazing utilization stipulations, the Proposed Action would maintain or

improve upland vegetation productivity and condition by maintaining utilization levels

that have been authorized leading up to this document."); Fed. Defs.' Statement of Facts

("SOF") ¶¶ 90-94, ECF No. 37.  "An agency will have acted arbitrarily and capriciously

only when 'the record plainly demonstrates that [the agency] made a clear error in

judgment.'"  *Tri-Valley CAREs*, 671 F.3d at 1124.

Second, Plaintiff's argument that the "old" adaptive management program

resembles adaptive management techniques in the Bar X and Driveway Authorization

misses the point—the Forest Service has not purported to implement entirely new

adaptive management techniques, utilization thresholds, or monitoring requirements.

Instead, the action implements a flexible range of authorization levels across a broader

range of pastures (both Bar X and Driveway) that are now formally incorporated into one

management area and considered together in analyzing capacity.  *See* FS006404-08; SOF

¶ 83.  This in turn allows range managers more flexibility to rotate pastures, change herd

sizes, and otherwise adjust management practices to respond to changing conditions and

capacity.  *See* FS006431 ("The flexibility of maintaining herds of varying sizes allows

appropriate stocking levels to be applied in proper vegetation units at optimum seasons of

the year without compromising the overall level of AUMs.").

In support of its ESA claim, Plaintiff's response brief merely reiterates these two

meritless challenges to the adaptive management approach instead of engaging with (or

offering any rebuttal of) Federal Defendants' explanation of how the Forest Service and

FWS complied with Section 7 consultation requirements in analyzing the proposed

action.  *Compare* Fed. Defs.' Br. 31-35 (describing the Forest Service's in-depth analysis of potential effects on Mexican spotted owls and their habitat in the BA, the agency's commitments to employ rotational grazing strategies and other mitigation measures specific to Mexican spotted owls, and FWS's concurrence with the Forest Service's determinations), *with* Pl.'s Resp. Br. 24-25 (dismissing the agencies' reliance on adaptive management and conservative range management practices as "unwarranted").

Plaintiff has provided no evidence undermining the Forest Service's robust analysis or FWS's rational concurrence with the determination that the authorization is "not likely to adversely affect" Mexican spotted owls and their habitat.  *See* FS001630-56; FS001597-99; FS001379-82; FS006444-46.  In reviewing compliance with Section 7 of the ESA, "[t]he Court must defer to the agency on matters within the agency's expertise, unless the agency completely failed to address some factor, consideration of which was essential to making an informed decision."  *Consol. Delta Smelt Cases*, 717 F. Supp. 2d 1021, 1058 (E.D. Cal. 2010) (quoting *Nat'l Wildlife Fed'n v. NMFS*, 422 F.3d 782, 798 (9th Cir. 2005)).  Plaintiff's opinion that the agencies' conclusions are "too optimistic," *see* Pl.'s Resp. Br. 2, does not come close to meeting this standard.[9]

**IV.     The Alternatives Analysis in the EA Satisfies NEPA's Requirements**.

Plaintiff expresses confusion that Federal Defendants would highlight the sufficiency of the EA's purpose and need statement in defending the Forest Service's alternatives analysis, but "[t]hese arguments are related: a project's scope and purpose

---

[9] Plaintiff's related attempt to support its NFMA claim by briefly dismissing the Forest Service's reliance on adaptive management as "misplaced," Pl.'s Resp. Br. 25, should also fail.  Plaintiff has not presented any evidence that undermines the authorization's explicit consistency with the Tonto Forest Plan, *see* Fed. Defs.' Br. 34-35, and cursory allegations that the EA does not adequately explain how it meets "the Forest Plan's *goals* of maximizing harvest species and threatened species[,]" Pl.'s Resp. Br. 25 n.17 (emphasis added), do not suffice.  *See* SOF ¶ 6 (The Forest Plan explains that "[a] goal is usually not quantifiable and may not have a specific date for completion.").

1   define the reasonable range of alternatives that must be analyzed."  *W. Watersheds*

2   *Project v. Abbey*, 719 F.3d 1035, 1046 (9th Cir. 2013) (citing *Westlands Water Dist. v.*

3   *U.S. Dep't of Interior,* 376 F.3d 853, 868 (9th Cir. 2004); *see also Carmel-By-The-Sea*,

4   23 F.3d at 1155 ("Project alternatives derive from a[] [NEPA document's] 'Purpose and

5   Need' section, which briefly defines 'the underlying purpose and need to which the

6   agency is responding in proposing the alternatives including the proposed action.'"

7   (quoting 40 C.F.R. § 1502.13; subsequent citation omitted)).

8        As Federal Defendants explained at length in their opening brief, the Forest

9   Service complied with NEPA's requirement that it consider reasonable alternatives,

10   including at least a no-action alternative (in this case, no grazing at all on the Bar X and

11   Driveway), and a proposed alternative that meets the stated purpose and need for the

12   action.  *See* Fed. Defs.' Br. 10-19; 40 C.F.R. § 1502.14(d) (requiring consideration of a

13   "no action" alternative); *Native Ecosystems Council v. U.S. Forest Serv.,* 428 F.3d 1233,

14   1246 (9th Cir. 2005) (explaining that NEPA "does not impose a numerical floor on

15   alternatives to be considered," so two alternatives may constitute "all reasonable

16   alternatives" for the proposed action).  The purpose and need statement in the EA calls

17   for assessing grazing opportunities on allotments previously evaluated as suitable for

18   grazing, consistent with management objectives and moving ecosystems toward desired

19   conditions.[10]  *See* FS006400-01.

20        Although Plaintiff requested the Forest Service analyze a "middle ground"

21   alternative that does not consider or allow grazing on the Colcord/Turkey Pasture, the

22   agency determined that such an alternative was not in line with the stated purpose and

23

24   [10] The Forest Service does not claim that its purpose and need statement "prioritize[d]
grazing on the Colcord/Turkey Pasture," *see* Pl.'s Resp. Br. 22 n.15.  Rather, it prioritized

25   *considering* grazing opportunities on all portions of the project area that have been
evaluated as suitable for grazing.  *See* FS006401.  An alternative excluding a single

26   suitable pasture from that analysis does not align with this purpose and need.

FEDERAL DEFS.' REPLY IN SUPP. OF MOTION FOR SUMM. J.      22

need for the action.  FS006421.  The EA also explains that analyzing current management

levels as a separate alternative would be unnecessary, because the flexible range in the

proposed alternative includes the possibility that grazing will continue at current rates and

pasture distributions if resource conditions warrant it.  *See* FS006421.  And, under

NEPA, an agency decisionmaker is empowered to select a modified version of an

alternative so long as it falls within the range of alternatives analyzed.  *See Half Moon

Bay Fishermans' Marketing Ass'n v. Carlucci*, 857 F.2d 505, 508-09 (9th Cir. 1988).

     The Forest Service's explanation for declining to consider Plaintiff's preferred

alternative meets and exceeds NEPA's requirements for the contents of an EA.  *See

Native Ecosystems Council*, 428 F.3d at 1246 ("[A]n agency's obligation to consider

alternatives under an EA is a lesser one than under an EIS.  In rejecting any alternatives,

the agency must only include 'brief discussions of the need for the proposal, of

alternatives required by [statute], of the environmental impacts of the proposed action

and alternatives, and a listing of agencies and persons consulted.'" (quoting 40 C.F.R. §

1508.9)); *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153

(9th Cir. 2008) ("whereas with an EIS, an agency is required to '[r]igorously explore and

objectively evaluate all reasonable alternatives,' *see* 40 C.F.R. § 1502.14(a), with an EA,

an agency only is required to include a brief discussion of reasonable alternatives.  *See* 40

C.F.R. § 1508.9(b)."); *Native Ecosystems Council*, 428 F.3d at 1248-49 (the agency's

rejection of a proposed middle ground alternative was reasonable when the "no action"

alternative in the EA achieved a similar result).  Plaintiff's true disagreement with the

Forest Service's alternatives analysis "appears to be a substantive one[,]" and even if the

Court were to find that "the merit of their environmental concerns may be strong, these

concerns are beyond the scope of [the Court's] review."  *Carmel-By-The-Sea*, 123 F.3d at

1159 (citing *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350 (1989)).

**V.    The Forest Service Rationally Determined that an EIS Was Not Required**.

Finally, the reasonableness of the Forest Service's determination in its FONSI that an EIS was not required is distinct from (though informed by) the sufficiency of the environmental analysis contained in the EA.  However, most of Plaintiff's arguments that various "intensity factors" identified in 40 C.F.R. § 1508.27(b) necessitate preparation of an EIS, *see* Pl.'s Resp. Br. 17-18, rehash its similar attacks on the sufficiency of the EA that Federal Defendants have already rebutted.  *See, e.g.*, Section II, *supra*, (explaining that potential increased human-cow interactions in the action area is not a substantial health or human safety concern and that similar effects on private land need not be analyzed in detail); Fed. Defs.' Br. 31-35 (describing the agencies' reasoned conclusions that the action is not likely to adversely affect the Mexican spotted owl and its habitat).

Moreover, Plaintiff has not offered any persuasive support for its claim that the authorization is "highly controversial" as that term is defined in evaluating the potential environmental effects of a proposed agency action.  Under NEPA, the agency official reviewing the alternatives and underlying EA must evaluate the context and intensity of potential impacts to determine if the proposed action will have a *significant* effect on the human environment, triggering preparation of an EIS.  *See Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998).  NEPA regulations identify ten factors to consider in evaluating intensity.  40 C.F.R. § 1508.27(b).  One of these factors is the degree to which the environmental effects of the action "are likely to be highly controversial."  *See* 40 C.F.R. § 1508.27(b)(4).  But a proposed action implicates the "controversy factor" only "if there is a '*substantial dispute* [about] the size, nature, or effect of the major Federal action *rather than the existence of opposition to a use*.'"  *WildEarth Guardians v. Provencio*, 923 F.3d 655, 673 (9th Cir. 2019) (quoting *Native Ecosystems Council*, 428 F.3d at 1240; citing *Wetlands Action Network v. U.S. Army*

1   *Corps of Eng'rs*, 222 F.3d 1105, 1122 (9th Cir. 2000) ("The existence of opposition to a

2   use, however, does not render an action controversial."), *abrogated on other grounds by*

3   *Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011)).

4          According to Plaintiff, the specific information it presented to the Forest Service

5   during the NEPA process that renders the authorization "highly controversial" is that

6   Plaintiff's members "(and recreators) have come to rely on the absence of cattle on the

7   Colcord/Turkey Pasture, and that allowing grazing would therefore have serious adverse

8   effects." Pl.'s Resp. Br. 18 (citations omitted). But even a "[h]igh level of concern and

9   contention" from residents of the Estates, *id.* at 19, does not convert general opposition to

10  the decision into "controversy" triggering the preparation of an EIS. This is particularly

11  true here where, as described above, Plaintiff has "cherry pick[ed] information and data

12  out of the administrative record to support its" attacks on the Forest Service's

13  methodology, but has pointed to no evidence that "casts serious doubt upon the

14  reasonableness" of the agency's decision. *See In Def. of Animals v. U.S. Dep't of*

15  *Interior*, 751 F.3d 1054, 1070 (9th Cir. 2014). Following careful review of the thorough

16  environmental analysis in the EA, the District Ranger reasonably concluded in the

17  FONSI that neither the context of the proposed action nor any of the ten intensity factors

18  suggested that the authorization would have "significant effects on the quality of the

19  human environment." FS006524-29. Thus, an EIS was not required.

20                                    **CONCLUSION**

21          For the foregoing reasons and those set forth in Federal Defendants' Motion for

22  Summary Judgment and Memorandum in Support, ECF No. 36, Federal Defendants

23  respectfully request the Court deny Plaintiff's motion for summary judgment and grant

24  Federal Defendants' cross-motion for summary judgment.

25  Respectfully submitted this 15th day of January, 2021,

26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PAUL E. SALAMANCA
Deputy Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

*/s/ Emma L. Hamilton*
EMMA L. HAMILTON
(CA Bar No. 325360)
Trial Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 305-0479
Fax: (202) 305-0506
emma.hamilton@usdoj.gov

ANDREW A. SMITH
(NM Bar No. 8341)
Senior Trial Attorney
Natural Resources Section
c/o United States Attorney's Office
201 Third Street, N.W., Suite 900
P.O. Box 607
Albuquerque, NM 87103
Phone: (505) 224 1468
andrew.smith@usdoj.gov

*Attorneys for Federal Defendants*