**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Neighbors of the Mogollon Rim Incorporated,<br><br>    Plaintiff,<br><br>v.<br><br>United States Forest Service, et al.,<br><br>    Defendants. | No. CV-20-00328-PHX-DLR<br><br>**ORDER** |

National Forest land is "the land of many uses."[1] One of those uses—cattle grazing—is challenged here, and that challenge turns entirely on whether Defendants the United States Forest Service ("Forest Service") and the United States Fish and Wildlife Service ("USFWS") complied with procedural requirements when implementing a new livestock grazing management plan for the Tonto National Forest Bar X allotments ("Bar X") and Heber-Reno Sheep Driveway ("Driveway"). Bringing this challenge is Plaintiff Neighbors of the Mogollon Rim, Incorporated, a non-profit organization comprised of property owners and residents of Colcord Estates, Ponderosa Springs, and Ponderosa Springs Estates ("the Communities"), which are located on private enclaves in the Tonto National Forest. The parties filed cross-motions for summary judgment (Docs. 33, 36), which are fully briefed (Docs. 39, 41). For reasons below, Defendants' motion for

---

[1] U.S. Dep't of Agriculture, *Kaibab National Forest 2013 Accomplishment Report* 1 (March 2014) (quoting Richard E. McArdle, Eighth Chief of the Forest Service).

summary judgment is granted and Plaintiff's motion for summary judgment is denied.[2]

**I. Background**

The Tonto National Forest is located northeast of Phoenix. The Bar X is located in the northeastern part of the Tonto National Forest and consists of four separate grazing allotments that are managed together: The Bar X, Haigler Creek, Young, and Colcord Canyon Allotments. The Driveway is a roughly two-mile wide string of eight pastures bisecting the Bar X, which is used to move sheep between Chandler and allotments on the Apache-Sitgreaves National Forests. Historically, four Driveway pastures have been associated with the Bar X: Lost Salt, Naegelin, McInturff, and Walnut. The northernmost portions of the Bar X are the Colcord Canyon Allotment and the Turkey Peak Pasture (collectively "Colcord/Turkey Pasture"). The Communities, comprising over 300 mostly unfenced homes, are located on private enclaves in the Colcord/Turkey Pasture.

Cattle has grazed on Bar X for over a century. Studies conducted by the Forest Service in the 1970s revealed that a history of severe overgrazing and poor management had significant, adverse environmental effects on the Bar X. Accordingly, in 1979 the Forest Service reduced grazing levels on the Bar X and deauthorized grazing on the Colcord/Turkey Pasture. After conducting further studies, the Forest Service increased grazing levels on the Bar X in 1985 but did not reauthorize grazing on the Concord/Turkey Pasture. The Forest Service noted, however, that it could reopen the Colcord/Turkey Pasture in the future based on assessments of current conditions.

Around 2006, the Bar X, LLC ("Permittee") purchased the Bar X ranch and, in 2007, was issued a grazing permit by the Forest Service. In 2015, the Forest Service authorized the Permittee to graze the Colcord/Turkey Pasture for one year, marking the first time since 1979 that the area had been subject to grazing. The unexpected presence of cattle near the Communities caused residents a great deal of concern, annoyance, and fear. The Forest Service again authorized grazing on the Colcord/Turkey Pasture in 2018, but later retracted that authorization in response to litigation brought by Plaintiff.

---

[2] Oral argument was held on July 21, 2021.

The Forest Service then initiated a National Environmental Policy Act ("NEPA") analysis to determine whether and how to modify grazing management on the Bar X. In particular, the Forest Service analyzed the likely effects of permitting grazing across the Bar X, including the Colcord/Turkey Pasture, as well as all four associated Driveway pastures ("Proposed Action"). The Proposed Action also would increase the maximum permitted amount of grazing on the Bar X and associated Driveway pastures, while formalizing a system of adaptive management, under which actual grazing levels and areas could be flexibly modified based on changing conditions.

In late 2018, the Forest Service prepared a Biological Assessment ("BA") analyzing the effects of the Proposed Action on endangered species in the Bar X. The BA concluded that the Proposed Action would be unlikely to adversely affect, among other habitats, the Mexican Spotted Owl ("MSO"). As part of an interagency consultation under the Endangered Species Act ("ESA"), the USFWS later issued a Biological Opinion ("BO") concurring with the Forest Service's determination.

In early 2019, the Forest Service released preliminary and draft Environmental Assessments ("EAs") outlining the Proposed Action and inviting comments. In December 2019, the Forest Service issued a final EA and a Decision Notice/Finding of No Significant Impact ("FONSI"), finding that the Proposed Action will not have a significant effect on the environment. The Forest Service then issued a new term grazing permit and a new allotment management plan ("AMP")[3] for the Bar X, permitting grazing on the Colcord/Turkey Pasture.

This lawsuit followed. Plaintiff challenges the Forest Service's new grazing scheme under the Administrative Procedures Act ("APA), 5 U.S.C. § 706. Plaintiff contends that the new grazing scheme violates NEPA, the ESA, and the National Forest Management Act ("NFMA").

**II. Legal Standard**

In an ordinary civil case, summary judgment is appropriate when there is no genuine

---

[3] An AMP is a long-term plan that sets objectives and guidelines for managing grazing allotments.

dispute as to any material fact and, viewing those facts in a light most favorable to the nonmoving party, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In this action, Plaintiff seeks judicial review of agency actions pursuant to the APA. Although cross-motions for summary judgment are the procedural vehicles by which the parties present their arguments, the Rule 56(a) standard does not accurately describe the Court's review. The parties might choose to highlight different parts of the record or take liberties in characterizing or summarizing it, but the administrative record is what it is. There are no fact disputes as that phrase is traditionally understood. The Court's task instead is to examine the administrative record as it exists and determine, in the context of the specific arguments advanced by Plaintiff, whether the challenged agency actions were arbitrary, capricious, or otherwise contrary to law.[4] *See Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002).

**III. Discussion**

Plaintiff's challenges arise under three separate statutes, and the Court addresses each in turn.

**A. NEPA**

NEPA is a procedural statute that requires federal agencies to "perform environmental analysis before taking any 'major Federal actions significantly affecting the quality of the human environment.'" *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1094 (9th Cir. 2013) (quoting 42 U.S.C. § 4332(2)(C)). NEPA "does not mandate particular results, but simply prescribes the necessary process. If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citations omitted). Stated differently, "NEPA merely prohibits uninformed—

---

[4] For these reasons, it is the undersigned's view that APA cases would be better resolved via procedures similar to those used in social security disability appeals. *See* LRCiv 16.1. Summary judgment briefing (particularly the use of separate statements of facts) is a poor fit because, at bottom, the Court is tasked with reviewing an administrative record and determining whether the agency's decision comports with the relevant legal standards and is supported by enough evidence.

rather than unwise—agency action." *Id.* at 351.

To satisfy NEPA, an agency may prepare an EA to determine whether a FONSI is warranted or whether, instead, to prepare an Environmental Impact Statement ("EIS") that further analyzes significant environmental impacts of the proposed action. 40 C.F.R. §§ 1501.4, 1508.9. An EA is a "concise public document" that "briefly provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or [FONSI]." 40 C.F.R. §1508.9(a)(1). An EA must contain a "reasonably thorough discussion of the significant aspects of probable environmental consequences," *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998), and take "a 'hard look' at the likely effects of the proposed action," *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 916 (9th Cir. 2012).

Plaintiffs contend that the Forest Service violated NEPA by: (1) failing to consider an adequate range of alternatives, (2) relying on incorrect, incomplete, or misleading data and assumptions, (3) failing to adequately consider the aesthetic, economic, social, and health impacts of the proposed action, (4) failing to adequately consider the impact of the proposed action on soil resources, water resources, and elk, deer, and turkey populations, and (5) issuing a FONSI instead of preparing an EIS. The Court addresses each in turn.

**1. Reasonable Range of Alternatives**

To satisfy NEPA, an EA must include "brief discussions of the need for the proposal, of alternatives as required by [statute], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b). An agency only needs to consider alternatives that are reasonably related to the purposes of the project. *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004). The law "does not impose a numerical floor on alternatives to be considered," *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005), except that an agency must always consider the alternative of taking no action, 40 C.F.R. § 1502.14(d), and must explain its reasons for eliminating an alternative, *N. Alaska Env'tl Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006). But "NEPA does

not require [an agency] to explicitly consider every possible alternative to a proposed action." *N. Alaska Environmental Ctr.*, 457 F.3d at 978. For example, an agency need not consider alternatives that are "infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area[,]" nor does NEPA "require a separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences." *Headwaters, Inc. v. Bureau of Land Management, Medford Dist.*, 914 F.2d 1174, 1180-81 (9th Cir. 1990). "[A]n agency's consideration of alternatives is sufficient if it considers an appropriate range of alternatives, even if it does not consider every available alternative." *Id.* at 1181.

Here, the purpose of the Forest Service's action is to "consider livestock grazing opportunities on public lands where consistent with management objectives" and "to authorize livestock grazing in a manner consistent with direction to move ecosystems toward their desired conditions." FS0064001. The Forest Service states that the project is needed because (1) Congress intended to allow grazing on suitable lands when consistent with other objectives, (2) the action area "contains lands identified as suitable for domestic livestock grazing in the Forest Plan and continued domestic livestock grazing is consistent with its goals, objectives, standards, and guidelines," (3) Forest Service policy encourages the agency to "make forage available to qualified livestock operators from lands suitable for grazing consistent with" applicable forest plans, and (4) the Forest Service wants "to continue contributions to the economic and social well-being of people by providing opportunities for economic diversity and by promoting stability for communities that depend on range resources for their livelihood." FS006401.

Against the backdrop of these purposes and needs, the Forest Service considered two alternatives: the Proposed Action, which permits grazing on all Bar X pastures and the four Driveway pastures while formally implementing robust adaptive management, and a no-action alternative. Plaintiff criticizes the Forest Service for not analyzing what they characterize as a "middle ground" alternative, in which grazing is allowed on parts of the Bar X but not on the Colcord/Turkey pasture. But the Forest Service complied with NEPA

by explaining its reasons for eliminating Plaintiff's preferred alternative: continuing the existing grazing management scheme would not meet the project's purpose and needs, in particular by not allowing for formal incorporation of flexible, adaptive management. The Forest Service also explained that the Proposed Action was designed to minimize or eliminate the need for additional alternatives because it permits the agency to alter grazing levels and locations as needed based on changing conditions. At any rate, Plaintiff's preferred alternative—that the Colcord/Turkey pasture be off limits to grazing—is a possible outcome under the Proposed Action, that is, Plaintiff's preferred alternative is subsumed within the Proposed Action, which empowers the Forest Service to adjust grazing levels and locations based on monitoring of conditions on the ground. The Forest Service's explanation is rational and satisfies NEPA's procedural requirements.

### 2. Adequacy of Data

Plaintiff argues that the Forest Service failed to take a hard look at the likely effects of the Proposed Action because it relied on inaccurate or misleading descriptions of baseline conditions and incorrect or misleading assumptions, data, and calculations. "An agency fails to meet its 'hard look' obligation when it 'rel[ies] on incorrect assumptions or data' in drafting an EIS or presents information that is 'so incomplete or misleading that the decisionmaker and the public could not make an informed comparison of alternatives.'" *Native Ecosystems Council v. Marten*, 883 F.3d 783, 795 (9th Cir. 2018) (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005)); *accord. Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016). But harmless errors—meaning errors that are unlikely to have prevented the decisionmaker from making an informed decision or the public from understanding the likely effects of the proposed action—do not render agency action arbitrary or capricious. *Native Ecosystems,* 883 F.3d at 796. The opponent of the agency action bears the burden of demonstrating that errors in the agency's data, assumptions, or assessments are prejudicial. *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1072 (9th Cir. 2018).

Plaintiff first argues that the Forest Service's Final EA misstates the average level

of grazing on the Bar X over the last 12 years. This is true. The Final EA states that livestock numbers on the Bar X averaged 3,707 AUMs per year over the last 12 years. But the Forest Service's records show that the average level of grazing on the Bar X plus the associated Driveway pastures was 3,187 AUMs per year over that period.

The agency acknowledges this discrepancy but argues that this single mathematical error is harmless. The Court agrees. This average was but one data point among many that the agency considered. There is no evidence that the agency's decision hinged on this single figure. Moreover, the fact that the Proposed Action authorizes significantly more grazing on the Bar X and associated Driveway pastures was not hidden from the public or from the decisionmaker, and the maximum grazing authorizing for the Bar X portion of the action area still is within the range of Bar X authorizations over the last 12 years, even if it is a slightly greater deviation from the average than the agency's erroneous figure suggested. Plaintiff has not demonstrated that this single mathematical error prevented the agency from reasonably assessing the likely effects of the Proposed Action.

Plaintiff also faults the Forest Service for stating that the Colcord and Ponderosa communities "have always been within an active grazing allotment." Plaintiff argues that this description is misleading because, aside from 2015, cattle have not been permitted to graze the Colcord/Turkey pasture since 1979. The Court is not persuaded that this statement is misleading. Although grazing has not been permitted on the Colcord/Turkey pasture since 1979, it is true that this area is part of an active grazing allotment. At any rate, Plaintiff has not shown that the agency's description of this area prevented the decisionmaker from making an informed decision or the public from understanding the likely effects of the proposed action. Indeed, the Final EA explicitly discloses that the Colcord/Turkey pasture was "removed from grazing" in 1979. FS006373.

Plaintiff next argues that the agency incorrectly suggested that its recent capacity analysis supports the Proposed Action, which authorizes 30% more grazing than the recent capacity. (Doc. 33 at 17.) First, the numbers do not starkly deviate—the Bar X portion falls within the range of authorizations within the last 12 years. (Doc. 36 at 23.) And

second, the recent capacities are estimated, and the Forest Service concedes that "more in depth studies" might produce different estimates, but the Tonto Plan does not require "absolute or precise" reflections of actual use. FS000229. Second and more broadly, the recent capacity numbers represent a single variable in the multivariate analysis that produced the authorization numbers. Had the Forest Service employed univariate analysis to produce its AMP, or recent capacity numbers played an outsized role in determining authorization numbers, perhaps it might have "relied on incorrect assumptions of data" and rendered an uninformed conclusion. But when the analysis captures a host of variables (e.g., slope, acreage, utilization, condition, and trend), including differential ones, the Court cannot say that considering an estimated recent capacity torpedoed the authorization numbers implemented by the Proposed Action. *Native Ecosystems,* 883 F.3d at 796.

### 3. Aesthetic, Economic, Social, and Health Impacts

Plaintiff argues that the Forest Service "displayed an almost total disregard for the" aesthetic, economic, social, and health impacts grazing would have on private property in Bar X, particularly the impacts affecting the Colcord and Ponderosa communities," which enjoyed a period of non-grazing from 1979. (Doc. 33 at 20.) These allegedly significant effects include the risk of cattle sauntering onto private property, damaging septic systems, or appearing on roadways.

"Significant" is defined by policy and assessed with an eye to the context and intensity of potential impacts. An EA must consider the "relationship of people with [the] environment" subject to the EA. 40 C.F.R. § 1508.14 (2019). This includes effects on recreational opportunities, *LaFlamme v. Fed. Energy Regulatory Com'n*, 852 F.2d 389, 399-400 (9th Cir. 1988); effects on human health and well-being caused by an action's sounds and smells, *Montana Wilderness Ass'n v. Connell*, 725 F.3d 988, 1003 (9th Cir. 2013); and economic effects, including effects on property values, *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1324-25 (D.C. Cir. 2015).

"To determine whether [NEPA] requires consideration of a particular effect, we must look at the relationship between that effect and the change in the physical

environment caused by the major federal action at issue." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 773 (1983). But "[a] risk of an accident is not an effect on the physical environment" that an EA must consider. *Id.* at 775. "A risk is, by definition, unrealized in the physical world" and "the element of risk lengthens the causal chain beyond the reach of NEPA." *Id.*; *see also Northcoast Envt'l Ctr. v. Glickman*, 136 F.3d 660, 668 (9th Cir. 1998) ("NEPA does not require an agency to consider the environmental effects that speculative or hypothetical projects might have on a proposed project.") (citation omitted)); *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283-84 (9th Cir. 1974) ("An EIS need not discuss remote and highly speculative consequences[,]" even if "the statement could have been improved by a discussion of these issues").

The Forest Service responded to these concerns in the EA, noting that (1) private landowners in Arizona bear the burden to exclude cattle from their private land, (2) any effects on the communities would be insignificant because they have always been within an active grazing allotment, and (3) same-place-same-time encounters between humans and cattle are not significant. FS006402-03. These adequately respond to Plaintiff's concerns. In spite of Plaintiff's emphasis on the recent no-grazing period on some of the pastures, the communities have indeed fallen within an active grazing allotment for over a century, along with the recreational opportunities offered by the communities.[5] And, Arizona, as an open range state, does indeed oblige landowners to erect fences around their property if they wish to keep cattle off their private land unless, by petition to the county board of supervisors, a no-fence district is formed. A.R.S. §§ 3-1421 to -1429. The impacts of cattle to private property, mediated as they are by state law and landowner action, are too attenuated for the Forest Service to consider a significant effect under the EA. As for the potential encounters—which are not always threats to safety—such an accident risk is not "an effect on the physical environment." *Metro. Edison*, 460 U.S. at 773. The EA properly considered the impacts that Plaintiff highlights.

---

[5] Plaintiff's concerns also seem to identify reliance interests, that is, relying on the fact that cattle have not grazed on the land adjoining their property for some years. But reliance interests are not cognizable as an effect that the Forest Service must consider in an EA, as Plaintiff conceded during oral argument.

**4.   Soil and Water Resources, and Elk, Deer, and Turkey Populations**

Plaintiff next argues that the Forest Service failed to take a "hard look" at the impact grazing would have on the soil and water resources and elk, deer, and turkey populations, contending that grazing necessarily has a negative effect on these elements. Plaintiff's argument does not attack any of the data regarding the soil and water resources and elk, deer, and turkey populations; instead, it merely challenges the relationship between grazing and the environmental elements. This fails.

First, a note on Plaintiff's argument. Plaintiff and the Forest Service talk crossways. Plaintiff approaches the problem like an algebra problem. Plaintiff plugs "grazing" into one side of the formula and "soil conditions," or another variable, into the other side. As grazing increases, the soil condition worsens. Thus, any amount of grazing necessarily harms the environment under this view.

But this is not how the Forest Service presents grazing in its impact analysis. The Forest Service approaches the problem like a multivariate calculus problem, where the concern is on the *rate of change* in the improvement of environmental characteristics like soil or water resources. (Doc. 36 at 27-28.) The Proposed Action seeks to find the level of grazing at which the rate of change in relevant environmental elements does not fall below zero. FS006427-34. In other words, Plaintiff says that grazing and soil condition cannot increase at the same time. The Forest Service, by contrast, presents a multivariate approach that shows how the Tonto Forest can improve its soil conditions (albeit at a slower rate than if grazing were disallowed) and serve as grazing land at the same time. Thus, grazing, and the improvement of other environmental conditions are not mutually exclusive.

This is why Plaintiff's argument, which omits any concern for the rates of improvement, misses its mark. Even more, Plaintiff does not attack the central element of the Proposed Action, the utilization thresholds, which restrict grazing activity in areas exceeding the utilization thresholds. FS006376-99. The AMP takes its cues from the threshold, resting pastures when those thresholds are met and distributing cattle to other

grazing areas. Notably, Plaintiff does not quarrel with the utilization thresholds and thus does not dispute the impact that using land up to the utilization thresholds might have on soil and water resources and the elk, deer, and turkey populations. The Forest Service took the required "hard look."

### 5. Propriety and Adequacy of FONSI

The Forest Service must prepare an EIS if a proposed "action might significantly affect environmental quality." *WildEarth Guardians v. Provencio*, 923 F.3d 655, 668-69 (9th Cir. 2019). The regulations set out ten factors to consider when determining whether an action might have a significant effect. *See* 40 C.F.R. § 1508.27(b). "One of these factors may demonstrate intensity sufficiently on its own, although the presence of one factor does not necessarily do so." *Wild Wilderness v. Allen*, 871 F.3d 719, 727 (9th Cir. 2017). Plaintiff challenges three of the factors; each fails.

Plaintiff first argues that "there is a serious threat that 'the proposed action [will] affect[] public health or safety,'" referencing the same concerns it raised in its "hard look" argument in the previous subsection. (Doc. 33 at 29 (quoting 40 C.F.R. § 1508.27(b)(2)).) The Court already found that the Forest Service did not act arbitrarily or capriciously when assessing these potential effects and determining that they were not significant; therefore, the Forest Service cannot have acted capriciously or arbitrarily in failing to draft an EIS, which is required only if the Proposed Action might significantly affect environmental quality.

Second, Plaintiff contends that the "effects on the quality of the human environment are likely to be controversial," 40 C.F.R. § 1508.27(b)(4), that is, "when evidence . . . casts serious doubt upon the reasonableness of the agency's conclusions," *Provencio*, 923 F.3d at 673. No such doubt exists here. The Proposed Action authorizes a range of grazing so long as it does not exceed certain use thresholds, and Plaintiff has not challenged the reasonableness of the use thresholds. Plaintiff may disagree with the range of grazing that is theoretically possible under the Proposed Action, but Plaintiff does not dispute the core of the Proposed Action, which is to authorize grazing in a larger geographic area so long

as it does not exceed the use thresholds.

Finally, Plaintiff argues that the Proposed Action threatens to "adversely affect an endangered or threatened species"—here, the MSO—"that has been determined to be critical under the [ESA]." (Doc. 33 at 30 (quoting 40 C.F.R. § 1508.27(b)(9).) For reasons explained below, the Forest Service did not act capriciously or arbitrarily when determining that the Proposed Action would not adversely affect the MSO. Thus, this element too fails to weigh in favor of drafting an EIS.

None of the three factors identified by Plaintiff show that the Proposed Action might "significantly affect environmental quality," and so an EIS was not required under the regulations.

**B. ESA**

Congress passed the ESA to conserve ecosystems upon which endangered species depend and to bolster the population of an endangered species such that ESA measures are not required. 16 U.S.C. §§ 1531(b), 1532(3). Section four lists endangered or threatened species as well as designating critical habitats for those species. *Id.* § 1533(a). Federal agencies, in consultation with USFWS, must "insure" that agency actions are not likely to jeopardize the continued existence of any listed species or destroy or adversely modify designated critical habitat. 16 U.S.C. § 1536(a)(2). These determinations are to be made based on the "best scientific and commercial data available." *Id.*

A federal agency must consult with the USFWS if it determines that a proposed action "may affect" an endangered species. C.F.R. § 402.14(a). To aid in the consultation process, it must prepare a biological assessment ("BA"). *Id.* § 402.12. If the agency concludes, and the USFWS concurs, that the action is "not likely to adversely affect" listed species or critical habitat, the consultation obligation is satisfied. *Id.*; *accord id.* at § 402.13(c). Otherwise, if the action is "likely to adversely affect" listed species or critical habitat, the agencies must engage in more formal consultation. *Id.* at § 402.14(b)(1).

Plaintiff argues that the Forest Service and USFWS capriciously and arbitrarily concluded that the Proposed Action is "not likely to adversely affect" the MSO because

"*any* grazing of the Colcord/Turkey and Lost Salt pastures" would deplete herbaceous vegetation, which provides habitat and cover to the MSO's prey. But, as before, Plaintiff does not challenge the utilization thresholds, which restrict the amount of grazing that, in practice, will be allowed to occur. *See* FS001379-82. These utilization thresholds ensure that herbaceous vegetation, upon which the MSO's prey depends, is not depleted. *Id.* The BA spent 25 pages drawing on survey data to assess potential impacts to the MSO habitat and explaining how the Proposed Action might mitigate any damages to that habitat. FS001630-656. The agencies complied with their consultation obligations.

Relatedly, Plaintiff also argues that the conclusions were arbitrary and capricious because they failed to explain why grazing could now not significantly affect MSOs when, in 2008, the Forest Service and USFWS had a zero-grazing policy in the Colcord/Turkey and Lost Salt pastures "due to the presence of Mexican Spotted Owls." FWS001865; FS002751. But that 2008 proposed action did not prohibit grazing in all MSO habitats, and the FWS did not conclude that "any" grazing would adversely affect MSO habitats. And, at any rate, several other factors affect the health of MSO habitats, like "human disturbance, or construction actions." FWS000525. The Forest Service's BA and USFWS's written concurrence do not show an arbitrary or capricious consultation or change of grazing authorizations.

**C. NFMA**

The NFMA requires the Forest Service to "develop, maintain, and, as appropriate, revise [forest plans]," 16 U.S.C. § 1604(a), which establish the overall management direction of a Forest Management System unit (like the Tonto National Forest) and must "provide for multiple use and sustained yield of the products and services." *Id.* at § 1604(e)(1). Any site-specific action taken by the Forest Service "must be consistent" with the applicable forest plan. 16 U.S.C. § 1604(i). When reviewing these agency actions, courts accord the Forest Service substantial deference. *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1097, 1099 (9th Cir. 2003).

Plaintiff first asserts that grazing will "not move the Tonto National Forest towards

the long-term resource goals set out in the Forest Plan," including soil productivity, riparian and watershed area conditions, wildlife habitat diversity, and increasing recreational opportunities. (Doc. 33 at 34.) But, as has already been determined, the Forest Service did not act arbitrarily or capriciously in concluding that the Proposed Action would not have a significant adverse effect on these elements. What's more, the Forest Plan contemplates grazing in the Tonto Forest, even in areas that are resource impaired or need to improve forage conditions. FS000388. Besides, Plaintiff, concedes that grazing is a permissible and contemplated use under the Tonto Forest Plan in the Bar X and Driveway areas. (Doc. 37 ¶ 14-16; Doc. 40 ¶ 14-16.) The Court cannot say that the Forest Service flouted the Forest Plan, given the multiple authorized uses and the Forest Service's conclusions regarding the probable effect of grazing.

Second, Plaintiff argues that the Proposed Action is inconsistent "with the Forest Plan's emphasis on production-utilization studies as a tool for determining proper stock levels." (Doc. 33 at 34.) True, as far as it goes. But crucially, the Forest Plan never requires a production-utilization survey before authorizing grazing on a pasture of allotment. FS000229; FS000258. The Forest Service is entitled to substantial deference here. The Court cannot say it acted arbitrarily or capriciously by electing not to use an analytic tool it was not required to use.

**IV. Conclusion**

Plaintiff does not show that the Forest Service or the USFWS acted arbitrarily or capriciously in promulgating the Proposed Action. Therefore,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 36) is **GRANTED** and Plaintiff's Motion for Summary Judgment (Doc. 33) is **DENIED**. The clerk of the Court is directed to enter judgment accordingly and terminate this case.

Dated this 26th day of January, 2022.

_____
Douglas L. Rayes
United States District Judge