### UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

———————————————

| | |
|---|---|
| Neighbors of the Mogollon Rim, Inc.,<br><br>                  Plaintiff,<br><br>                vs.<br><br>United States Forest Service;<br>United States Fish and<br>Wildlife Service,<br><br>                  Defendants. | )<br>)<br>)  CV 20-00328-DLR<br>)<br>)  Phoenix, Arizona<br>)  July 28, 2021<br>)  2:00 p.m.<br>)<br>)<br>)<br>)<br>)  <u>AMENDED</u><br>)<br>) |

———————————————

BEFORE:  THE HONORABLE DOUGLAS L. RAYES, JUDGE

<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>

<u>TELEPHONIC ORAL ARGUMENT</u>

APPEARANCES:

For the Plaintiff:
          Advocates for the West
          By: ANDREW R. MISSEL, ESQ.
          3701 S.E. Milwaukie Avenue, Suite B
          Portland, OR  97202

For the Defendant:
          U.S. Department of Justice
          By: EMMA L. HAMILTON, ESQ.
          150 M Street NE, Suite 3-1809
          Washington, DC  20002

Official Court Reporter:
Barbara H. Stockford, CRR, RMR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 39
Phoenix, Arizona  85003-2151
(602) 322-7247

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1          THE COURTROOM DEPUTY:  This is Case No. CV2020-0328,

2  Neighbors of the Mogollon Rim, Inc., versus United States

3  Forest Service and others.

4          This is the time set for telephonic oral argument.

5  Will the parties please announce for the record.

6          MR. MISSEL:  This is Andrew -- I'm sorry.  This is

7  Andrew Missel, counsel for plaintiffs Neighbors of the Mogollon

8  Rim.

9          MS. HAMILTON:  And Emma Hamilton, counsel for federal

10  defendants.

11          THE COURT:  Okay.  Good afternoon.  This is

12  Judge Rayes.  We're here on oral argument.  This thing is well

13  briefed.  I just have a few questions though.  Let's start

14  with -- for plaintiff.  And, again, who's representing

15  plaintiff on this?

16          MR. MISSEL:  Your Honor, this is Andrew Missel

17  representing plaintiffs.

18          THE COURT:  Okay.  I thought Mr. Dillenburg was on the

19  line too.

20          MR. DILLENBURG:  Yes, Your Honor, I'm here, but I'm

21  not arguing.

22          THE COURT:  Okay, all right.  Mr. Missel, I've just --

23  my first question:  Am I understanding this right that the new

24  grazing plan sets an upper numerical limit on grazing, but the

25  actual amount of authorized grazing in any given year can be

1   lower depending on conditions?

2        MR. MISSEL:  Your Honor, it does -- there's a range of

3   grazing levels that can happen from year to year that would

4   depend.  The upper limit that's set is almost three times

5   higher than the amount of grazing that's actually been

6   occurring in recent years, but there is --

7        THE COURT:  But with the -- but the grazing plan has

8   annual requirements that annual grazing must maintain and not

9   exceed specific resource conditions, right?  So, for example,

10   if the cattle grazed more than the maximum allowable amount of

11   a certain plant, then the Forest Service, under this plan

12   anyway, will make changes such as reducing the number of

13   cattle, rotating pastures or requiring range improvements.

14   That's the adapted management.  Is that a fair big-picture

15   summary?

16        MR. MISSEL:  Your Honor, I think that's a fair

17   big-picture summary.  I would say two things if I may.

18        THE COURT:  Okay.

19        MR. MISSEL:  The first is that those measures you're

20   talking about have already been in place.  So there's really

21   not a lot new under the sun in this plan.  They already

22   practice rotational grazing.  They already have allowable use

23   guidelines.  The guidelines in the new plan are not different

24   from the guidelines in the old plan.  And, frankly, under

25   current stocking levels which are, again, lower than the ones

1     that are contemplated in the plan, it's not as if the area is

2     doing, you know, particularly -- particularly great.

3           This is something that we discussed in our opening

4     summary judgment motion.  You know, we talked about some of the

5     bad conditions, watershed being at risk, some of the water

6     quality problems.  These are also discussed in the final EA at

7     6382 to -85 -- that's Forest Service Administrative Record --

8     and 6386 to -92.  So the idea that these same measures that

9     haven't really protected resources in the grazed areas are

10    going to somehow magically work in the future even when you

11    expand grazing, the Forest Service has never really explained

12    how that's going to work.

13          The second thing I was going to say is this is the

14    NEPA decision point.  So it's true that there's a range of

15    possible stocking -- or there's a range of possible grazing

16    intensity levels that can happen over the years, but this

17    authorizes it up to a pretty high limit under NEPA, and there

18    is no requirement that any future NEPA be done.  They can go up

19    to that.  I can't -- I think it's something like 9,000 AUMs or

20    something like that over the entire Bar X and associated

21    Driveway pastures without doing any further NEPA analysis.  So

22    I think, for purposes of NEPA, you have to look at what is the

23    upper range of that and what effect would that have on the

24    environment.

25          THE COURT:  Part of the argument is that the

1    Forest Service already has been using the adaptive management

2    for years.  So the new grazing scheme will only represent a

3    substantial increase in authorized grazing without

4    significantly different management.  Is that your argument?

5           MR. MISSEL:  Yeah, I think that's right, Your Honor.

6    And, of course --

7           THE COURT:  Let me ask you this:  Assume that

8    I disagree with your premise and that the new grazing scheme

9    does institute a more robust and flexible form of adaptive

10   management.  What does that do to your argument?

11          MR. MISSEL:  Sure.  So I think you'd still have this

12   issue about the -- these long-closed areas, the Colcord/Turkey

13   Pasture where there hasn't been any grazing, except for one

14   year, for 40 years.  So I think you would still have an issue

15   there where, you know, even in those areas where there hasn't

16   been any grazing, the soil conditions, some of the other

17   conditions aren't ideal, aren't meeting the Forest Plan desired

18   conditions even when you're completely letting them not be

19   grazed at all.  So that would suggest that whatever adaptive

20   management scheme is going to be in place is not going to be

21   sufficient.  But I would also say, Your Honor, that --

22          THE COURT:  Let me ask you this.  What I'm hearing you

23   say is any adaptive management plan they try in this area is

24   futile because, after 40 years, it hasn't worked that the soil

25   is rebounding.  Is that what you're saying?

1    MR. MISSEL:  Well, Your Honor, I'm not sure I would go

2 that far.  I think that that goes a little bit farther than we

3 would need to say.  I think --

4    THE COURT:  That's what I thought you just said.  You

5 said that, even after 40 years of no grazing, it still isn't

6 good enough.

7    MR. MISSEL:  Right.  So I think the agency would have

8 to explain why, given -- given that, the agency would have to

9 explain why it can allow grazing on this area now in a way

10 that's not going to further imperil resources and lead -- leave

11 the ungrazed areas further away from desired conditions.  So

12 it's not -- you know, maybe the agency can explain that, but

13 I don't think -- I don't think it adequately did that.  I mean,

14 like a lot of our claims, it's really procedural problems that

15 the agency is not offering.

16    THE COURT:  Well, let me ask you this:  Aren't

17 I required to defer to the Forest Service's expertise when it

18 comes to the efficacy of its adaptive management?

19    MR. MISSEL:  Your Honor, I think that you're required

20 to defer to their expertise, but I don't think that means you

21 ignore the facts in the record.

22    THE COURT:  Let me ask you this:  What facts in the

23 record suggest that I should ignore it?

24    MR. MISSEL:  Well, again, I would point to -- and this

25 is discussed in our -- this is discussed in our opening summary

1    judgment brief at Pages -- let's see -- 23 through 28 and then

2    there's a lot of tables and maps in the final EA at 6382

3    through -92 showing the substandard conditions on the Bar X of

4    these impaired water and soil resources.  And I suppose what

5    I would say is, if the adaptive management scheme really is so

6    great, one would think that those resources would be in

7    significantly better condition.

8         THE COURT:  Well, I guess what you're saying there --

9    are you saying that there is a minimum level what the resources

10   should be if the adaptive manage plan is working and they

11   haven't met that minimum level?

12        MR. MISSEL:  Well, Your Honor, I would say that the

13   level is set by the Forest Plan.  So the Forest Plan sets the

14   desired conditions for the -- for the area and those desired

15   conditions are not being met and they haven't been met.  So

16   that -- yeah, I mean, in that sense, yes, again, it's not --

17   the desired conditions are where the forest is supposed to get

18   to.  It's not necessarily where it's at.

19        THE COURT:  You're saying that, because we haven't

20   reached the desired conditions, the adaptive management plan is

21   a failure?

22        MR. MISSEL:  Well, I -- I'm not sure I would go so far

23   as to call it a failure.  What I would say is that there's an

24   inadequate explanation for how that same adaptive management

25   scheme is going to fare in the face of increased overall

UNITED STATES DISTRICT COURT

1  grazing and opening up these areas to grazing that have not

2  been grazed.

3       THE COURT:  Let me just switch gears for a second.

4  I'm just curious.  Have the cattle begun grazing in the area

5  now?

6       MR. MISSEL:  Yes, and I -- you know, obviously, this

7  is not in the record, but since Your Honor is asking, my

8  understanding is that a lot of people in the community have

9  seen cattle go through their properties.

10       THE COURT:  Okay.  And I was just curious, anything

11  that has happened as a result of that that would pertain to

12  your arguments here?

13       MR. MISSEL:  I mean, I'm not aware right now of any --

14  that there have been any injuries necessarily.  So -- but there

15  certainly have been, as far as I can tell, incidences of large

16  numbers of cattle going through people's yards which I think

17  tend to dissuade people from perhaps recreating in their yards.

18  There is that, but I don't have a lot of hard data on that.

19       THE COURT:  Okay, all right.  I was just curious;

20  I was just curious.

21       Let me go back to my questions:  You're not

22  challenging any of the new grazing scheme's resource use

23  thresholds or limitations, are you?  For example, you don't

24  argue that the Forest Service's adaptive management scheme

25  should impose greater allowable use thresholds; is that right?

1          MR. MISSEL:  No.  No.  It's --

2          THE COURT:  It's right?  Am I correct?

3          MR. MISSEL:  Yeah, you're -- Your Honor, you're

4    correct.  We're not challenging that.

5          THE COURT:  If you're not challenging the specific

6    allowable use thresholds, then on what basis do you challenge

7    the efficacy of the adaptive management?

8          MR. MISSEL:  Well, Your Honor, I -- I think that the

9    key to this is that our NEPA claims are -- they're procedural

10   claims.  So they're about the agency's consideration of

11   effects. So the question is not whether their allowable use

12   thresholds are good or bad.  That's a question for some

13   substantive statute.  The question is whether they've taken a

14   look at the probable effects of the decision to increase the

15   grazing levels and to authorize grazing on this long-closed

16   pasture.  And I think our central point is that there -- the

17   Forest Service's message seems to be don't worry about it;

18   everything is going to be fine because we've got rotational

19   grazing; we've got use thresholds.

20          And our point is, well, it seems like those aren't

21   working so great at current stocking level.  So how are they

22   going to work when you expand grazing?  So it's not about

23   challenging the use thresholds as being good or bad.  It's

24   about challenging the agency's evaluation of the effects of its

25   decision which is all that NEPA requires.

1          THE COURT:  Now, the Forest Service argues that, even

2     if it overstated historic grazing levels and, as a result,

3     authorized an overly high maximum level of grazing, those

4     errors would be corrected by the use thresholds and other

5     limiting conditions contained in the authorizations.

6          So, for example, even though the new grazing scheme

7     authorizes the maximum of 9,250 AUMs, in practice, that level

8     of grazing will not occur if it would exceed the allowable

9     resources' thresholds.  Why is that wrong?

10         MR. MISSEL:  Your Honor, I would say that that's a --

11    I mean, I would characterize that almost as a -- well, two

12    reasons why it's wrong.  The first is that, again, we still

13    have the issue of -- putting aside the issue of the overall

14    amount of grazing, we still have the issue of opening up the

15    Colcord/Turkey Pasture.

16         Second of all, I would say, you know, this argument

17    sort of sounds in like harmless error, I would say, but the

18    fact is that this -- this mistake still has this legal

19    consequence which is that the -- this upper limit of AUMs is in

20    the allotment management plan.  So it's now incorporated in

21    this new allotment management plan which allows for that level

22    of grazing to be found or allows for that level of grazing

23    without any further NEPA analysis.

24         And the third thing I would say, Your Honor, is,

25    again, for purposes of NEPA, what matters is that the agency

1   accurately assesses the effects of its action.  So this isn't

2   about the -- the claim isn't that, oh, in the future -- don't

3   worry; in the future, we're never actually going to see this

4   much grazing because there's these other allowable use

5   thresholds preventing it from getting there.

6          The point is they have to look at what the effects

7   would be of 9,250 animal unit months in order to comply NEPA,

8   the procedural claim.  So that error might be -- maybe or maybe

9   not that error is harmless for, like, a substantive claim, but

10  it's not harmless for NEPA purposes.

11         THE COURT:  Well, let me -- I'm not sure I understood

12  your answer with regard to my question.

13         Why is the Forest Service wrong in its argument that

14  higher levels of grazing would be corrected by the use

15  thresholds and other limiting conditions contained in the

16  authorization?  In other words, even though they're authorized

17  for higher amounts, they wouldn't get there based on the

18  conditions on the ground.  Is the Forest Service wrong about

19  that?

20         MR. MISSEL:  Your Honor, I think the problem is that,

21  for NEPA purposes, you can't say "Well, here's the action that

22  we're undertaking, but don't worry, it probably won't actually

23  happen."  The action that they're proposing to undertake is to

24  authorize grazing up to 9,250 animal unit months.  So when

25  they're assessing the environmental effects of the action, they

1   have to look at not what would happen if 9,250 animal unit

2   months worth of grazing occurred.  That's --

3        THE COURT:  Aren't they saying that it won't occur if

4   it's creating adverse effects?  So, basically, the grazing

5   scheme won't have significant adverse environmental effects

6   because the use thresholds will prevent significant

7   environmental degradation; isn't that what they're saying?

8        MR. MISSEL:  That -- I mean, that's -- that's -- that

9   is, I think, what they're saying.

10       THE COURT:  So I understand, why is it wrong when they

11  say our adaptive measures will cover any problem because we'll

12  be monitoring on the ground what's happening and, if it gets to

13  the point where it is causing problems with the environment, we

14  will make the proper adjustments?

15       MR. MISSEL:  Well, Your Honor, I would -- I would

16  again point to the fact that the sort of scheme that they are

17  contemplating seems to -- seems to have not resulted in

18  conditions meeting Forest Plan objectives.  So it seems like

19  they would need to do a little more explaining to explain how

20  those -- essentially, just saying in a conclusory fashion "Oh,

21  we've got this adaptive management.  We've got pasture rotation

22  and that's going to make sure that we don't have any bad

23  environmental effects," they have to do a better job of

24  explaining that conclusion.  And the --

25       THE COURT:  The problem is the explanation then.

1    MR. MISSEL:  Well, I think that is always a problem.

2    That's usually the problem in NEPA cases.  And I would -- you

3    know, I would point out that, you know, that the explanation

4    has to be the one in the record, not the one generated in this

5    case by, you know, the excellent lawyers on the other side.  It

6    has to be what the Forest Service said at the time.

7        THE COURT:  You're saying the record is inconsistent

8    with the arguments they're making now?

9        MR. MISSEL:  Am I saying -- what am I saying?

10       THE COURT:  That the record is inconsistent with the

11   arguments that are being made on this issue by the

12   Forest Service.

13       MR. MISSEL:  Well, no.  I would say that the -- the

14   place to look for the explanations is in the record.  And

15   I don't think that there's -- as we explained in our briefing,

16   I don't think that there's sufficient explanations for how

17   using the same strategy, but greatly increasing grazing and

18   opening up this area to grazing which was devastated in the

19   past, is not going to lead to effects.

20       THE COURT:  Well, what it seems like you're arguing --

21   and you're focusing on the maximum grazing levels and the

22   opening of the Colcord Pasture, but you're not looking at the

23   rest of the grazing plan which includes the use thresholds.

24   Don't we have to look at the agency action as a whole and not

25   look just as -- to the discrete parts that you object to?

1    MR. MISSEL:  Yes, Your Honor.  I would agree with

2 that.  It's just that the use thresholds, the pasture

3 rotations, all these other aspects of the plan are things that

4 have been used before.  It's the same use threshold going

5 forward as have been used in the past.

6    THE COURT:  You're saying they failed?  You're saying

7 they failed in the past?

8    MR. MISSEL:  What I am -- Your Honor, what I think I'm

9 saying is that the agency hasn't explained how, given their

10 performance in the past, they -- hasn't explained well enough

11 its conclusion that those are sufficient to protect against

12 significant effects going forward given the increase in the

13 amount of grazing and the expansion into the new area.

14    Your Honor, I would also point out that that -- none

15 of this really -- all of this discussion we've been having,

16 I don't think it really gets to one of our major claims which

17 is our alternative claim, our claim that the agency didn't

18 consider any middle ground alternative or provide a reasonable

19 explanation for failing to consider a middle ground

20 alternative.  That's really one of our -- I think one of our

21 main contentions here.

22    THE COURT:  I understand that contention, but I have

23 questions on some of the other arguments you've made.

24    MR. MISSEL:  Sure.

25    THE COURT:  Is there something you want to fill me in

1    on that contention that wasn't said in your paper?

2            MR. MISSEL:  Your Honor, no.  I think that it's pretty

3    well covered.

4            The thing I would emphasize is -- the thing I would

5    emphasize is that the -- the middle ground alternative that was

6    being asked for is very different from the preferred

7    alternative both legally and practically.  There's a huge

8    difference between having grazing authorized on the

9    Colcord/Turkey Pasture such that any given year the

10   Forest Service could say "Yep, go graze there this year"

11   without any further NEPA analysis or a middle ground

12   alternative in which the new allotment management plan, like

13   the old one, would say no grazing on the Colcord/Turkey Pasture

14   and people would know that, for the next 10 years, there is not

15   going to be any grazing or that, if the Forest Service wants to

16   allow grazing there, it has to do NEPA again.  Those are two

17   legally and practically different alternatives.  So I think

18   that's the thing -- only thing I want to emphasize about that.

19           THE COURT:  Okay.  Well, I want to finish up on what

20   we were talking about before though.

21           Are you saying that, if the agency is going to expand

22   the grazing levels, it must also explain why it is maintaining

23   existing adaptive management tools rather than expanding those

24   to match the new grazing maximums?

25           MR. MISSEL:  Well, Your Honor, I -- I wouldn't say

```
1    that -- I wouldn't say, if there's any specific -- you know,
2    that would be sort of a substantive prescription and
3    I wouldn't -- especially under NEPA, I wouldn't pretend to
4    prescribe anything substantive like that.  I think what I would
5    say is that --
6            THE COURT:  Let me ask you this.  I'll let you finish
7    in a minute, but let me ask you this.  So if the agencies don't
8    expand the grazing levels, does it need to explain anything
9    about why it's maintaining existing adaptive management tools
10   rather than expanding those to match the new grazing maximums?
11           MR. MISSEL:  Well, I think it all depends on context
12   and history.  And, here, what you've got is you've got --
13           THE COURT:  I'm trying to understand.  What are you
14   asking them to do with the additional explanation?  What
15   additional explanation are you asking them to put in there
16   then?
17           MR. MISSEL:  Sure.  So I think -- I think the -- you
18   know, I think there's -- I think there's two different ways of
19   looking at it.  One is that, if they're going to -- they need
20   to more fully explore the effects of the decision and not just
21   rely on -- not just sort of conclude, oh, well, these measures
22   that we've been using already are going to protect against
23   significantly adverse effects, which seems to ignore the fact
24   that, you know, I think it's like 10 of the 11 watersheds are
25   operating at risk or impaired.  I think that they need to
```

```
1    connect those dots better.  You know, maybe they can connect
2    the dots.
3           It's possible they can connect the dots and they can
4    say, well, actually, you know, we -- even though it looks like
5    maybe conditions are not so great given our current schemes, we
6    think for Reason X, Reason Y, it will work going forward, but
7    that doesn't -- that's not the mode of its analysis.
8           The mode of its analysis just seems to be, well,
9    here's some bad -- here's some substandard conditions on the
10   Bar X where there's been grazing and even where there's not
11   been grazing, and now we're going to expand it and use the same
12   adaptive management and other sort of mitigation schemes and it
13   will all be fine.
14          THE COURT:  I think we've just gone in a circle.
15   I think you're back to the question I asked you before.  Are
16   you saying that, if the agency is going to expand the grazing
17   levels, it must also explain why it's maintaining the existing
18   adaptive management tools rather than expanding those to match
19   the new grazing maximums?
20          MR. MISSEL:  I mean, I think that that would be --
21   I think -- the truth is they're not -- I mean, I guess I'm --
22   Your Honor, I'm slightly confused.  They're not changing the
23   adaptive management tools.  So, you know --
24          THE COURT:  That's what I'm asking you.  If they're
25   changing the grazing levels, are you arguing they also have to
```

1    change the adaptive management tools?

2              MR. MISSEL:  Well, Your Honor, certainly not under

3    NEPA.  You know, I suppose under NFMA, there could be an

4    argument that it would be impossible for them to meet the

5    Forest Plan objectives without also using more robust adaptive

6    management and other mitigation practices, but that's not a

7    claim we've brought really.  I think our NFMA claim is mostly

8    about -- is mostly sort of the classic APA failure-to-explain

9    claim.  In other words, they're not --

10             THE COURT:  Well, let me interrupt you.  I apologize.

11   But are you arguing that, if they expand the grazing levels,

12   that the Forest Service has to explain why they aren't changing

13   the adaptive management tools?

14             MR. MISSEL:  Well, I -- it's -- Your Honor -- and the

15   only reason I'm hesitating to just answer with a flat "yes" is

16   that I suppose there's other -- maybe there's other ways that

17   explain sort of how far they could meet Forest Plan objectives

18   while expanding grazing without changing adaptive management

19   tools.

20             THE COURT:  How?  How?

21             MR. MISSEL:  I don't know.  But, you know, that's

22   their -- you know, their job under the APA is to provide that

23   explanation.  And, you know, that's kind of where they fall

24   short here.  There's an overreliance -- sorry.

25             THE COURT:  No, go ahead.  I was just listening to

1    you.

2            MR. MISSEL:  Oh.  Well, there's just an overreliance

3    in a kind of conclusory fashion on these adaptive management

4    and other mitigation tools which, without sort of an

5    acknowledgment that even with those tools in place at lower

6    stocking levels than contemplated in the new plan, it's not as

7    if it's led to a beautiful resurgence of the area, meeting the

8    whole, you know, Forest Plan objective.

9            THE COURT:  So what I hear you saying is that, if the

10   agency is going to expand the grazing levels, it doesn't have

11   to explain why they aren't changing adaptive management tools.

12   They just have to give some explanation and you don't know what

13   that explanation could be?

14           MR. MISSEL:  Well, they have to provide -- under NFMA,

15   they have to provide an explanation for how it's going to meet

16   Forest Plan objectives.  That's the explanation they have to

17   provide.

18           In the NFMA part of our opening summary judgment

19   brief, which is not -- admittedly, not super-long, but, in the

20   NFMA part of our opening summary judgment brief, we -- I think

21   what we basically say is, given that current conditions across

22   a lot of the Bar X are pretty far from the Forest Plan

23   objectives and now they're going to expand grazing, it seems

24   like, for them to explain how that choice is going to help them

25   meet Forest Plan objectives, they're going to have to provide a

1    pretty good explanation for that.

2          I suppose, yeah, one explanation, slash, substantive

3    choice would be to say we've got a whole new adaptive

4    management scheme that's really robust and here's how it's

5    going to help us expand grazing and meet Forest Plan

6    objectives, but they don't do that.

7          THE COURT:  So you're saying the existing management

8    plan -- adaptive management plan just isn't good enough?

9          MR. MISSEL:  Well, you know, I think it's -- I'm not

10   sure if I would say it's not good enough, Your Honor.  What

11   I would say is that it -- they have not explained how it is

12   sufficient to help them meet Forest Plan objectives in the

13   context of increased grazing levels.

14         THE COURT:  Okay.  Now, according to the

15   Forest Service, although the Colcord and Ponderosa residents

16   complained of potential adverse effects of the new grazing

17   scheme, they do not present the Forest Service with any

18   scientific studies or other information suggesting significant

19   health, safety, aesthetic or recreational impacts of

20   human/cattle interactions.  Is that true?

21         MR. MISSEL:  Your Honor, I'm not sure what they mean

22   by "scientific evidence."  There were several members of the

23   community that submitted comments to the Forest Service along

24   the lines of "In 2015, I was nearly attacked" or "I was

25   attacked by cattle" or "I saw someone be attacked by cattle."

1    I suppose that's not peer reviewed, but it is certainly
2    firsthand evidence.
3            I'm not sure why the Forest Service -- there's nothing
4    in the NEPA regulations that says they have to have formal
5    scientific papers to that effect.  I think -- I think comments
6    from the public about their experiences should be sufficient.
7            THE COURT:  So you're saying the residents did provide
8    the Forest Service with some evidence to back up their
9    concerns?
10           MR. MISSEL:  Yes.  There's Forest Service -- you know,
11   this is -- in our Statement of Facts, Paragraph 63, we cite a
12   bunch of places in the record where there were comments to the
13   Forest Service saying "Hey, in 2015" -- the one time -- again,
14   the one time in the last 40 years that there were cattle
15   allowed to graze there -- "I had an encounter with a cow."
16   "I saw someone have an encounter with it."  "I saw them in the
17   road."  There were also concerns about decreases in property
18   values.  There were, of course, the issue that has been
19   discussed more than anything else probably, the expense of
20   installing fencing.  All of these were issues that were raised
21   to the Forest Service during the NEPA process.
22           THE COURT:  Let me just interrupt you.  I apologize.
23   I think everyone anticipates that, if there's cattle out there
24   grazing in the backyards, there's going to be some contact.
25   I think the argument they made is there was no significant

1  health, safety, aesthetic or recreational impacts that would

2  have been presented.

3         So you're saying the testimony or the information

4  provided by the residents about their personal impacts, running

5  into a cow somewhere, is the evidence; is that right?

6         MR. MISSEL:  Yes, Your Honor.  And I think more --

7  more to the point legally, whether or not those effects are

8  significant is exactly the point of preparing the environmental

9  assessment.  So the Forest Service's answer to that "Oh, we

10 don't have to talk about those effects because they're not

11 significant" puts the answer before the question.  So the whole

12 purpose of an EA is to determine whether effects are

13 significant.  And for those class of effects, those effects to

14 the community, the Forest Service just basically ignored them.

15        THE COURT:  Okay.  So the significant effects are the

16 loss in property value and the incidental contacts individuals

17 living in the area have had when they've come across a cow or

18 some cattle somewhere; is that right?

19        MR. MISSEL:  I think there's more than that,

20 Your Honor.  There's also, again, the risk of accidents and

21 blockages in the road.  There's other wildlife such as

22 primarily turkey, elk and deer being driven out of the area

23 because of the presence of cattle which diminish recreational

24 opportunities.  There's -- I mean, I know this sounds like a

25 small thing, but this is a cognizable effect under NEPA.

1   There's the foul smell flowing from cattle being in the area

2   and defecating.  Those are all the kinds of effects that NEPA

3   requires the agency to consider.  And the agency just -- again,

4   it doesn't -- the question of whether they're significant or

5   not is a question that's answered by the environmental

6   assessment.  But here --

7              THE COURT:  Sorry.  Let me ask you this:  You note in

8   your brief that the Ponderosa and the Colcord residents have

9   come to rely on the absence of grazing.  Why is that reliance

10  reasonable given that the area historically has been part of a

11  grazing allotment and, back in 1985, the Forest Service

12  explained that grazing could be reauthorized in the area in the

13  future?

14             MR. MISSEL:  Sure.  So, Your Honor, I have two answers

15  to that.  The first is I think the question of whether it's

16  reasonable reliance or not doesn't matter for NEPA purposes.

17  So NEPA requires agencies to take into account the effects of

18  their decisions, not just the effects of their decisions that

19  don't -- that only implicate reasonable reliance interests.  So

20  there's no "come to the nuisance" theory, you know, like the

21  old tort "you can't file a suit for nuisance if you came to the

22  nuisance."  There's no --

23             THE COURT:  Let me interrupt you.  Why were you making

24  the reliance argument then?

25             MR. MISSEL:  Well, I think, even though it's

1  irrelevant for NEPA purposes, I understand that it's sort of an

2  equitable -- there's still sort of in the background this

3  equitable, you know, background thrum.  And I would say that,

4  first of all, a lot of the residents moved in well after 1980.

5          And I think the case was cited in our brief is the --

6  one of the recent Supreme Court cases, *Regents -- Department of*

7  *Homeland Security versus Regents of University of California*

8  case which is -- you know, sort of briefly discusses the issue

9  of reliance and says you don't necessarily need to have a

10  legally cognizable reliance interest, but, again, I would say

11  that all of that is -- for the NEPA claim, it's irrelevant.  It

12  just doesn't matter.  They have to look at the effects of the

13  decision, not -- regardless of whether it affects people who,

14  you know, knew about or didn't know about the grazing

15  designation of the area, regardless of whatever legal reliance

16  interests anyone might have.

17          THE COURT:  I guess my question is, for purposes of

18  this decision, are you telling me that we don't need to

19  consider the reliance argument?

20          MR. MISSEL:  Your Honor, what I would say is that, for

21  purposes of the NEPA claim, the presence or absence of reliance

22  interest is irrelevant.

23          THE COURT:  Well, for purposes of any claim here.  Is

24  there anything in this -- in my determination in these

25  cross-motions for summary judgment where reliance is relevant?

1          MR. MISSEL:  I don't think so, no.  I think that --

2          THE COURT:  All right.  Well, Mr. Missel, those are

3     all the questions I had.  Anything else you want to say before

4     I move on to the other side?

5          MR. MISSEL:  No, Your Honor.  I think -- I'm happy to

6     answer your questions and I would just -- I would re-emphasize

7     that our main claims in this case are really all these

8     procedural NEPA claims that are about the process the agency

9     went through and the reason -- the reasons it provided for its

10    decision.  I think that -- that's important to remember.  And,

11    with that, I'm happy to turn it over.

12         THE COURT:  Okay.  Thank you.

13         All right.  Who is arguing for the defense now?

14         MS. HAMILTON:  Emma Hamilton, Your Honor.

15         THE COURT:  Good afternoon, Ms. Hamilton.

16         My first question:  You explained that the no-action

17    alternative in the context of grazing is no grazing at all

18    rather than maintaining the grazing scheme then in existence.

19    Does that mean that the Forest Service considered only the new

20    grazing scheme and eliminating all grazing in the entire action

21    area?

22         MR. HAMILTON:  Yes, Your Honor.  So those are the two

23    alternatives that the Forest Service considered here.  But as

24    we described in our briefing, in an environmental assessment,

25    an EA, the Ninth Circuit has held that considering just two

1    alternatives is permissible under NEPA as long as those two

2    alternatives are reasonably related to the project.

3            THE COURT:  Let me ask you this:  Doesn't NEPA require

4    that all reasonable alternatives have to be considered and

5    explanation provided as to why an alternative was eliminated?

6            MS. HAMILTON:  Well, in an EA, Your Honor, the

7    standards for how thoroughly various alternatives need to be

8    analyzed and discussed is lesser than in an environmental

9    impact statement.  But, as the Forest explained in the EA, it

10   did consider just these two alternatives to be the extent of

11   the reasonable alternatives based on the purpose and need for

12   the action, and review of whether the alternatives themselves

13   and the number of alternatives was reasonable is tied to that

14   purpose and needs statement.

15           So here the Forest looked at alternatives that include

16   adaptive management and a range of grazing levels and it listed

17   alternatives as required under NEPA for no grazing.  And so it

18   wasn't reasonable for the Forest Service to then consider other

19   lesser grazing schemes that might fall under the proposed

20   alternatives because it had already sort of considered how this

21   range with the maximum approved level would potentially impact

22   the environment.

23           THE COURT:  What would prevent the Forest Service from

24   setting a very high maximum grazing level and, because the

25   maximum is so high, you could tinker every year without having

1   to go through administrative process?

2      MS. HAMILTON:  Your Honor, I think -- I think that

3   that would likely be an unreasonable alternative under NEPA.

4   So I think the purpose of having a range for the capacity

5   analysis and for the decision is to truly make sure that this

6   decision is connected to what the Forest is actually proposing

7   as a potential on the ground.  And so to sort of arbitrarily

8   select an incredibly high number that would never be able to be

9   authorized under this decision would not be the type of

10  reasonable alternative that would meet NEPA's requirements.

11     THE COURT:  "The EA explains that maintaining the

12  then-existing grazing scheme would not meet the purpose and

13  need to manage resources in a manner that achieves Forest Plan

14  objectives and desired conditions or formally incorporate

15  adaptive management that allows for sufficient management

16  flexibility."  That statement is somewhat conclusory.  So I'd

17  like you to break it down for me.  First, can you explain

18  specifically how continuing the then-existing grazing scheme or

19  something similar to it would fail to meet the Forest Service's

20  objectives?

21     MS. HAMILTON:  Yes, Your Honor.

22     So the Forest Service's objectives for this decision

23  was to consider grazing opportunities on forest system lands

24  within this action area that are identified as suitable for

25  grazing.  And so that's how they designed this proposed

1    alternative which is to look at all the pastures and all the
2    allotments that are part of the Bar X and the Driveway and have
3    been identified as active allotments that are suitable for
4    grazing under the Forest Plan, and the Forest's goal was to
5    look at all that available area and consider increasing grazing
6    in pastures and allotments where an increase could be
7    consistent with balancing other resource objectives under the
8    Forest Plan.  And so to consider an alternative that did not --
9    that simply would not consider grazing on some of these active
10   suitable pastures did not meet that purpose and need that the
11   Forest Service set out in the EA.

12        THE COURT:  So the Forest Service objective that would
13   not be met by continuing the then-existing grazing scheme would
14   be that you wouldn't be utilizing all the land for grazing?  Is
15   that what you're saying?

16        MS. HAMILTON:  Or at least considering the potential
17   for all the available land to sustain grazing, Your Honor.  So
18   part of the purpose of this project was to see whether the
19   Forest Service could increase the geographic area of where it
20   was authorizing cattle each season --

21        THE COURT:  My question is a little different.  I'm
22   asking you, basically, what's the Forest Service objective that
23   the then-existing grazing scheme didn't meet?

24        MR. HAMILTON:  Your Honor, I believe it was
25   consideration of increased grazing on these areas that had been

1    rested for decades.  That's not to say the agency predetermined

2    that it had to increase grazing, but that was the objective of

3    the proposed action was to at least consider the feasibility of

4    increasing grazing on some of these pastures.  And so an

5    alternative that kept grazing at exactly the same levels and

6    the exact same areas and continued to rest certain pastures

7    essentially because of the personal preferences of some of the

8    nearby landowners just simply did not meet that defined purpose

9    and need.

10            THE COURT:  I'm still trying to understand.  You're

11   saying the Forest Service objective was to involve more land

12   and grazing?

13            MS. HAMILTON:  Yes, lands that had already been

14   designated as suitable and as already part of active grazing

15   allotments, yes.

16            THE COURT:  Okay.  Second, can you explain what you

17   mean by "formally incorporate adaptive management that allows

18   for sufficient management flexibility"?  Was adaptive

19   management previously practiced only informally?  If so, what

20   is the difference between formal and informal adaptive

21   management?

22            MS. HAMILTON:  Your Honor, that's correct that, in the

23   previous grazing authorization, some forms of adaptive

24   management including the use thresholds that you've

25   discussed -- those were formally incorporated.  So it's sort of

1    an inartful use of the word "formal" to suggest there was no

2    formal adaptive management in the prior plan.  But adaptive

3    management is -- works best and it's easier for the Forest

4    Service to sort of shift and manage grazing in different areas

5    when there's more available acreage.  And so formally

6    incorporating these associated Driveway pastures into the

7    action area that's actually being proposed for grazing and

8    analyzed for grazing under this NEPA analysis, that's the way

9    in which the proposed action is formally incorporating more

10   opportunities for adaptive management by bringing in these four

11   associated Driveway pastures that, in the past, had been

12   sporadically used but were not formally analyzed as part of

13   this Bar X complex, this area consisting of both the Bar X and

14   the Driveway pastures.  So that's the piece that had been

15   informal in the past and, in this new proposal, is -- it

16   formally incorporates a much larger geographic area of suitable

17   range lands and that allows the Forest Service, in its yearly

18   annual authorizations, to move cattle from pasture to pasture

19   in a wider area.  And, in a time of drought, these types of

20   options for range managers are particularly important.

21          THE COURT:  So let me see if I understand what you

22   just told me.  You're saying that, in the past, there wasn't a

23   formal management -- adaptive management plan?

24          MS. HAMILTON:  No, Your Honor.  In the past, there was

25   a formal adaptive management plan, but it was limited to

1   analysis of the Bar X pastures and allotments.

2           THE COURT:  And so there wasn't a formal for the other

3   pastures; is that right?

4           MS. HAMILTON:  Right.  And those Driveway pastures had

5   been, over time, informally used for cattle sometimes when the

6   permittees could work it out with the sheep permittees, but it

7   had never -- as in this decision where the use and the capacity

8   of all the four Driveway pastures plus the Bar X was actually

9   fully analyzed, that had not happened in past authorizations.

10          THE COURT:  Okay.  Is the adaptive management plan

11  under the new grazing scheme more robust than under the old

12  management scheme?  And, if so, how?

13          MS. HAMILTON:  So I think, Your Honor, it's more

14  robust in the sense that there's more acreage now available

15  under this plan for the Forest Service to work with and

16  planning pasture rotations and time, season of use for the

17  permittees' cattle.

18          The use threshold levels that you discussed with

19  plaintiff's counsel earlier, those are the same.  And I will

20  just note that those threshold levels are directly tied to

21  objectives and standards in the Forest Plan and that there is a

22  thorough discussion in the environmental assessment of how the

23  current use threshold levels incorporated into the adaptive

24  management plans have been and will work to continue to move

25  various resources toward conditions in the Forest Plan.  And

1    there is simply no requirement in the Forest Plan that grazing

2    cannot occur in an area until it's reached a pristine

3    condition.  That's not reflected in the Forest Plan.  And

4    National Forest System lands are dedicated to multiple use and

5    part of the role of the Forest Plan is to find ways to balance

6    these uses and, in some cases, move the conditions toward

7    desired conditions over time.

8             THE COURT:  Okay.  So are you saying that, even though

9    the resource thresholds might be the same -- excuse me.

10             Are you saying that the reason why the resource

11    threshold might be the same, the larger geographic area gives

12    the agency more flexibility in moving cattle around if the use

13    thresholds are being reached in some areas, but not other

14    areas?

15             MR. HAMILTON:  It does, Your Honor, because it allows

16    for actually permitted levels of cattle that can be moved into

17    these pastures that have not previously been part of the

18    analysis, and so it allows range managers to work with --

19             THE COURT:  So my next question is:  Is the expanded

20    geographic area the only thing that's more robust about the

21    adaptive management under the new scheme?

22             MS. HAMILTON:  Yes.  I mean, in terms of the word

23    "robust," I think the most significant change in the type of

24    adaptive management being applied is the geographic area.  But,

25    again, I would just note that the EA explains how these --

1    these threshold use levels will work and have been working to

2    move resources in the right direction.

3            THE COURT:  So just so I understand your answer, so

4    the expanded geographic area is the only thing that's more

5    robust about the adaptive management under the new scheme; is

6    that right?

7            MS. HAMILTON:  Yes, Your Honor.

8            THE COURT:  Okay.  Now plaintiff claims that the

9    Forest Service is already employing adaptive management.  So

10   what we're dealing with here isn't a grazing scheme that

11   employs new adaptive management plans.  They're arguing it's

12   just a grazing scheme that authorizes substantially more

13   grazing.  And I think that's what you said.  Is that wrong?

14           MS. HAMILTON:  So it's not wrong that the use

15   thresholds that are built into the decision are -- are

16   essentially unchanged or are the same use thresholds that

17   existed before.  That's not wrong.  But the opportunity for

18   increased adaptive management in these new pastures does make

19   the opportunity for the range specialists to employ adaptive

20   management more robust.

21           THE COURT:  And just so I understand, you're saying

22   those opportunities are not that the plan is more robust itself

23   other than that there's more -- more geographic area, expanded

24   geographic area; is that right?

25           MS. HAMILTON:  Yes, Your Honor.  And areas that have

1    been largely rested for decades.  So these are areas where the

2    available forage in its current condition can support grazing

3    perhaps in some cases more than some areas that have been more

4    recently grazed.  So both the new geographic area and the

5    conditions there are helpful in allowing adaptive management to

6    figure out how best to utilize the entire action area to the

7    benefit of and the best protection of all the resources that

8    the Forest Service is required to consider under the Forest

9    Plan.

10            THE COURT:  So just so I understand, the new adaptive

11   management tools are essentially an expanded geographic area?

12            MS. HAMILTON:  Yes.

13            THE COURT:  Okay.

14            MS. HAMILTON:  Yes, Your Honor.

15            THE COURT:  Now, the EA also explained that the new

16   grazing scheme was designed -- and this is to minimize or

17   eliminate the need for additional alternatives because the

18   scope of current management places it within the range of

19   alternatives between the no-grazing and the proposed action.

20            Does this mean that, so long as new grazing scheme

21   authorizes both adaptive management and grazing in excess of

22   the old levels, the Forest Service has no obligation to

23   consider lesser degrees of grazing?

24            MS. HAMILTON:  Well, Your Honor, I think that sentence

25   was intended to mean that, first, that the Forest Service did

1  consider lesser levels.  It considered no grazing.  So that

2  meets NEPA's requirement for no action.  But, second, that the

3  existence of adaptive management and the range that's

4  incorporated into the decision in the proposed action means

5  that a potentially lesser level of grazing hasn't already been

6  analyzed because, if the maximum level of grazing analyzed in

7  this decision would not have significant effects on the

8  environment, then it stands to reason that a slightly less or

9  somewhere else on that spectrum level of grazing would also not

10 have significant impacts on the environment.  And that's the

11 purpose of an environmental assessment is to determine whether

12 potential environmental impacts are significant such that an

13 environmental impact statement would be required.

14         And, Your Honor, agencies are also not required to

15 analyze alternatives that are substantially similar to others

16 under NEPA.  And so that's another reason why to set out a

17 whole section analyzing it, an alternative that's already

18 essentially covered by the flexible range alternative, was not

19 necessary and it's not unreasonable not to do that in this

20 case.

21         THE COURT:  You're saying the plaintiff's suggested

22 alternative didn't need to be reviewed or analyzed because it

23 was like the other alternatives you have?

24         MS. HAMILTON:  In part, Your Honor.  And I think

25 that's what the portion of the EA that you quoted is referring

1    to, the fact that the agency designed a flexible range with a

2    maximum, near its maximum capacity.  So it would not be

3    necessary to analyze several different levels of grazing below

4    that other than, of course, the required no-action alternative

5    of no grazing.

6              THE COURT:  Now the EA, I think Mr. Missel pointed

7    out, notes that several pastures have poor soil productivity

8    and erosion.  Can you explain how allowing or increasing

9    grazing in those pastures is supposed to improve those soil

10   conditions?

11             MS. HAMILTON:  Yes, Your Honor.

12             So the -- I would just start with the Forest Plan

13   requirements.  I think plaintiffs sort of suggest or would like

14   the Forest Plan to make a requirement that grazing can never

15   occur in areas where resource conditions have been impaired or

16   are below their targets.  But the Forest Service actually

17   explicitly gives direction for how agencies can manage grazing

18   even in areas with substandard conditions and that includes

19   certain range improvements.

20             I think some of the suggestion for mitigation measures

21   include increased geographic areas so that less soil is being

22   compacted near riparian areas.  There are several examples in

23   the environmental assessment and the effects and mitigation

24   analysis section which starts at Page No. 6342 but continues

25   for, you know, dozens of pages.  But there are explanations in

1   the EA about how conservative grazing levels with mitigation

2   measures and adaptive management can, over time, help to move

3   these areas toward the desired conditions in the Forest Plan,

4   and the EA cites the Forest Plan objectives and desired

5   conditions to help support their analysis here.

6          And, of course, the EA also points out that a

7   no-grazing alternative would likely move these areas toward

8   their desired conditions more quickly, but the NEPA standard is

9   not to select the most environmentally sound option, but just

10  to consider all the options which the Forest Service did here.

11  And I think it's laid out in the EA the reasoning and the steps

12  and the tying it back to the Forest Plan standards, and so it's

13  explicitly allowed under the Forest Plan to continue managing

14  for grazing in areas that have not yet met desired conditions,

15  and the Forest Service did a careful job here of explaining how

16  they will do so in a way that complies with the plan.

17          THE COURT:  So you're saying that, if resources are

18  already less than desirable such as water resources or riparian

19  areas, it does not violate the Forest Plan to introduce an

20  increase in grazing and making those conditions probably worse?

21          MS. HAMILTON:  Well, other than the "probably worse,"

22  I'm not sure that's exactly what the Forest Plan says.  But --

23          THE COURT:  Well, let me ask you this then.  If

24  resources are already less than desirable, if the conditions

25  for, like, the water resources or riparian areas, how does

1    introducing or increasing grazing make those conditions better?

2          MS. HAMILTON:  Well, I think, Your Honor, it's not --

3    the immediate introduction of grazing is not the action that,

4    in itself, would improve these resources or help move them

5    toward Forest Plan desired conditions.  But I think there's an

6    acknowledgment in the Forest Plan and reflected in the EA that,

7    over time, carefully managed conservative grazing will not make

8    these conditions worse and will, in fact, contribute to

9    conditions where the soil or the water can start recovering to

10   the levels required in the Forest Plan, although it just might

11   take longer with grazing in the area.  But that's something

12   that the Forest Plan contemplates and sanctions because it does

13   give direction for range managers to authorize grazing and

14   using methods and mitigation measures that they think are most

15   appropriate in a given scenario and use those methods to, over

16   time, move toward forest conditions.

17         So not every individual action that a forest takes

18   under the Forest Plan must always immediately move every

19   resource toward its desired conditions because forests are

20   designed for multiple use.  So the Forest Plan standards make

21   it clear that it's enough to follow those standards and, over

22   time, move toward the conditions even if that involves grazing

23   in sensitive areas in the short term.

24         THE COURT:  So if I understand what you're telling me,

25   you're saying that the new grazing scheme might slow progress,

1    but it won't halt it and, therefore, it meets the Forest

2    Service plan; is that right?

3            MS. HAMILTON:  Yes, Your Honor.

4            THE COURT:  Okay.  In Paragraph 42 of the separate

5    statement of facts, plaintiff creates a table and this table

6    purports to summarize the grazing levels on the Bar X and

7    Driveway pastures for each of the years from 2013 to 2019.

8    Now, I think you dispute this table noting that it was created

9    by plaintiff and is not part of the administrative record.  But

10   do you dispute plaintiff's math?

11           MS. HAMILTON:  Your Honor, no.  The Forest Service

12   doesn't dispute the specifics of plaintiff's math except

13   I think perhaps in one section there was one number off.  But,

14   generally, what the Forest Service takes issue with with these

15   tables is that the plaintiff has sort of broken down the

16   records of grazing over time in the Bar X that the Forest

17   Service has been keeping and attempted to create its own

18   breakdown of maybe where cattle were grazing -- if there were

19   two authorized pastures, maybe they all went to one or maybe

20   they split up.  And that's simply not a level of detail that

21   the Forest Service determined was required in keeping these

22   records and in analyzing historic use to propose the current

23   action.

24           And so this is a situation where I think deference to

25   how the Forest Service has been compiling and analyzing and

| | |
|---|---|
| 1 | calculating its -- its records on authorizations over time is |
| 2 | due here.  And plaintiff has broken down different tables and |
| 3 | then made averages with different spans of different years. |
| 4 | And, while those might -- the math involved in reaching those |
| 5 | calculations is not necessarily incorrect, it's not necessary |
| 6 | to -- to use the numbers in that way to reach a reasonable |
| 7 | decision, one that's not arbitrary and capricious.  And the |
| 8 | Forest Service objects to plaintiff's attempt to suggest that |
| 9 | not breaking down the numbers in that way somehow renders the |
| 10 | agency's analysis unsound. |
| 11 | THE COURT:  I want to clear this up.  You said you |
| 12 | don't dispute their math.  I'm not talking about their addition |
| 13 | and subtraction.  I'm talking about the data.  Do you dispute |
| 14 | the data that plaintiff has put in that table? |
| 15 | MS. HAMILTON:  No, Your Honor.  It looks like the data |
| 16 | in those tables comes from the historic annual operating |
| 17 | instructions, the AOIs.  But the AOIs merely show authorized |
| 18 | use for that season.  And then, as plaintiff points out, in the |
| 19 | tables it sometimes shows two pastures listed where one might |
| 20 | be optional.  And so it can't be confirmed that that many |
| 21 | cattle or range of cattle were or were not in a given pasture. |
| 22 | So it's just -- it's just unnecessary and too specific, |
| 23 | I think, breakdown of the data that's available in the record. |
| 24 | THE COURT:  You're saying it's an unnecessary |
| 25 | breakdown, but you agree that the data is correct.  So what's |

1   the problem with considering their data then?

2          MS. HAMILTON:  Well, I think the problem overall, Your

3   Honor, is just putting too much weight on the specific

4   calculations of past stocking levels compared to what the

5   Forest Service determined in this case was the capacity, the

6   potential max capacity for these allotments.  And so certainly

7   historic use data is one relevant factor that goes into

8   determining the capacity of an allotment.  But the fact that

9   plaintiffs are able to calculate an average of how much they

10  believe was authorized possibly on certain allotments over time

11  does not mean that an authorization that's higher than that is

12  per se unreasonable or it can't be explained, because there are

13  so many other professional judgment factors and range

14  management expertise considerations that go into the ultimate

15  capacity analysis.

16         THE COURT:  According to plaintiff, the average amount

17  of grazing allowed on the Bar X pastures and associated

18  Driveway pastures combined from 2013 to 2019 is lower than the

19  maximum amount of grazing allowed on just the Bar X pastures,

20  not including the Driveway pastures under the proposed plan.

21         Do you disagree with that statement?

22         MR. HAMILTON:  No, Your Honor.  I don't disagree with

23  that.  This decision certainly does authorize increased cattle

24  grazing compared to past years.  But briefly, if I may, since

25  we're getting into the capacity analysis, I did want to make

1    sure to clarify something that was not clarified in our

2    briefing about the AUM range that's listed in the EA.

3         So the EA, as you know, lists the 4,000 to 9,250 AUM

4    range in sort of describing the decision.  However, the Forest

5    Service has determined that its capacity analysis worksheet

6    which is discussed in the briefing by both parties, it lists a

7    lower number of AUMs and a permitted animal number.  The Forest

8    Service has determined that the permitted animal number is

9    correct from the capacity analysis and the permitted animal

10   number is what the agency relied on throughout this analysis

11   and is relied on in the permit and is reflected in permitted

12   numbers.

13        THE COURT:  What is the number?  What number are we

14   talking about?

15        MS. HAMILTON:  Yes, Your Honor.  So, in the capacity

16   calculation worksheet which is Forest Service 64 -- or I'm

17   sorry -- it's Forest -- I will find the correct cite for that.

18   It's 4382.

19        So in that worksheet, the Forest found the maximum

20   capacity of 590 animals across the combined Bar X and Driveway.

21   And that's -- you know, that's the number that the Forest

22   Service relied on in its analysis, and it's quite similar to

23   the number that was actually permitted in the 2019 permit

24   following the analysis and decision, and that -- that final

25   number that was permitted is 552 total animals.  So it's lower

1    than the initial capacity estimate.

2            The transcription error that occurred that's relevant

3    to the EA is simply that, in describing the decision, instead

4    of just using that 552 animal number which is in the EA, in a

5    table on Page 40, the Forest Service, for comparison and

6    description, also included an AUM range, a number, and used an

7    incorrect conversion factor there.  So, actually, this 9,250

8    number is incorrect and is significantly higher than what was

9    actually permitted and actually analyzed.

10           So the error is both procedurally and substantively

11   harmless because the Forest Service did not rely on this number

12   in its analysis and -- or its permitting.  But I just did want

13   to note that, unfortunately, because this was discovered after

14   our briefing, federal defendant's briefing does refer to this

15   incorrect number that appears in the EA.

16           But I can -- I can certainly get into more detail

17   about specifically why this is harmless, but, as I said, it

18   wasn't used in the analysis.  It's more of a description error,

19   if Your Honor has any questions about that.

20           THE COURT:  Let me just ask you a question going back

21   to plaintiff's table again with the data that we talked about

22   that you concede is accurate.

23           So, for purposes of this case, are you saying we could

24   accept the plaintiff's historical use data and still find for

25   you because historical use data was not the only relevant

1   factor to this decision?  Is that what you're saying?

2          MS. HAMILTON:  Yes, Your Honor.  And -- and in light

3   of what I just explained, the actual AUMs that are analyzed and

4   permitted in this decision is actually much closer to those

5   historic AUM use ranges, though it is still an increase.

6          THE COURT:  All right.  Now, Mr. Missel mentioned this

7   when talking about potential impacts of the proposed action on

8   the residents of the Ponderosa and Colcord communities.

9   Mr. Missel mentioned it in the EA notes that same place/same

10  time encounters between uses occurred where the people had

11  interactions with cattle.  And I guess the EA notes that same

12  place and same time encounters between users -- uses are not

13  considered conflicts or safety issues that require

14  consideration in grazing authorization planning analysis.  So

15  Mr. Missel mentioned some of the things that had happened.  Why

16  aren't those encounters relevant?

17         MS. HAMILTON:  Well, Your Honor, I think the portion

18  of the EA that you just highlighted shows that, in the Forest

19  experience and, again, utilizing their expertise and experience

20  with managing recreation and public uses of the forest as well

21  as grazing, generally encounters between humans and cattle

22  while recreating are not -- do not pose danger, are not -- are

23  not significant to the point that their analysis would be --

24  would require an EIS.  And that's what the Forest determined --

25         THE COURT:  Let me just back up.  I can understand

1    that, if someone is out hiking and there is some cattle grazing

2    in the area, but what about in someone's backyard?

3            MS. HAMILTON:  Right, Your Honor.  The Forest Service

4    did mention in the EA that the private landowners nearby had

5    expressed opposition to grazing for that reason, this time

6    particularly in the Colcord Pasture, and that's at 6403.

7            But the Forest mentioned this issue in the EA and

8    determined that, in light of the fact that, if these events are

9    taking place in someone's yard because they have not decided to

10    put up a fence to fence out the cattle as is -- the burden is

11    on the homeowner in Arizona, was central to the preliminary

12    injunction briefing -- because of that, the Forest Service

13    concluded that these types of impacts in people's yards and

14    related concerns were not within the scope of this decision.

15    And NEPA regulations only require that, in an environmental

16    assessment, the Forest Service create a concise public document

17    that includes brief discussions of environmental impacts.  And

18    that's 40 CFR Section 1508.9.  And so NEPA does not require --

19            THE COURT:  What you're --

20            MR. HAMILTON:  I'm sorry, Your Honor.

21            THE COURT:  What you're saying is the encounters with

22    people aren't environmental -- aren't impacting the environment

23    and that's why they're not considered?

24            MS. HAMILTON:  Well, I think -- I think that

25    encounters with people and -- that were happening on the

1    forest, had there been more evidence, if you will, or if there

2    was -- if the Forest Service had determined that there were

3    encounters with people and cattle on the forest that were

4    significant enough to rise to the level requiring a EIS, then

5    that would be appropriately analyzed under NEPA.

6         But here, the main issues that people brought to the

7    attention of the Forest Service during the scoping process

8    involves issues that occurred if cattle crossed on to unfenced

9    nearby private property and also, in terms of recreation away

10   from those yards, community members' personal distaste and fear

11   about encountering cattle on trails.  But NEPA does not require

12   agencies to analyze in detail every single conceivable impact

13   including impacts to subjective experiences recreating and

14   especially not in an EA which is defined under NEPA regulations

15   as a concise document with brief discussions of potential

16   impact.

17        THE COURT:  Let me just see if I understand.  You're

18   saying that, for purposes of the analysis, it isn't even

19   something that needs to be considered, the interactions of

20   humans with the cattle?

21        MS. HAMILTON:  I think it was considered to the extent

22   necessary which was to mention that people had brought these

23   concerns during the scoping process, but to point out the state

24   statute placing the burden on the individuals to prevent these

25   types of interactions on their private property.  And the

1    Forest Service made a reasoned determination, in its experience

2    and history of recreational uses on the forest, that this was

3    not a significant impact that needed to be analyzed in extreme

4    detail in either the EA or the EIS.

5        THE COURT:  What I think I'm hearing you say is that

6    these people bought houses in grazing areas and, therefore, if

7    there's any interactions in the backyard, it's their fault

8    because they didn't put up a fence.  Is that what I'm hearing?

9        MS. HAMILTON:  Well, yes, in the sense that the way

10   the statutory scheme is set up in Arizona is that it's not the

11   Forest Service's responsibility to fence other people's private

12   property to prevent --

13       THE COURT:  No, I understand.  I'm just trying to

14   understand.  The EA has a statement in there that it isn't even

15   something that needs to be considered, the interactions with

16   the people and the cattle, and I'm trying to understand why

17   that is.  And what I'm hearing is, basically, that these homes

18   are in the grazing area and, therefore, it's the homeowner's

19   responsibilities to fence off their yards so the cattle do not

20   enter the yard.  Is that right?

21       MS. HAMILTON:  Yes, yes, Your Honor.

22       THE COURT:  Okay.  Why wasn't the Forest Service

23   required to address potential aesthetic, economic, social and

24   health effects such as potential decreases in residents'

25   property values, foul smells or potential safety issues?

1      MS. HAMILTON:  Well, Your Honor -- oh, I'm sorry, go

2  ahead.

3      THE COURT:  Is it the same reasoning you just

4  discussed or is there something more?

5      MS. HAMILTON:  It's the same reason, Your Honor.

6  I think it's the fact that some of these impacts -- the burden

7  falls on nearby landowners to mitigate or address if they find

8  them to be personally significant.

9      And then I think the other portions of the EA that

10  I mentioned that do point to the fact that encounters between

11  people and cattle may occur and, for some people, it may be a

12  negative experience and, for some people, it may not be.  That

13  is, I think in the context of an EA, which is just a concise

14  statement of why the Forest Service did not find such impact

15  significant, they sufficiently analyzed that here.  They

16  acknowledged that some people do not enjoy encountering cattle

17  while recreating, but determined that those effects that

18  plaintiff members have complained of do not, you know, rise to

19  a level of significance that an EIS would be required.

20      THE COURT:  Okay.  Those are the questions I have.  Is

21  there anything else you want to add?

22      MR. HAMILTON:  There's not, Your Honor.  Just that

23  plaintiffs have not met the high burden here under APA review

24  of showing that the agency's decision was arbitrary or

25  capricious or should be overturned.

1          Nothing else to add from me.  The rest we would just

2     rest on our briefing papers.

3          THE COURT:  All right.  Thank you.

4          Mr. Missel, is there anything else you want to tell

5     me?

6          MR. MISSEL:  Your Honor, at the risk of -- I would

7     just two say two things very briefly.  One, it doesn't -- it

8     doesn't matter if those effects on the communities are not

9     significant.  The whole point of an EA is to consider the

10    effects to see if they're significant.  So they can't just not

11    consider them by saying conclusively they're not significant.

12         The second thing I would say is, as far as the

13    alternatives go, you know, the Forest Service admits -- or the

14    federal defendants admit in their reply at Page 22, Note 10,

15    that the purpose of the project is not to maximize grazing.

16    It's to consider maximize -- sorry.  It's to consider grazing

17    opportunities.  But considering doing something necessarily

18    means deciding whether or not to do it.

19         So what that means is that they should look at an

20    alternative where Colcord/Turkey is open; Colcord/Turkey is

21    closed.  Now, they say, oh, we looked at something where all

22    the pastures are closed, but that's a different alternative

23    from one where the rest of the pastures remain open and that

24    one remains closed.  Because that's a different alternative and

25    because the purpose is to consider grazing opportunities, not

1    to maximize grazing, that's an alternative they should have

2    considered.  And that is all I will say.

3            THE COURT:  I just have a question.  Are there any

4    deadlines?  And I think the issue of -- the only deadline has

5    already been resolved by our ruling on the TRO.  Is there

6    anything else out there that I need to know about that would be

7    a deadline in this case?

8            MR. MISSEL:  I don't believe so, Your Honor.  I mean,

9    there's obviously -- at some point, there will be the decision

10   the Forest Service will have to make about next year, about

11   issuing annual operating instructions for next year, but,

12   obviously, grazing is already occurring now for this year.

13           THE COURT:  Okay.  All right.  Well, I will take it

14   under advisement.  It was well briefed and well argued and

15   thank you very much.

16           MR. MISSEL:  Thank you, Your Honor.

17           MS. HAMILTON:  Thank you, Your Honor.

18           THE COURT:  We are at recess.  Bye-bye.

19           (Proceedings adjourned at 3:19 p.m.)

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3          I, BARBARA H. STOCKFORD, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12          DATED at Phoenix, Arizona, this 31st day of March

13   2022.

14

15

16                    ____/s/ Barbara H. Stockford____
                      Barbara H. Stockford, RMR, CRR, CRC
17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT